# EXHIBIT 1

**| Respond to Selected Documents**

**Sort Date Entries: Descending Ascending**

**Display Options:** All Entries ⌄

**08/26/2025**

**Affidavit Special Process Serv**
(Docketed on 9-5-2025 at 0823) Return of Service; Electronic Filing Certificate of Service. (accepted as filed) /am
**Filed By:** CHRISTOPHER CLARK
**On Behalf Of:** GREAT OUTDOORS GROUP LLC, BPS DIRECT LLC
**Corporation Served**
Document ID - 25-SMCC-2167; Served To - CONTINENTAL CASUALTY COMPANY; Server - WILLIS, CLAYTON ; Served Date - 08/26/2025; Served Time - 08:24:19; Service Type - SP; Reason Description - SERV; Service Text -served Traci Macmann /am

**08/25/2025**

**Order - Special Process Server**
Order for Special Process Server signed and filed/af

**08/19/2025**

**Summons Issued-Circuit**
Document ID: 25-SMCC-2167, for CONTINENTAL CASUALTY COMPANY Summons saved and attached in PDF format for Attorney to retrieve from secure case.net/af

**08/18/2025**

**Entry of Appearance Filed**
Entry of Appearance; Electronic Filing Certificate of Service.
**Filed By:** WILLIAM ROBERT BAY
**Motion Special Process Server**
(Docketed on 08/25/2025 at 1620) Motion for Special Process Server; Proposed Order; Electronic Filing Certificate of Service./ af
**Filed By:** CHRISTOPHER CLARK
**On Behalf Of:** GREAT OUTDOORS GROUP LLC, BPS DIRECT LLC
**Entry of Appearance Filed**
Entry of Appearance C. Clark; Electronic Filing Certificate of Service.
**Filed By:** CHRISTOPHER CLARK
**On Behalf Of:** GREAT OUTDOORS GROUP LLC, BPS DIRECT LLC

**08/15/2025**

**Filing Info Sheet eFiling**

**Filed By:** MATTHEW SCOTT DARROUGH
**Pet Filed in Circuit Ct**
Petition; Exhibit 1 - Policy; Exhibit 2 - Ruiz Complaint; Exhibit 3 - Ruiz Amended Complaint; Exhibit 4 - Ruiz Settlement Agreement; Exhibit 5 - Ruiz ROR Letter.
**Filed By:** MATTHEW SCOTT DARROUGH
**On Behalf Of:** GREAT OUTDOORS GROUP LLC, BPS DIRECT LLC

Electronically Filed - Greene - August 15, 2025 - 04:04 PM

**IN THE CIRCUIT COURT OF GREENE COUNTY**
**(THIRTY-FIRST JUDICIAL CIRCUIT)**
**STATE OF MISSOURI**

| | | |
|---|---|---|
| **GREAT OUTDOORS GROUP, LLC AND** | ) | |
| **BPS DIRECT LLC,** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. |
| v. | ) | |
| | ) | Division No. |
| **CONTINENTAL CASUALTY COMPANY,** | ) | |
| | ) | |
| Registered Agent for Summons: | ) | |
| CT Corporation System | ) | **JURY TRIAL DEMANDED** |
| 5661 Telegraph Road, Suite 4B | ) | |
| St. Louis, MO 63129 | ) | |
| | ) | |
| Defendant. | ) | |

<u>**PETITION**</u>

COME NOW Plaintiffs Great Outdoors Group, LLC and BPS Direct LLC and for their

Petition against Defendant Continental Casualty Company state:

**THE PARTIES**

1.      Plaintiff Great Outdoors Group, LLC ("Bass Pro"), formerly known as Bass Pro

Group, LLC, is a Delaware limited liability company with its principal place of business in

Springfield, Missouri.

2.      Through membership interests in Bass Pro, Johnny Morris Outdoors, LLC has

direct or indirect management control over Bass Pro.

3.      Bass Pro is a retailer operating in the United States under various trade names with

approximately 40,000 employees.

4. Plaintiff BPS Direct LLC ("BPS Direct") is a Delaware limited liability company with its principal place of business in Springfield, Missouri. Bass Pro and BPS Direct are referred to herein collectively as Plaintiffs.

5. Through membership interests in BPS Direct, Johnny Morris Outdoors, LLC has direct or indirect management control over BPS Direct.

6. BPS Direct provides products online.

7. On information and belief, Defendant Continental Casualty Company ("CCC") is, and at all relevant times has been, an Illinois insurance company with its principal place of business in Illinois.

8. On information and belief, CCC is admitted through licensure to market and sell insurance coverage in the State of Missouri, including Greene County, and has and does market and sell insurance coverage in the State of Missouri, including Greene County.

9. On information and belief, CCC is part of the CNA family of insurance companies.

10. The claims asserted herein arise out of CCC's refusal to satisfy its obligations under a fiduciary liability policy relating to a putative class action suit that purported to allege Plaintiffs breached their fiduciary duties and violated ERISA with respect to an employee plan and more specifically, CCC's improper and bad-faith refusal to pay Plaintiffs' defense costs in and settlement of the putative class action.

<h3 align="center">JURISDICTION AND VENUE</h3>

11. This Court has original jurisdiction over this civil case under Article V, Section 14 of the Missouri Constitution and under RSMo. § 478.070.

12. This Court has personal jurisdiction over CCC under RSMo. § 506.500. On information and belief, CCC is now and has been at all relevant times transacting business in

Missouri on a regular basis, entering contracts in Missouri, and/or evaluating claims relating to Missouri insureds, including the insurance policy purchased by Johnny Morris Outdoors, LLC at issue herein. In addition, CCC committed tortious acts in Missouri.

13. The exercise of personal jurisdiction over CCC is consistent with due process as CCC has purposefully availed itself of the benefits of conducting business in Missouri.

14. Venue is proper under RSMo. § 508.010.2(4), because Plaintiffs reside in Greene County, CCC can be found in Greene County, and CCC committed tortious acts first injuring Plaintiffs in Greene County.

## GENERAL ALLEGATIONS

### A. The Policy

15. Johnny Morris Outdoors, LLC sought purchase of a fiduciary liability policy from CCC covering the period of November 1, 2023 to November 1, 2024.

16. For premium paid, CCC issued a "Fiduciary Liability Solutions" policy numbered 596433932 (the "Policy") to Johnny Morris Outdoors, LLC for the period of November 1, 2023 to November 1, 2024.

17. A true and accurate copy of the Policy is attached as **Exhibit 1** and incorporated by reference as if set forth fully herein.

18. The Policy identifies Johnny Morris Outdoors, LLC as the "Named Insured." Ex. 1, Declarations, Item 1.

19. The Policy defines "Insureds" in relevant part to mean "any **Plans**, **Insured Persons** or **Insured Entities**." Ex. 1, Sec. II Definitions. As alleged more specifically below, the definition of "Insureds" includes: Johnny Morris Outdoors, LLC (an "Insured Entity"); Bass Pro

(an "Insured Entity"); BPS Direct (an "Insured Entity"); and the Bass Pro Group LLC Health and Welfare Plan (a "Plan").

20. The Policy defines "Insured Entity" in relevant part to mean "the **Named Insured** and any **Subsidiary**." Ex. 1, Sec. II Definitions.

21. The Policy defines "Subsidiary" in relevant part to mean "any entity (other than a partnership) in which the **Named Insured** has **Management Control** directly or indirectly through one or more other **Subsidiaries**: a. on or before the effective date of this Policy; or b. after the effective date of this Policy by reason of being created or acquired by the **Insured Entity** after such date, if and to the extent coverage with respect to the entity is afforded pursuant to Section XV." Ex. 1, Sec. II Definitions.

22. The Policy defines "Management Control" to mean "(1) owning interests representing more than 50% of the voting, appointment or designation power for the section of a majority of . . . the members of the management board of a limited liability company; or (2) having the right, pursuant to written contract or by-laws, charter, operating agreement or similar documents of the entity, to elect, appoint or designate a majority of . . . the management board of a limited liability company." Ex. 1, Sec. II Definitions.

23. Plaintiffs are "Insureds" under the Policy as they are "Insured Entities" in that the Named Insured Johnny Morris Outdoors, LLC has direct or indirect "Management Control" over the Plaintiffs through the membership of limited liability companies.

24. The insuring agreement for the Policy states:

[CCC] shall pay on behalf of the **Insureds** that **Loss** resulting from a **Claim** first made against the **Insureds** during the **Policy Period** . . . for a **Wrongful Act** by such **Insured** or by any natural person for whose **Wrongful Act** such **Insured** is legally responsible, provided that the **Claim** is reported in writing to [CCC] during the **Policy Period** . . . pursuant to Section VI. of this Policy.

Ex. 1, Sec. I. A. Insuring Agreement.

25.     Among other things, the definition of "Claim" in the Policy includes any civil proceeding alleging a "Wrongful Act." Ex. 1, Sec. II Definitions and Endorsements 10 and 11.

26.     The Policy defines "Wrongful Act" to mean:

1.  any actual or alleged act, error or omission by the **Insured**:

    a.  in the **Insured's** performance of fiduciary duties for a **Plan**, including, but not limited to, a breach of duty imposed upon the **Insured** by **ERISA or any Similar Act**;

    b.  solely in the **Insured's** capacity as an **Administrator**;

    c.  solely in the **Insured's** capacity as a settlor of a **Plan**; or

    d.  committed or attempted in connection with the purchase of insurance through a **Healthcare Exchange**;

2.  any matter claimed against an **Insured** solely by reason of his, her or its status as a fiduciary of a **Plan**.

Ex. 1, Sec. II Definitions as modified by Endorsement 14.

27.     The Policy defines "Loss" to mean:

**Loss** means those amounts that any **Insured** is legally liable to pay as awards, settlement or judgments (including any award of pre-judgment and post-judgment interest on a covered judgment and plaintiff's attorneys' fees the **Insureds** are legally obligated to pay on a covered judgment) and **Defense Costs. Loss** shall also include punitive, exemplary or multiple damages if insurable to the fullest extent permitted by any applicable law. Where the **Insureds** reasonably determine that punitive, exemplary or multiple damage are insurable under any applicable law, the Insurer shall not challenge that determination of insurability.

However, **Loss** (other than **Defense Costs**) shall not include:

1.  any **Clean-up Costs;**

2.  any taxes, sanctions, criminal or civil fines, or penalties imposed by law other than, to the extent insurable by law:

a. the five percent or less, or the twenty percent or less, penalty imposed upon an **Insured** as a fiduciary under Sections 502(i) or 502(l), respectively, of the Employee Retirement Income Security Act of 1974;

b. the civil fines and penalties imposed by the Pension Ombudsman appointed by the United Kingdom Secretary of State for Social Service or by the United Kingdom Occupational Pensions Regulatory Authority, or the Pensions Regular, pursuant to the English Pension Scheme Act 1993, the English Pensions Act 1995, the United Kingdom Pensions Act of 2004 or rules and regulations thereunder; provided any coverage for such civil fines and penalties applies only if the funds or assets of the subject **Plan** are not used to fund, pay or reimburse the premium for this coverage;

c. those civil fines and penalties imposed under the Health Insurance Portability and Accountability Act of 1996 codified at 42 U.S.C. 1320-5(a) ("**HIPPA Penalties**");

d. those civil fines and penalties imposed under Section 502(c) of the Employee Retirement Income Security Act of 1974, as amended ("**Section 502(C) Penalties**");

e. those civil fines and penalties imposed under the Pension Protection Act of 2006 ("**Pension Protection Act Penalties**")'

f. those civil fines and penalties imposed for an inadvertent violation of the Patient Protection and Affordable Care Act or the Health Care and Education Reconciliation Act of 2010 ("**PPACA/HCERA Penalties**")

g. the 15% or less tax penalty imposed upon an **Insured** under Section 4975 of the Internal Revenue Code of 1986 ("**Section 4975 Penalties**");

provided, however with respect to c. through g., above:

i. if a fine or penalty is accessed pursuant to two or more statutes above, the Insurer's maximum sublimit of liability for such fine or penalty is the highest single sublimit available for such fine or penalty; and

ii. the maximum limit of the Insurer's liability for such fines and penalties shall be the sublimit amount stated in the Declarations regardless of the number of **Claims** made or **Insureds** covered under this Policy, and such sublimit of Liability is party of and not in addition to the Limit of Liability set forth in Item 6 of the Declarations;

iii. notwithstanding anything to the contrary in this Policy, no retention shall apply to such **Loss.**

3. any amount for which an **Insured Person** is absolved from payment by reason of any covenant, agreement or court order;

4. any amount deemed uninsurable under the law pursuant to which this Policy is construed;

5. any amount attributable to the costs of non-monetary relief, including, without limitation, any costs associated with compliance with any injunctive relief of any kind or nature;

6. benefits due or to become due under any **Plan**, or benefits which would be due under any **Plan** if such **Plan** complied with all applicable law, except that such benefits shall constitute **Loss** if:

   a. an **Insured Person** is legally obligated to pay such benefits as a personal obligation; and
   b. recovery for the benefits is based upon a covered **Wrongful Act;**

   provided, however, nothing in this subparagraph shall exclude that portion of **Loss** related to a **Claim** to the extent it alleges a loss to a **Plan**, or loss in the actual accounts of participants in a **Plan**, by reason of a change in value of the investments held by that **Plan**, including, but not limited to, the securities of an **Insured Entity**, regardless of whether the amounts sought in such **Claim** have been characterized by plaintiffs as benefits or held by a court to be benefits; or

7. an employer's contributions owed to a **Plan** and other amounts for which the **Insureds** are legally obligated to pay by reason of the failure to collect such contributions, unless such failure is due to the negligence of the **Insured.**

Ex. 1, Sec. II Definitions as modified by Endorsement 13.

28.     The Policy sets the Limit of Liability, inclusive of Defense Costs, in the aggregate amount of $10,000,000. Ex. 1, Declarations, Item 6.

29.     The Policy sets a retention for a "Mass or Class Action Claim" at $1,500,000. Ex. 1, Sec. IV Limit of Liability/Retention/Presumptive Indemnity par. 2 as modified by Endorsement 15.

**B.  The Ruiz Suit**

30.     On or about April 26, 2024, Nora Ruiz ("Ruiz") initiated a putative class action lawsuit under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 *et seq.* ("ERISA") against Bass Pro Group, LLC, which is now known as Great Outdoors

Group, LLC, and BPS Direct, in the United States District Court for the Western District of Missouri numbered 6:24-cv-03122-MDH (the "Suit").

31.     A true and correct copy of the Complaint filed in the Suit is attached and incorporated by reference herein as **Exhibit 2.**

32.     Among other things, the Complaint alleged that: Plaintiffs sponsored and administered a medical plan, through which their employees receive health insurance (the "Plan"); Plaintiffs required employees and their dependents participating in the Plan to declare whether they are tobacco users; tobacco users were required to pay an additional $40 a week to maintain health insurance coverage; the tobacco surcharge failed to comply with the terms of ERISA, applied to medical plans by the Patient Protection and Affordable Care Act and implementing regulations without a reasonable alternative; and that Plaintiffs failed to provide proper notification in Plan materials relating to a reasonable alternative standard. Ex. 2, paragraphs 2 through 8.

33.     The Complaint in the Suit purported to set forth the following claims: Count I - ERISA Statutory Violation: Unlawful Surcharge – Failure to Provide Reasonable Alternative Standard; Count II – ERISA Statutory Violation: Unlawful Surcharge – Failure to Provide Required Notice; Count III – ERISA Breach of Fiduciary Duty 28 U.S.C. § 1109. Ex. 2, Complaint.

34.     The Complaint in the Suit sought judgment for the following requested relief: class certification; reimbursement for persons who paid the tobacco surcharge within the relevant limitations period; disgorgement and/or restitution of all payments unlawfully assessed or alternatively, profits earned by Plaintiffs in connection with receipt of unlawful fees; a declaratory judgment that Plaintiffs' acts violate ERISA and applicable law as well as the terms of the Plan; a permanent injunction prohibiting Plaintiffs from collecting a tobacco surcharge until and unless they revise the surcharge to comply with ERISA statutory requirements; an accounting; a

surcharge against Plaintiffs on all funds collected in violation of ERISA and the terms of the Plan; liability for all losses to the Plan resulting from breach of fiduciary duties and the grant of other proper relief authorized by 29 U.S.C. § 1109, including removal and replacement of the fiduciary; a constructive trust on profits received by Plaintiffs as a result of fiduciary breaches or for which they are liable; all damages available at law in an amount to be determined at trial; reasonable attorneys' fees and costs; interest; and all other equitable, remedial, and legal relief as the Court deems just and proper. Ex. 2, Complaint, Request for Relief.

35.     Plaintiffs answered the Complaint on June 17, 2024 without admitting the veracity of material allegations or the propriety of the claims included or relief sought in the Complaint and asserting certain affirmative and additional defenses and filed an amended answer on October 1, 2024 .

36.     On or about October 10, 2024, Ruiz sought to amend her Complaint in the Suit to plead additional legal theories of liability including a cause of action for violation of the terms of the plan under ERISA § 502(a)(1)(B) and to add the ERISA Plan (the Bass Pro Group LLC Health and Welfare Plan) as a defendant in the Suit.

37.     A true and correct copy of Ruiz's amended complaint in the Suit for which she sought leave to file is attached as **Exhibit 3** and incorporated by reference as if set forth fully herein.

38.     Ruiz and Plaintiffs scheduled an October 17, 2024 mediation for purposes of the Suit.

39.     Plaintiffs kept CCC fully informed of the Suit and settlement discussions, including the mediation that CCC attended.

40. Before Plaintiffs responded to Ruiz's motion for leave to amend her Complaint and add the Plan as defendant, the Suit settled following a mediator's proposal.

41. A true and accurate copy of the Settlement Agreement is attached hereto as **Exhibit 4** and incorporated by reference as if set forth herein.

42. The Whereas clauses in and Section V of the Settlement Agreement state Plaintiffs deny and continue to deny and disclaim all allegations made by Ruiz and deny and continue to deny and disclaim they are liable or owe damages to anyone with respect to the facts or causes of action alleged by Ruiz in the Suit. It further states in Section V that the parties agree the Settlement Agreement is not an admission of wrongful acts and shall not serve as evidence that any parties prevailed or of any wrongdoing. Ex. 4, Settlement.

43. The Settlement Agreement allows for certification of a class for settlement purposes only and identifies a "Maximum Settlement Fund" in the amount of $4,950,000, which is the maximum payable under the Settlement Agreement to fully resolve and settle the Suit, including any claim for attorneys' fees and costs approved by the Court, all amounts to be paid to Class Members, the settlement administration costs, any Court-approved Service Payment, and Reserve Fund. Ex. 4, Settlement.

44. On January 16, 2025, the District Court entered an order granting preliminary approval of the class action settlement, which states in part, "[n]either this Order, the Settlement Agreement, nor any other documents or information relating to the settlement of this Litigation shall constitute, be construed to be, or be admissible in this Litigation or any other proceeding as evidence: . . . (b) of an adjudication of the merits of this Litigation; (c) of an adjudication of any of the matters subject to the Release in the Settlement Agreement; (d) that any party prevailed in this case; or (e) that Defendants or the Released Parties have engaged in any wrongdoing."

45.     On March 7, 2025, counsel for Ruiz filed a motion for attorneys' fees, expenses, and service award seeking one-third of the common settlement fund ($1,650,000) as attorneys' fees, $17,893.68 in litigation expense, and a service award to Ruiz as named plaintiff in the amount of $10,000.

46.     On May 29, 2025, the District Court entered final approval of the class action settlement.

47.     Under the class action settlement, Plaintiffs had obligation to fund the settlement within 14 days of the "Effective Date," meaning within 14 days of finality.

48.     Plaintiffs funded the class action settlement as required under the class action settlement in July 2025.

**C.  The Coverage Claim**

49.     The Plaintiffs are "Insureds" under the Policy.

50.     The Suit satisfies the definition of "Claim" in the Policy.

51.     Ruiz filed the Suit in the period of the Policy.

52.     The Suit alleges "Wrongful Acts" as defined in the Policy.

53.     Plaintiffs promptly notified CCC of the Suit, seeking coverage for the Suit available under the Policy.

54.     The Insuring Agreement in the Policy is satisfied.

55.     CCC issued a reservation of rights letter on June 11, 2024 (the "ROR Letter").

56.     A true and accurate copy of the ROR Letter is attached as **Exhibit 5** and incorporated as if set forth fully herein.

57. The ROR Letter recognized that the Suit asserted allegations that fell within the scope of the Policy's coverage and stated CCC would be providing certain coverage for the matter, including Defense Costs, subject to its reservations. Ex. 5, ROR Letter.

58. The ROR Letter identified the definition of "Loss" in the Policy and stated that CCC reserves the right to limit or disclaim coverage for settlement or judgment on the basis that it does not constitute "Loss" under the Policy, including claims for disgorgement, restitution, the return/reimbursement of the tobacco surcharge, and cost of any non-monetary relief. Ex. 5, ROR Letter.

59. The ROR Letter also identified Exclusion III.3 in the Policy "Illegal Profits/Deliberate Acts" that pertains to claims based upon or arising out of "the gaining of any profit, remuneration or financial advantage to which any **Insured** was not legally entitled", also identifying that the exclusion can apply only if such gain is "established in a final non-appealable adjudication in any action or proceeding, other than an action or proceeding initiated by the Insurer to determine coverage under this Policy" and containing a non-imputation clause. Ex. 5, ROR Letter.

60. The ROR Letter stated that the Complaint asserts allegations that potentially implicate Exclusion III.3, including, but not limited to, claims for restitution, disgorgement, and the return of tobacco surcharges that Ruiz alleges Plaintiffs illegally charge and/or received. Ex. 5, ROR Letter.

61. In subsequent communication, CCC stated its unwillingness to cover the full costs of any settlement under the Ruiz suit.

62.     On or about July 16, 2024, the claims manager for CCC communicated with Plaintiffs in an effort to revisit coverage prior to the October 17, 2024 mediation, identifying the "Loss" definition and Exclusion III.3.

63.     Prior to the October 17, 2024 mediation, Plaintiffs expressed disagreement with CCC's position that its reservations impact coverage for purposes of mediating the dispute with Ruiz or settling the Suit, demanding that CCC extend authority to fund any reasonable settlement plus Defense Costs minus the Retention.

64.     The Suit did not settle at the October 17, 2024 mediation and the mediator provided a mediator's proposal on October 18, 2024 that required response by 5:00 p.m. on October 28, 2024.

65.     After the mediation, but before the response deadline to the mediator's proposal, CCC offered to pay amounts less than the full amount required by the Policy if Ruiz and Plaintiffs accepted the mediator's proposal, conditioning such offers on a release of Plaintiffs' coverage claims against CCC.

66.     CCC agreed to waive enforcement of any Policy provisions requiring consent for Plaintiffs to enter the Settlement Agreement for the Suit, but refused to pay amounts equivalent to Plaintiffs' Defense Costs and the Settlement in the Suit minus the $1,500,000 retention, which amount to approximately $3,700,000.

67.     Plaintiffs agreed to the settlement identified in the mediator's proposal, binding themselves to fund such settlement despite CCC's unwillingness to contribute the full amount due under the Policy or other amounts without a claim release from Plaintiffs.

68.     Plaintiffs incurred Defense Costs of at least $249,171.95 in attorney's fees and $5,912.18 in expenses in connection with the Suit.

69.     CCC has failed and refused and continues to fail and refuse to provide Plaintiffs the benefits owed by CCC under the Policy relating to the Defense Costs and Settlement of the Suit.

70.     Plaintiffs are informed and believe that CCC has unnecessarily, improperly, and intentionally refused to honor CCC's coverage obligations under the Policy.

71.     All conditions precedent under the Policy have been satisfied or CCC has waived or should be estopped from asserting such conditions.

**COUNT I**
**(Breach of Contract)**

72.     Plaintiffs reallege and incorporate paragraphs 1 through 71, inclusive, as if set forth fully herein.

73.     The Policy is a contract of insurance that is valid and enforceable against CCC.

74.     The Suit implicated the Policy's Insuring Agreement, requiring CCC to satisfy Plaintiffs' "Loss" in the Suit subject to the Policy's Retention and not to exceed the Policy Limit.

75.     The amounts paid or to be paid by Plaintiffs for purposes of the Settlement Agreement in the Suit are amounts that Plaintiffs are legally liable to pay as settlement (including plaintiff's attorneys fees) and with Plaintiffs' defense costs are "Loss" under the Policy.

76.     Plaintiffs have performed or are otherwise excused from performing all of their obligations and responsibilities required pursuant to the Policy.

77.     CCC has failed and refused to honor its obligations under the Policy relating to the Suit and made clear it will continue to fail and refuse to honor those obligations.

78.     CCC has breached the Policy or made unequivocal expression of unwillingness to pay for the settlement and defense costs for the Suit less the retention, constituting an anticipatory repudiation of CCC's obligations under the Policy and thus, a breach of the Policy.

Electronically Filed - Greene - August 15, 2025 - 04:04 PM

79.    As a result, Plaintiffs have been damaged in an amount of at least $3,705,048, (comprised of the settlement and defense costs less the retention), pre-judgment interest for such sum, and attorneys' fees and costs to obtain coverage benefits, all to be proven at the time of trial.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against CCC in the amount of at least $3,705,048 plus pre-judgment interest, post-judgment interest, attorneys' fees and costs incurred herein and such other and further relief as the Court deems just and proper.

**COUNT II**
**(Bad Faith/Vexatious Refusal to Pay)**

80.    Plaintiffs reallege and incorporate paragraphs 1 through 79, inclusive, as if set forth fully herein.

81.    CCC owed certain duties to Plaintiff upon submission of the Claim through resolution of the Suit, including obligations to pay the Settlement of the Suit.

82.    Those duties included, but were not limited to, a duty of good faith and fair dealing, including a duty of good faith to settle.

83.    Those duties included, but were not limited to, an obligation to provide coverage as required by the Policy unless CCC had a good-faith belief based on its investigation or other available information that the Policy would not afford coverage.

84.    Those duties included, but were not limited to, an obligation to conduct its investigation and make its coverage decision based on the terms of the coverage.

85.    Those duties included, but were not limited to, an obligation to accurately represent the coverage provided under the Policy to Plaintiffs.

86. On information and belief, CCC knew or should have known at all relevant times it owed coverage under the Policy for the Suit, including for the Settlement in the Suit, and that it was withholding monies or contributions it had an obligation to pay.

87. CCC refused repeated requests from Plaintiffs to honor CCC's obligations, including satisfaction of the Settlement in the Suit. When refusing Plaintiffs' requests, CCC sought to rely on: Exclusion III.3 that facially has no application until and unless there is a "final adjudication" that did not occur because of the settlement; an exception to the "Loss" definition for "benefits due or to become due under a **Plan**" that it knew it could not demonstrate as the Suit did involve benefits due under the Plan; and an exception to the "Loss" definition for an amount deemed uninsurable under the law when the settlement involved no admissions of liability or damages and controlling law would not deem the settlement uninsurable.

88. CCC's repeated refusals to pay or agree to pay the amounts due and owing for the Claim under the Policy were in violation of the terms of the Policy, vexatious, and without reasonable cause or excuse.

89. CCC, through the foregoing actions and inactions, breached its duties of good faith, including its duty of good faith settlement practices.

90. At all times, CCC had the ability to satisfy its coverage obligations to Plaintiffs had it exercised ordinary and/or reasonable care in the use of means at hand.

91. CCC failed to use such care when to the ordinary mind it must have been apparent that CCC would cause its insureds harm without reasonable cause or excuse.

92. CCC's actions and inactions were carried out with conscious or reckless disregard for the welfare of its insured.

93.     CCC consciously disregarded its insureds' known rights and wrongfully interfered with their prospective economic advantage and interests in the benefits of the insurance purchased by improperly withholding policy benefits.

94.     Plaintiffs are entitled to recover all damages caused by CCC's bad faith settlement practices and pursuant to the provisions of RSMo. §375.420, they are entitled to a penalty of twenty (20) percent of the first one thousand five hundred (1,500) dollars due and owing Plaintiffs under the Policy and then (10) percent of the remaining amount due under the Policy, plus Plaintiffs' reasonable attorneys' fees and expenses in pursuing satisfaction of CCC's obligations, including those incurred in this lawsuit.

WHEREFORE, Plaintiffs respectfully request entry of judgment in their favor and against CCC for their damages from CCC's bad faith tactics, vexatious penalties as permitted in RSMo. § 375.420, reasonable attorneys' fees, the costs of this action, and for any other and further relief as this Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted,

THOMPSON COBURN LLP


By: */s/ Matthew S. Darrough*
    William R. Bay, #26977
    Matthew S. Darrough, #46307
    Christopher L. Clark, #72747
    One U.S. Bank Plaza, Suite 2700
    St. Louis, Missouri 63101
    (314) 552-6000
    FAX (314) 552-7000
    wbay@thompsoncoburn.com
    mdarrough@thompsoncoburn.com
    cclark@thompsoncoburn.com

*Attorneys for Plaintiffs*

---

Electronically Filed - Greene - August 15, 2025 - 04:04 PM



November 6, 2023

Caren Welik
Vice President
MARSH USA LLC
540 W MADISON ST STE 1200
CHICAGO, IL 60661-7608

Re:    Johnny Morris Outdoors, LLC
       Fiduciary Liability Solutions
       Policy Number 596433932
       Expiration Date: 11/01/2024

Dear Caren,

We are pleased to enclose Policy Number 596433932 for Johnny Morris Outdoors, LLC. We trust that this policy meets with the specifications outlined in our quotation (number 6319105101). Please review it carefully to confirm this. Should you detect any problem, please contact me as soon as possible.

If commissions or other compensation are payable hereunder, Insurance Producer will comply with all applicable federal and state laws, rules, regulations and/or orders governing disclosure by an agent, broker or producer to an insured or prospective insured of commissions or other compensation.

We appreciate the opportunity to do business with Johnny Morris Outdoors, LLC and with you. If you should have any comments, questions, or concerns, please do not hesitate to contact me.

Sincerely,

Dylan Reich
Underwriting Consulting Director
(312) 995-0939
dylan.reich@cna.com

Exhibit 1

 **FIDUCIARY LIABILITY SOLUTIONS**

**NOTICE:**

**THIS IS A CLAIMS MADE POLICY AND, SUBJECT TO ITS PROVISIONS, APPLIES ONLY TO ANY CLAIM FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD. CLAIMS MUST BE REPORTED TO THE COMPANY IN ACCORDANCE WITH SECTION VI. DEFENSE COSTS ARE WITHIN THE LIMIT OF LIABILITY. PLEASE REVIEW THE POLICY CAREFULLY AND DISCUSS THE COVERAGE WITH YOUR INSURANCE AGENT OR BROKER.**

**Terms in bold face type have the special meaning. See the definitions sections of this Policy.**

| NAMED INSURED AND ADDRESS | | PRODUCER |
|---|---|---|
| **Item 1.** | Johnny Morris Outdoors, LLC<br>2500 East Kearney Street<br>Springfield, MO 65898<br><br>Attn: | MARSH USA LLC<br>Caren Welik<br>540 W MADISON ST STE 1200<br>**CHICAGO, IL 60661-7608** |
| **CUSTOMER NUMBER** | | **INSURER** |
| 486111 | | Continental Casualty Company |
| **POLICY NUMBER** | | 151 North Franklin Street |
| 596433932 | | Chicago, IL 60606 |

**Item 2.** Policy Period: 11/01/2023 to 11/1/2024

12:01 a.m. local time at the address stated in Item 1.

**Item 3.** Policy Premium: ███████

**Item 4.** Notices to Insurer:

**Claims:**
CNA – Claims Reporting
P.O. Box 8317
Chicago, IL 60680-8317
Email: SpecialtyNewLoss@cna.com
Fax: 866-773-7504

All other notices:
CNA Global Specialty Lines

**Item 5.** Extended Reporting Period:

a. Period: 365 days
b. Premium: 175% of **Policy Premium**

**Item 6.** Limit of Liability (Inclusive of **Defense Costs**):

$10,000,000 aggregate limit of liability

| All sublimits scheduled below shall be part of, and not in addition to, the aggregate limit of liability set forth above. | |
|---|---|
| $ 250,000 | **Voluntary Compliance Costs** |
| $ 1,500,000 | **HIPAA Penalties** |
| $ 100,000 | **Section 502(C) Penalties** |
| $ 100,000 | **Pension Protection Act Penalties** |

CNA-78145-XXc (03-14)
Page 1

© CNA All Rights Reserved.

**Exhibit 1**


| | |
|---|---|
| $ 250,000 | **PPACA/HCERA Penalties** |
| $ 250,000 | **Section 4975 Penalties** |

**Item 7.**    Retentions:

Each **Claim -**                         $100,000
Each **Securities Claim -**              $100,000

**Item 8.**    Prior or Pending Date:  None

**Item 9.**    Endorsements forming a part of this Policy at issuance:

| | | |
|---|---|---|
| CNA-78173-XX | 2014-03-01 | Amend Prior Notice Exclusion |
| CNA-78150-XX | 2014-03-01 | State Amendatory Inconsistent |
| CNA-78446-MO | 2014-04-01 | Amendatory Endorsement Missouri |
| CNA-78190-MO | 2014-04-01 | Amendment To Extended Reporting Period Various Options Endorsement Missouri |
| CNA-83296-XX | 2015-08-01 | No Retention For Voluntary Compliance Costs Endorsement |
| CNA-78182-XX | 2014-03-01 | Prior Or Pending Date Applicable To Increased Limits Endorsement |
| CNA-81500-XX | 2015-02-01 | Additional Subsidiary Endorsement (Prior Or Pending Date) |
| CNA-78154-XX | 2014-03-01 | Amend Definition Of Application Endorsement |
| CNA-78193-XX | 2014-03-01 | Amend Insurers Right To Cancel Endorsement 20 Days Notice Provision |
| CNA-92116-XX | 2019-04-01 | Amend Claim Endorsement (Internal Appeal) |
| CNA-92117-XX | 2019-04-01 | Amend Claim Endorsement (Fact Finding Investigation) |
| CNA-92154-XX | 2018-05-01 | Amend Application Section To Bar Coverage And Make Non-Rescindable Endorsement |
| CNA-92133-XX | 2018-05-01 | Amend Loss Endorsement (Retention) |
| CNA-92126-XX | 2018-11-01 | Healthcare Exchange Endorsement |
| CNA-98515-XX | 2020-05-01 | Mass Or Class Or Collective Action Retention Endorsement |

These Declarations, along with the completed and signed **Application**, the Policy, and any written endorsements attached shall constitute the contract between the **Insureds** and the Insurer."

Authorized Representative:

Date:  November 6, 2023

© CNA  All Rights Reserved.

Electronically Filed - Greene - August 15, 2025 - 04:04 PM



**FIDUCIARY LIABILITY SOLUTIONS**

**THIS POLICY APPLIES ONLY TO ANY CLAIM FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD. CLAIMS MUST BE REPORTED TO THE COMPANY IN ACCORDANCE WITH SECTION VI. DEFENSE COSTS ARE WITHIN THE LIMITS OF LIABILITY.**

**PLEASE REVIEW THE POLICY CAREFULLY AND DISCUSS THE COVERAGE WITH YOUR INSURANCE AGENT OR BROKER.**

**Terms in bold face type have special meaning. See the definitions sections of this Policy.**

The Insurer and the **Insureds** agree as follows, in consideration of the payment of the premium and in reliance upon all statements made in the **Application** furnished to the Insurer designated in the Declarations, a stock insurance corporation, hereafter called the "Insurer."

### I. A.   INSURING AGREEMENT

The Insurer shall pay on behalf of the **Insureds** that **Loss** resulting from any **Claim** first made against the **Insureds** during the **Policy Period** or the Extended Reporting Period, if applicable, for a **Wrongful Act** by such **Insured** or by any natural person for whose **Wrongful Act** such **Insured** is legally responsible, provided that the **Claim** is reported in writing to the Insurer during the **Policy Period**, or the Extended Reporting Period, if applicable, pursuant to Section VI. of this Policy.

### I. B.   SUPPLEMENTARY PAYMENTS

The Insurer shall reimburse the **Insured**, subject to the aggregate Limit of Liability, up to the Limit of Liability provided on the Declarations, for **Voluntary Compliance Costs** first ascertained by or assessed against an **Insured** during the **Policy Period** in connection with all **Voluntary Compliance Programs**, provided the **Insured** gives prior notice to the Insurer of its intent to enter into such **Voluntary Compliance Program** during the **Policy Period**, or the Extended Reporting Period, if applicable,. This supplementary payment is part of and not in addition to the aggregate Limit of Liability stated in Item 6 of the Declarations.

Any notice the **Insured** gives the Insurer pursuant to this Section shall be deemed notification of a potential **Claim** under Section VI. 2. of this Policy.

### II.   DEFINITIONS

**Administrator** means an **Insured** who renders **Administration Services** in connection with a **Plan**.

**Administration Services** means any of the following services in connection with a **Plan**:

1. communicating with or providing information regarding any **Plan** to **Employees**, **Plan** participants or beneficiaries;

2. determining vesting and eligibility for **Plan** participation or benefits;

3. calculating benefits provided under the **Plan**;

4. counseling and interpreting **Plans** to **Employees**, **Plan** participants or beneficiaries;

5. processing applications and related forms required for the payment of benefits;

6. performing any record-keeping and data processing functions required by **ERISA or any Similar Act** or a **Plan**;

7. preparing and filing any necessary reports or returns required under **ERISA or any Similar Act** or the Internal Revenue Code, and the regulations thereunder;

8. effecting the payment of benefits or authorized administrative expenses;

9. providing **Managed Care Services** to **Employees**, **Plan** participants or beneficiaries;

10. enrolling, terminating or canceling **Employees** or **Plan** participants or beneficiaries.

**Application** means all signed applications, any attachments to such applications, other materials submitted therewith or incorporated therein, and any other documents submitted in connection with the underwriting of this Policy. **Application** includes any public filing by or on behalf of an **Insured Entity** made with any federal, state, local or foreign regulatory agency, provided that such public filing was filed during the twelve (12) month period immediately preceding the inception of the **Policy Period**.

**Claim** means:

**Exhibit 1**



1.  any written demand for monetary or non-monetary relief (including a request to toll or waive the statute of limitations or for injunctive or declaratory relief);

2.  any civil investigation by the United States Department of Labor or the U.S. Pension Benefit Guaranty Corporation, or any similar governmental authority located outside the United States;

3.  any civil, criminal, administrative, regulatory or alternative dispute resolution proceeding, or an **Extradition**;

alleging a **Wrongful Act**, including any appeal therefrom.

A **Claim** shall be deemed first made on the following dates:

a.  with respect to a written demand for monetary or non-monetary relief, upon the earlier of the **Insured's** or Insurer's receipt of notice of such demand;

b.  with respect to any civil investigation by the United States Department of Labor or the U.S. Pension Benefit Guaranty Corporation, or any similar governmental authority located outside the United States, upon the date of receipt by any **Insured** of written notice from the investigating authority identifying the **Insured** as an individual or entity against whom a proceeding may be commenced, or upon the arrest and detainment or incarceration for more than 24 hours of an **Insured Person** by any law enforcement authority in a **Foreign Jurisdiction**;

c.  with respect to a civil proceeding in a court of law or equity or an alternative dispute resolution proceeding, on the date of service upon or other receipt by any **Insured** of a complaint against the **Insured** in such proceeding;

d.  with respect to a criminal proceeding, upon the date of the return of an indictment, information or similar document against the **Insured**;

e.  with respect to a regulatory proceeding (civil, criminal or administrative) against any **Insured**, on the earliest of the date of service upon or other receipt by the **Insured** of a complaint, a notice of charges or similar document;

f.  with respect to an **Extradition**, upon the arrest and detainment or incarceration for more than 24 hours of an **Insured Person** by any law enforcement authority in a **Foreign Jurisdiction**.

**Clean-up Costs** means any expenses, including but not limited to legal and professional fees, incurred in testing for, monitoring, cleaning up, removing, containing, treating, neutralizing, detoxifying or assessing the effects of **Pollutants**.

**Consulting Fees** means reasonable and necessary fees, costs and expenses incurred by the **Insureds**, including the fees charged by a third party actuary, benefits consultant, accountant or legal counsel, resulting solely from the correction of actual or alleged inadvertent non-compliance by a **Plan** with any statute, rule or regulation. However, **Consulting Fees** shall not include fees, costs or expenses relating to a **Plan** audit or relating to finding, assessing or identifying such violation.

**Defense Costs** means fees, costs and expenses incurred by the Insurer in the investigation, adjustment, defense or appeal of any covered **Claim**, and includes premium for appeal bonds, attachment bonds or similar bonds arising out of a covered judgment. The Insurer has no obligation to provide such bonds. **Defense Costs** shall not include salaries, wages, fees, overhead or benefit expenses associated with the directors, officers and employees of the Insurer or the **Insureds**. Solely with respect to an **Extradition**, **Defense Costs** also includes any **Extradition Costs**.

**Domestic Partner** means any person qualifying as such under any federal, state or local laws or under a **Plan**.

**Employees** mean all past, present or future full-time, part-time, volunteer, seasonal and temporary individuals whose work is directed or controlled by the **Insured Entity** or any **Plan**. **Employee** does not include any independent contractor but shall include leased workers whose work on behalf of the **Insured Entity** is directed and controlled by the **Insured Entity**.

**ERISA or any Similar Act** means the Employee Retirement Income Security Act of 1974, as amended, or any similar common or statutory law of the United States, Canada or their states, territories or provinces or any other jurisdiction anywhere in the world, and any rules and regulations promulgated thereunder.

**Executive** means any past, present or future:

1.  duly elected or appointed director, officer, trustee or governor of a corporation, management committee member of a joint venture or manager of a limited liability company;

© CNA All Rights Reserved.



**FIDUCIARY LIABILITY SOLUTIONS**

2.  official in an **Insured Entity** or **Plan** organized and operated in a **Foreign Jurisdiction** who is holding a position that is equivalent to an executive position listed in 1; or

3.  In-House General Counsel or Risk Manager (or equivalent positions) of the **Named Insured**.

**Extradition** means a process by which one country surrenders an **Insured Person** to another country for prosecution, incarceration or to answer any criminal accusation, where an **Insured Person** is the subject of:

1.  an official request for an order of **Extradition**; or

2.  a warrant for arrest where such warrant is an element of **Extradition**.

**Extradition Costs** means reasonable and necessary fees, costs and expenses incurred in connection with a **Claim** against an **Insured Person** for a **Wrongful Act** with the Insurer's prior written consent (such consent not to be unreasonably withheld) to challenge, resist or defend against any request for or order of **Extradition**, or any appeal of any order of **Extradition**.

**Financial Insolvency** means, with respect to the **Insured Entity**:

1.  the appointment of a receiver, conservator, liquidator, trustee, rehabilitator or similar official to take control of, supervise, manage or liquidate such **Insured Entity**; or such **Insured Entity** becoming a debtor in possession; and

2.  the inability of such **Insured Entity** financially or under applicable law to advance **Defense Costs** or indemnify the **Insured Persons** for **Loss**.

**Foreign Jurisdiction** means any jurisdiction, other than the United States or any of its territories or possessions.

**Insureds** mean:

1.  any **Plans**, **Insured Persons** or **Insured Entities**; and

2.  any **Plan Committees** of **Insured Entities** in their capacity as fiduciaries, trustees or **Administrators** of **Plans**.

**Insured Entity** means the **Named Insured** and any **Subsidiary**, including any such entity as a debtor in possession under United States bankruptcy law or an equivalent status under the law of any other country.

**Insured Persons** means all **Executives** and all **Employees** of the **Insured Entity** or any **Plan**.

**Interrelated Wrongful Acts** means any **Wrongful Acts** which are logically or causally connected by reason of any common fact, circumstance, situation, transaction or event.

**KSOP** means a qualified retirement plan that combines an employee stock ownership plan with a 401(k) retirement plan.

**Loss** means those amounts that any **Insured** is legally liable to pay as awards, settlements or judgments (including any award of pre-judgment and post-judgment interest on a covered judgment and plaintiff's attorneys fees the **Insureds** are legally obligated to pay on a covered judgment) and **Defense Costs**. **Loss** shall also include punitive, exemplary or multiple damages if insurable to the fullest extent permitted by any applicable law. Where the **Insureds** reasonably determine that punitive, exemplary or multiple damages are insurable under any applicable law, the Insurer shall not challenge that determination of insurability.

However, **Loss** (other than **Defense Costs**) shall not include:

1.  any **Clean-up Costs**;

2.  any taxes, sanctions, criminal or civil fines, or penalties imposed by law other than, to the extent insurable by law:

    a.  the five percent or less, or the twenty percent or less, penalty imposed upon an **Insured** as a fiduciary under Section 502(i) or 502(l), respectively, of the Employee Retirement Income Security Act of 1974;

    b.  the civil fines and penalties imposed by the Pension Ombudsman appointed by the United Kingdom Secretary of State for Social Services or by the United Kingdom Occupational Pensions Regulatory Authority, or the Pensions Regulator, pursuant to the English Pension Scheme Act 1993, the English Pensions Act 1995, the United Kingdom Pensions Act 2004 or rules or regulations thereunder; provided any coverage for such civil fines and penalties applies only if the funds or assets of the subject **Plan** are not used to fund, pay or reimburse the premium for this coverage;

Electronically Filed - Greene - August 15, 2025 - 04:04 PM


Electronically Filed - Greene - August 15, 2025 - 04:04 PM

    c. those civil fines and penalties imposed under the Health Insurance Portability and Accountability Act of 1996 codified at 42 U.S.C. 1320d-5(a) ("**HIPAA Penalties**");

    d. those civil fines and penalties imposed under Section 502(c) of the Employee Retirement Income Security Act of 1974, as amended (**Section 502(C) Penalties**");

    e. those civil fines and penalties imposed under the Pension Protection Act of 2006 ("**Pension Protection Act Penalties**");

    f. those civil fines and penalties imposed for an inadvertent violation of the Patient Protection and Affordable Care Act or the Health Care and Education Reconciliation Act of 2010 ("**PPACA/HCERA Penalties**");

    g. the 15% or less tax penalty imposed upon an **Insured** under Section 4975 of the Internal Revenue Code of 1986 ("**Section 4975 Penalties**");

    provided, however with respect to c. through g., above:

    i. if a fine or penalty is accessed pursuant to two or more statutes above, the Insurer's maximum sublimit of liability for such fine or penalty is the highest single sublimit available for such fine or penalty; and

    ii. the maximum limit of the Insurer's liability for such fines and penalties shall be the sublimit amount stated in the Declarations regardless of the number of **Claims** made or **Insureds** covered under this Policy, and such sublimit of Liability is part of and not in addition to the Limit of Liability set forth in Item 6 of the Declarations;

3. any amount for which an **Insured Person** is absolved from payment by reason of any covenant, agreement or court order;

4. any amount deemed uninsurable under the law pursuant to which this Policy is construed;

5. any amount attributable to the cost of non-monetary relief, including, without limitation, any costs associated with compliance with any injunctive relief of any kind or nature;

6. benefits due or to become due under any **Plan**, or benefits which would be due under any **Plan** if such **Plan** complied with all applicable law, except that such benefits shall constitute **Loss** if:

    a. an **Insured Person** is legally obligated to pay such benefits as a personal obligation, and

    b. recovery for the benefits is based upon a covered **Wrongful Act**;

    provided, however, nothing in this subparagraph shall exclude that portion of **Loss** related to a **Claim** to the extent it alleges a loss to a **Plan**, or loss in the actual accounts of participants in a **Plan**, by reason of a change in value of the investments held by that **Plan**, including, but not limited to, the securities of the **Insured Entity**, regardless of whether the amounts sought in such **Claim** have been characterized by plaintiffs as benefits or held by a court to be benefits; or

7. an employer's contributions owed to a **Plan** and other amounts for which the **Insureds** are legally obligated to pay by reason of the failure to collect such contributions, unless such failure is due to the negligence of the **Insured**.

**Managed Care Services** means the administration or management of a health care plan utilizing cost control mechanisms, including but not limited to utilization review, case management, disease management or the use of a preferred provider network; provided, however, that **Managed Care Services** does not include (1) any services provided by a health care plan administered by the **Insureds** (a "Self Administered Plan") and (2) any acts, errors or omissions in the rendering of or failure to render **Medical Services** by the **Insureds**.

**Management Control** means: (1) owning interests representing more than 50% of the voting, appointment or designation power for the selection of a majority of: the Board of Directors of a corporation; the management committee members of a joint venture; or the members of the management board of a limited liability company; or (2) having the right, pursuant to written contract or the by-laws, charter, operating agreement or similar documents of the entity, to elect, appoint or designate a majority of: the Board of Directors of a corporation; the management committee of a joint venture; or the management board of a limited liability company.

**Medical Services** means health care, medical care, or treatment provided to any individual, including medical, surgical, dental, psychiatric, mental health, chiropractic, osteopathic, nursing or other professional health care; the use, prescription, furnishing or dispensing of medications, drugs, blood, blood products or medical, surgical,

© CNA  All Rights Reserved.

**Exhibit 1**



Electronically Filed - Greene - August 15, 2025 - 04:04 PM

dental or psychiatric supplies, equipment or appliances in connection with such care; the furnishing of food or beverages in connection with such care; the furnishing of counseling or other social services in connection with such care; and the handling of or the performance of post-mortem examinations or human bodies; provided, however, that utilization review shall not be deemed **Medical Services**.

**Named Insured** means the company named in Item 1 of the Declarations, including such company as a debtor in possession under United States bankruptcy law or an equivalent status under the law of any other country.

**Non-Indemnifiable Loss** means **Loss** which an **Insured Entity** fails or refuses to indemnify an **Insured Person**:

1. because of **Financial Insolvency**; or

2. because it is not permitted to indemnify pursuant to law or contract or the charter, bylaws, operating agreement or similar documents of an **Insured Entity** or **Plan**.

**Pension Plan** means any employee pension benefit plan subject to regulation under **ERISA or any Similar Act**. **Pension Plan** shall not include an employee stock ownership plan or a **KSOP**.

**Plan** means:

1. any **Welfare Plan** or **Pension Plan** which was, on or prior to the effective date of this Policy, sponsored solely by any **Insured Entity**, or sponsored jointly by the **Insured Entity** and a labor organization, solely for the benefit of the **Employees** or **Executives** of the **Insured Entity**;

2. any **Welfare Plan** or **Pension Plan** which, after the effective date of this Policy, becomes sponsored solely by any **Insured Entity**, or sponsored jointly by the **Insured Entity** and a labor organization, solely for the benefit of the **Employees** or **Executives** of the **Insured Entity**, if and to the extent coverage with respect to the **Welfare Plan** or **Pension Plan** is afforded pursuant to Section XV. of this Policy;

3. any other employee benefit plan or program not subject to **ERISA or any Similar Act** which is sponsored solely by the **Insured Entity** for the benefit of the **Employees** or **Executives**, including any fringe benefit or excess benefit plan;

4. any other plan or program otherwise described in paragraphs 1. through 3. above while such plan or program is being actively developed, formed or proposed by the **Insured Entity** prior to the formal creation of such plan or program; or

5. solely with respect to an **Insured's** capacity as an **Administrator**, any government-mandated insurance for workers' compensation, unemployment, social security or disability benefits for **Employees**;

**Plan** does not include any multi-employer plan as defined in **ERISA or any Similar Act**.

**Plan Committee** means any employee benefit committee, including, but not limited to any plan investment or administration committee, that is established by an **Insured Entity** and that is comprised entirely of **Insured Persons**.

**Policy Period** means the period from the effective date of this Policy to the Policy expiration date stated in Item 2 of the Declarations, or its earlier cancellation date.

**Pollutant** means any substance exhibiting hazardous characteristics as is or may be defined or identified on any list of hazardous substances issued by the United States Environmental Protection Agency or any state, local or foreign counterpart. **Pollutant** also means, without limitation, any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals or waste (including materials to be recycled, reconditioned or reclaimed), as well as any air emission, odor, waste water, oil or oil products, infectious or medical waste, asbestos, or asbestos products or any noise.

**Securities Claim** means a **Claim**, other than an administrative or regulatory proceeding against or investigation of an **Insured Entity**, made against any **Insured** and:

1. alleging a violation of any federal, state, local or foreign law (including common law), regulation or rule regulating securities of an **Insured Entity**, including, but not limited to, the purchase or sale or offer or solicitation of an offer to purchase or sell securities of an **Insured Entity**; or

2. brought derivatively on the behalf of an **Insured Entity** by a security holder of such **Insured Entity**.

**Securities Claim** shall not include a **Claim** in which the claimant alleges a loss or seeks damages as a result of a **Plan's** allegedly excessive fees or excessive cash holdings within an investment fund designed to hold employer



securities, as long as such **Claim** does not include an allegation based upon a drop in the price or decrease in the valuation of the employer securities.

**Subsidiary** means:

1.  any entity (other than a partnership) in which the **Named Insured** has **Management Control** directly or indirectly through one or more other **Subsidiaries**:

    a.  on or before the effective date of this Policy; or

    b.  after the effective date of this Policy by reason of being created or acquired by the **Insured Entity** after such date, if and to the extent coverage with respect to the entity is afforded pursuant to Section XV.; or

2.  any entity exempt from federal income taxation and sponsored exclusively by the **Insured Entity**.

**Takeover** means:

1.  the acquisition by another entity or person, or group of entities or persons acting in concert, of:

    a.  the ownership or control of voting stock of the **Named Insured** resulting in such entity, person or group owning or controlling more than 50% of the voting stock of the **Named Insured**, or

    b.  assets of the **Named Insured** resulting in such entity, person or group owning more than 50% of the total consolidated assets of the **Named Insured** as of the date of the **Named Insured's** most recent audited consolidated financial statement prior to such acquisition;

2.  the merger of the **Named Insured** into another entity such that the **Named Insured** is not the surviving entity; or

3.  the consolidation of the **Named Insured** with another entity.

**Voluntary Compliance Costs** means:

1.  **Consulting Fees** incurred in connection with, or

2.  any fines, penalties or sanctions paid by an **Insured** to a governmental authority pursuant to:

a **Voluntary Compliance Program** for the actual or alleged inadvertent non-compliance by a **Plan** with any statute, rule or regulation; provided **Voluntary Compliance Costs** shall not include (i) any costs to correct the non-compliance, or (ii) any **Consulting Fees**, fines, penalties or sanctions relating to a **Plan** which, as of the earlier of inception of this **Policy** or inception of the first policy in an uninterrupted series of policies issued by the Insurer of which this **Policy** is a direct or indirect renewal or replacement, any **Insured Person** knew to be actually or allegedly non-compliant.

**Voluntary Compliance Program** means any voluntary compliance resolution program or similar voluntary settlement program administered by the U.S. Internal Revenue Service, the U.S. Department of Labor or other similar governmental authority located outside the United States, including without limitation:

1.  the Employee Plans Compliance Resolution System consisting of the Self-Correction Program, the Voluntary Compliance Resolution Program and the Audit Closing Agreement Program all as set forth in IRS Revenue Procedure 2003-44 (as amended, modified, expanded or superseded by any successor Revenue Procedure); or

2.  the Delinquent Filer Voluntary Compliance Program, and the Voluntary Fiduciary Correction Program administered by the Department of Labor.

**Welfare Plan** means any employee welfare benefit plan subject to regulation under **ERISA or any Similar Act**.

**Wrongful Act** means:

1.  any actual or alleged act, error or omission by the **Insured**:

    a.  in the **Insured's** performance of fiduciary duties for a **Plan**, including, but not limited to, a breach of duty imposed upon the **Insured** by **ERISA or any Similar Act**;

    b.  solely in the **Insured's** capacity as an **Administrator**; or

    c.  solely in the **Insured's** capacity as a settlor of a **Plan**;

2.  any matter claimed against an **Insured** solely by reason of his, her or its status as a fiduciary of a **Plan**.



**FIDUCIARY LIABILITY SOLUTIONS**

## III.　　EXCLUSIONS

The Insurer shall not be liable to pay that part of **Loss** under this Policy in connection with any **Claim** made against any **Insured**:

1. **Assumed Liability**

   based upon or arising out of liability of others assumed by any **Insured** under any contract or agreement; however, this exclusion shall not apply to the extent that:

   a. the **Insured** would have been liable in the absence of such contract or agreement; or

   b. the liability was assumed in accordance with or under the trust instrument or equivalent documents governing the assets of the **Plan**;

2. **Bodily Injury/Property Damage**

   for any actual or alleged bodily injury, mental anguish, emotional distress, sickness, disease or death of any person or damage to or destruction of any tangible property, including loss of use; provided, however, this exclusion shall not apply to:

   a. any **Claim** for any actual or alleged bodily injury, mental anguish, emotional distress, sickness, disease or death of any person resulting from selection of any **Managed Care Services** provider;

   b. **Defense Costs** arising out of any **Claim** for any actual or alleged bodily injury, mental anguish, emotional distress, sickness, disease or death of any person;

3. **Illegal Profits/Deliberate Acts**

   based upon or arising out of:

   a. the gaining of any profit, remuneration or financial advantage to which any **Insured** was not legally entitled; or

   b. the committing of any deliberate fraudulent or deliberate criminal act by any **Insured**,

   if established in a final non-appealable adjudication in any action or proceeding, other than an action or proceeding initiated by the Insurer to determine coverage under this Policy.

   For purposes of determining the applicability of this Exclusion, the facts pertaining to and the knowledge possessed by any **Insured** shall not be imputed to any other **Insured**;

4. **Prior Notice**

   based upon or arising out of:

   a. any **Wrongful Act** or any matter, fact, circumstance, situation, transaction, or event notice of which was given by an **Insured** under any fiduciary liability policy of which this Policy is a direct or indirect renewal or replacement; or

   b. any other **Wrongful Act** whenever occurring, which, together with a **Wrongful Act** described in a. above, would constitute **Interrelated Wrongful Acts**;

5. **Prior or Pending**

   based upon or arising out of or attributable to essentially the same facts, circumstances, situations, transactions or events underlying or alleged in any litigation, any administrative or regulatory proceeding, any investigation or any alternative dispute resolution proceeding that was pending on or prior to the Prior or Pending Date set forth in the Declarations;

6. **Specified Legislation**

   for any actual or alleged violation of any law governing workers' compensation, unemployment insurance, social security, disability benefits or any other similar federal, state or local statutory or regulatory law or common law anywhere in the world, except the Consolidated Omnibus Budget Reconciliation Act of 1985 or the Health Insurance Portability and Accountability Act of 1996 or any amendments to such laws or any rules or regulations promulgated under such laws.

## IV.　　LIMIT OF LIABILITY/RETENTION/PRESUMPTIVE INDEMNIFICATION

© CNA All Rights Reserved.

**Exhibit 1**


Electronically Filed - Greene - August 15, 2025 - 04:04 PM

1. **Aggregate Limit of Liability**

   The Limit of Liability stated in Item 6 of the Declarations is the aggregate limit of the Insurer's liability for:

   a. all **Loss** under this Policy, and

   b. all **Voluntary Compliance Costs** incurred by the **Insured** in connection with all **Voluntary Compliance Programs** first noticed to the Insurer during the **Policy Period**.

   The Limit of Liability for the Extended Reporting Period shall be part of and not in addition to the Limit of Liability for the **Policy Period**. Further, a **Claim** which is made subsequent to both the **Policy Period** and the Extended Reporting Period (if applicable), and which pursuant to Section VI. is considered made during the **Policy Period** or Extended Reporting Period, shall also be subject to the one aggregate Limit of Liability stated in Item 6 of the Declarations.

   **Defense Costs** are part of **Loss** and as such are subject to the Limit of Liability for **Loss**.

2. **Retention**

   The Insurer shall only be liable for the amount of **Loss** arising from each **Claim**, including a **Securities Claim**, which is in excess of the applicable Retention amount stated in Item 7 of the Declarations. A single Retention shall apply to **Loss** arising from all **Claims** alleging the same **Wrongful Act** or **Interrelated Wrongful Acts**. In the event a **Claim** implicates more than one Retention, then as to such **Claim**, the higher of such Retentions shall be deemed the Retention applicable to **Loss** arising from such **Claim**. The Retention shall be uninsured. The Insurer will have no obligation to pay all or any portion of any applicable Retention. No Retention applies with respect to **Non-Indemnifiable Loss**. In addition, no Retention applies with respect to that portion of **Loss** assessed as fines and penalties covered under the definition of **Loss**, part 2. c. through f., but such Retention shall continue to apply to all other **Loss**, including **Defense Costs**, arising out of such **Claim**.

3. **Indemnification and Failure or Refusal to Indemnify/Presumptive Indemnification**

   a. If for any reason an **Insured Entity** fails or refuses to advance, pay or indemnify covered **Loss** of an **Insured Person** within the applicable Retention, if any, then the Insurer shall advance such amounts on behalf of the **Insured Person** until either an **Insured Entity** has agreed to make such payments, or the Retention has been satisfied. In no event shall any such advancement by the Insurer relieve any **Insured Entity** of any duty it may have to provide advancement, payment or indemnification to any **Insured Person**.

   Advancement, payment or indemnification of an **Insured Person** by an **Insured Entity** shall only be deemed failed or refused to the extent such advancement, payment or indemnification is not provided, or agreed to be provided, or acknowledged by and collectible from an **Insured Entity**. Any payment or advancement by the Insurer within an applicable Retention shall apply towards the exhaustion of the **Limits of Liability**.

   "Fails" or "failed", as used herein, means an **Insured Person** requested in writing that an **Insured Entity** advance, pay or indemnify an **Insured Person** for **Loss** and such advancement, payment or indemnification has not been provided by, agreed to be provided by or acknowledged as an obligation by the **Insured Entity** within 60 days of such request. "Refuses" or "refused", as used herein, means that an **Insured Entity** gave written notice to an **Insured Person** that it would not honor such **Insured Person's** request to pay, advance or indemnify for **Loss**.

   b. The **Insured Entity** agrees to indemnify the **Insured Persons** or to advance **Defense Costs** to the fullest extent permitted by law. If the Insurer pays any amount as set forth in paragraph a. above, then the **Insured Entity** shall reimburse the Insurer for such amounts and such amounts shall become immediately due and payable as a direct obligation of the **Insured Entity** to the Insurer. The failure of an **Insured Entity** to perform any of its obligations to indemnify the **Insured Persons** or advance **Defense Costs** under this Policy shall not impair the rights of an **Insured Person** under this Policy.

**V.     SETTLEMENT/PAYMENT OF RETENTION/ALLOCATION**

1. **Insurer's Duty to Defend**

   The Insurer shall have the right and duty to defend in the **Insured's** name and on the **Insured's** behalf a **Claim** covered by this Policy even if any of the allegations of the **Claim** are groundless, false or fraudulent. The Insurer shall have the right to appoint counsel and to make such investigation and defense of a **Claim** as



Electronically Filed - Greene - August 15, 2025 - 04:04 PM

is deemed necessary by the Insurer. If a **Claim** is subject to arbitration or mediation, the Insurer shall be entitled to exercise all of the **Insured**'s rights in the choice of arbitrators or mediators and in the conduct of an arbitration or mediation proceeding.

The **Insured** shall have the right to effectively associate with the Insurer in the defense of any **Claim**, including, but not limited to, negotiating a settlement, subject to the provisions of this Section V. The Insurer shall not, however, be obligated to defend any **Claim** after either:

a.   the applicable limit of liability has been exhausted; or

b.   the **Insured** rejects a settlement offer recommended by the Insurer, as provided in paragraph 2 of this Section.

2.   **Admission of Liability, Settlement, Consent**

The Insurer shall not be liable for any **Loss** incurred by an **Insured** to the extent the **Loss** results from an **Insured** admitting liability, consenting to any judgment, agreeing to any settlement or making any settlement offer without the Insurer's prior written consent. The **Insureds** agree that they shall not knowingly take any action which increases the Insurer's exposure for **Loss** under this Policy.

Notwithstanding the above, if the **Insureds** are able to settle all **Claims** which are subject to a single Retention for an aggregate amount, including **Defense Costs**, not exceeding such Retention, the Insurer's consent shall not be required for the settlement of such **Claim**.

The Insurer may make any settlement of any **Claim** it deems expedient with respect to any **Insured**, subject to such **Insured's** written consent, such consent not to be unreasonably withheld.

3.   **Allocation of Loss/Disproven Allegation Protection**

If the Insurer defends a **Claim** that is determined to not be covered, in whole or in part, under the terms of this Policy, the Insurer shall not seek reimbursement of that portion of **Defense Costs** incurred in connection with the defense of the uncovered portion of such **Claim**.

## VI.   NOTICE OF CLAIM/CIRCUMSTANCE AND INTERRELATED CLAIM CLAUSE

1.   **Notice of Claim**

The **Insureds** shall, as a condition precedent to the obligations of the Insurer under this Policy, give written notice to the Insurer of a **Claim** as soon as practicable after the Risk Manager or General Counsel (or equivalent positions) of the **Insured Entity** first become aware of such **Claim**, but in no event later than sixty (60) days after the end of the **Policy Period** or the Extended Reporting Period, if applicable. Failure to give such notice as soon as reasonably practicable shall not invalidate coverage of such **Claim**, unless the failure to provide timely notice has prejudiced the Insurer or unless the notice is provided after the expiration of the **Policy Period** or any Extended Reporting Period (if applicable).

2.   **Notice of Circumstance**

If during the **Policy Period**, or any Extended Reporting Period, as applicable, an **Insured** first becomes aware of any facts or circumstances that may reasonably be expected to give rise to a **Claim** and during such period gives written notice to the Insurer of: the **Wrongful Act** allegations anticipated as the basis of the potential **Claim**; the names of any potential claimants; the identities of the specific **Insureds** allegedly responsible for such **Wrongful Act**; the consequences that have resulted or may result from such **Wrongful Act**; the nature of the potential monetary damages or non-monetary relief that may be sought in consequence of such specific **Wrongful Act**; and the circumstances by which **Insureds** first became aware of such **Wrongful Act**, then any **Claim** otherwise covered pursuant to this Policy that is subsequently made and that arises out of such **Wrongful Act** shall be deemed to have been first made against an **Insured** and reported to the Insurer by an **Insured** at the time such written notice was received by the Insurer.

No coverage is provided for fees and expenses incurred prior to the time such **Wrongful Act** results in a **Claim**, even if such amount also benefits the defense of a covered **Claim** or such **Wrongful Act** subsequently gives rise to a **Claim**.

3.   **Interrelated Claims**

**Exhibit 1**



**FIDUCIARY LIABILITY SOLUTIONS**

More than one **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be considered as one **Claim** which shall be deemed to have been first made on the earlier of:

a.  the date on which the earliest such **Claim** was first made, or

b.  the first date valid notice was given by the **Insureds** to the Insurer under this Policy or any prior policy of:

    i. any **Wrongful Act**;

    ii.  any **Voluntary Compliance Program**; or

    iii.  any fact, circumstance, situation, event or transaction which underlies any such **Claim**.

In no event shall an individual lawsuit or proceeding constitute more than one **Claim**.

4.  **To Whom Notices are Sent**

The **Insureds** shall give written notice to the Insurer by regular mail, email or facsimile sent to the addresses specified in the Declarations. The date the Insurer receives such notice shall constitute the date such notice was given. Proof of mailing shall be sufficient proof of notice.

## VII.    EXTENDED REPORTING PERIOD

1.  **Optional Extended Reporting Period**

If the **Named Insured** cancels or if the Insurer or the **Named Insured** non-renews this Policy, the **Named Insured** shall have the right to purchase, upon payment of an additional premium as described in the Declarations, an extension of this Policy for the period described in the Declarations, but only to the extent a **Claim** is first made or deemed to be first made during such period for **Wrongful Acts** committed before the earlier of the end of the **Policy Period** or the effective date of any **Takeover**.

The extension described above shall be referred to as an Extended Reporting Period.

2.  **Payment of Extended Reported Premium**

As a condition precedent to the right to purchase the Extended Reporting Period, the total premium for this Policy must have been paid. The right to purchase any Extended Reporting Period shall end unless the Insurer receives written notice of the **Named Insured's** election to purchase such Extended Reporting Period and full payment of the premium for such period within 30 days after the end of the **Policy Period** or the effective date of any **Takeover**.

3.  **Non-Cancellation/Premium Fully Earned**

If the Extended Reporting Period is purchased, it is non-cancelable and the entire premium shall be deemed fully earned at its commencement without any obligation by the Insurer to return any portion thereof.

4.  **No Separate Limit**

There is no separate or additional Limit of Liability for the Extended Reporting Period.

## VIII.   CANCELLATION

1.  **Insurer's Right to Cancel**

The Insurer shall not cancel this Policy except for non-payment of any premium when due. The Insurer shall provide to the **Named Insured** written notice of such cancellation stating when, not less than 15 days thereafter, such cancellation shall be effective.

2.  **Named Insured's Right to Cancel**

The **Insureds** grant the exclusive authority to cancel this Policy to the **Named Insured**. The **Named Insured** may cancel this Policy by providing the Insurer written notice stating when thereafter such cancellation shall be effective. The mailing or delivery of such notice shall be sufficient. The unearned premium shall be computed in accordance with customary short rate provisions and premium adjustment may be made at the time cancellation is effected or as soon as practicable.

## IX.    TERRITORY

Coverage shall apply to **Claims** made and **Wrongful Acts** committed worldwide.

© CNA  All Rights Reserved.

**Exhibit 1**

**FIDUCIARY LIABILITY SOLUTIONS**

## X.    APPLICATION

The **Application** shall be considered as a separate application for each **Insured Person**. Under no circumstances shall the coverage provided by this Policy for **Insured Persons** for **Non-Indemnifiable Loss** be deemed void, whether by rescission or otherwise, once the premium has been paid. Knowledge possessed by any **Insured Person** or by any **Insured Entity** shall not be imputed to any other **Insured Person**.

The Insurer has relied on the accuracy and completeness of the statements, information and representations contained in the **Application**. All such statements, information and representations are the basis of this Policy and are to be considered as incorporated into and constituting a part of this Policy.

If the statements, information or representations in the **Application** were not accurate and complete, and such inaccuracy or incomplete disclosure materially affected either the acceptance of the risk or the hazard assumed by the Insurer under the Policy, then the Insurer shall have the right to void coverage:

1.  with respect to any **Insured Entity** to the extent it indemnifies an **Insured Person** who knew as of the effective date of this Policy the facts that were misrepresented or omitted;

2.  with respect to any **Insured Entity** if the Chief Executive Officer, Chief Financial Officer or General Counsel of the **Named Insured** or the individual who signed the **Application** knew as of the effective date of the Policy the facts that were misrepresented or omitted.

## XI.    OTHER INSURANCE

If any **Loss** resulting from any **Claim** or any **Voluntary Compliance Costs** is insured under any other insurance, this Policy shall apply only as excess over any other valid and collectible insurance unless such other insurance is written only as specific excess insurance over the limit of liability provided by this Policy. This Policy shall specifically be excess of any other valid and collectible insurance pursuant to which any other insurer has a duty to defend a **Claim** for which this Policy may be obligated to pay **Loss**.

Notwithstanding anything to the contrary above, this Policy shall apply as primary to any personal umbrella excess liability insurance purchased by an **Insured Person**.

## XII.    ESTATES, LEGAL REPRESENTATIVES AND SPOUSES

The estates, heirs, legal representatives, assigns, spouses and any **Domestic Partner** of **Insured Persons** shall be considered **Insureds** under this Policy; provided, however, coverage is afforded to such estates, heirs, legal representatives, assigns, spouses and **Domestic Partners** only for a **Claim** arising solely out of their status as such and, in the case of a spouse or **Domestic Partner**, where such **Claim** seeks damages from marital community property, jointly held property or property transferred from an **Insured Person** to such **Insured Person's** spouse or **Domestic Partner**. No coverage is provided for any act, error or omission of an estate, heir, legal representative, assign, spouse or **Domestic Partner**. All terms and conditions of this Policy, including without limitation the Retention, applicable to **Loss** incurred by an **Insured Person** shall also apply to loss incurred by such estates, heirs, legal representatives, assigns, spouses and **Domestic Partners**.

## XIII.    NO ACTION AGAINST INSURER

1.  No action shall be taken against the Insurer unless, as a condition precedent, there shall have been full compliance with all the provisions of this Policy

2.  No person or organization shall have any right under this Policy to join the Insurer as a party to any **Claim** against an **Insured** to determine such **Insured's** liability, nor shall the Insurer be impleaded by an **Insured** or their legal representatives in any such **Claim**.

## XIV.    ASSIGNMENT OF INTEREST

Assignment of interest under this Policy shall not bind the Insurer unless the Insurer's consent to such assignment is endorsed to this Policy.

## XV.    NEW AND EXISTING SUBSIDIARIES OR PLANS

1.  If, after the effective date of this Policy the **Insured Entity** first has **Management Control** of any entity other than a partnership, then such entity and any subsidiaries, plans, directors, officers, trustees or employees of such entity who otherwise would thereby become an **Insured** shall be covered under this Policy, subject to its terms and conditions. However, if the total assets of such entities (as reflected in the most recent audited consolidated financial statements of such entity and the **Insured Entity**) exceed twenty-five percent (25%) of

© CNA  All Rights Reserved.

**Exhibit 1**



**FIDUCIARY LIABILITY SOLUTIONS**

the combined total assets of all **Insured Entities**, as of the inception date of this Policy, then such entity shall be insured under this Policy for a period of 60 days from the effective date of **Management Control** or until the termination of this Policy, whichever is earlier. Coverage shall continue beyond such 60 day period only if the Insurer, at its sole option upon submission of such information as the Insurer may require, and payment of any additional premium or amendment of the provisions of the Policy, agrees to provide coverage for such subsidiaries, plans, directors, officers, trustees or employees.

2. There shall be no coverage under this Policy:

   a. for any **Wrongful Act** by or on behalf of any **Subsidiary** whether such **Subsidiary** qualified as such prior to the inception date of the Policy, or after the inception date of this Policy by virtue of paragraph 1 above, or by **Insured Persons** of any such **Subsidiary**, where such **Wrongful Act** occurred in whole or in part before the date an **Insured Entity** first had **Management Control**; or

   b. for any **Wrongful Act** occurring on or after the date an **Insured Entity** first had **Management Control** of any **Subsidiary**, which, together with any **Wrongful Acts** described in paragraph 2.a. above, would be considered **Interrelated Wrongful Acts**.

## XVI.    CHANGE OF STATUS OF INSUREDS

1. **Takeover** of the **Named Insured**

   In the event of a **Takeover**, coverage under this Policy shall continue until this Policy is otherwise terminated, but only with respect to **Claims** for **Wrongful Acts** occurring, or **Voluntary Compliance Programs** noticed to the Insurer, before the effective date of the **Takeover**. This Policy may not be canceled after the effective date of the **Takeover** and the entire premium for this Policy shall be deemed earned as of such effective date.

   If the Insurer is notified in writing of the **Takeover** prior to the **Takeover** effective date, it will offer to extend the Policy beyond its expiration date for **Claims** first made or deemed to be first made during such extension for **Wrongful Acts** committed, or **Voluntary Compliance Programs** noticed to the Insurer, before the effective date of such **Takeover**. The Insurer shall offer such extension pursuant to such terms, conditions and exclusions and additional premium as the Insurer may reasonably decide.  Such extension may not be canceled after its effective date and the entire premium for it shall be deemed earned as of such effective date. There is no separate or additional Limit of Liability for any such extension. If the **Named Insured** accepts this extension, Section VII., Extended Reporting Period, is deleted in its entirety.

2. Cessation of **Subsidiary**

   If any organization ceases to be a **Subsidiary**, coverage under this Policy shall continue until this Policy is otherwise terminated, but only with respect to **Claims** for **Wrongful Acts** occurring, or **Voluntary Compliance Programs** noticed to the Insurer, before the effective date of such cessation, unless (i) the Insurer is notified in writing of such cessation prior to the effective date thereof and agrees in writing to provide coverage for **Wrongful Acts** occurring, or **Voluntary Compliance Programs** noticed to the Insurer, on or after such effective date, and (ii) an **Insured Entity** accepts any special terms, conditions and exclusions and pays any additional premium charge required by the Insurer.

3. Sale or Termination of the **Plan**

   If an **Insured Entity** sells, spins-off, transfers or terminates a **Plan** before or after the inception date of this Policy, coverage with respect to such **Plan** shall only apply with respect to **Claims** for **Wrongful Acts** committed, attempted, or allegedly committed or attempted prior to the date the **Plan** was sold, spun-off, transferred or terminated or prior to the date that the **Insured Entity** or **Insured Person** ceases to be a fiduciary or **Administrator** of a sold, spun-off, transferred or terminated **Plan**.

## XVII.    ASSISTANCE AND COOPERATION

Each **Insured** shall give the Insurer full cooperation and, without any waiver of privilege or confidentiality, shall furnish the Insurer with copies of reports, investigations, pleadings and all related papers, and such other information, assistance and cooperation as the Insurer may reasonably request. The **Insureds** shall do nothing that in any way increases the Insurer's exposure under this Policy or in any way prejudices the Insurer's potential or actual rights of recovery.  The failure of any **Insured Person** to give the Insurer cooperation and information as required hereunder shall not impair the rights of any other **Insured Person** under this Policy.

© CNA  All Rights Reserved.

**Exhibit 1**



**FIDUCIARY LIABILITY SOLUTIONS**

If the amount of any covered **Loss** or **Voluntary Compliance Costs** which are otherwise due and owing by the Insurer under this Policy exceeds the then-remaining Limit of Liability of this Policy, the Insurer shall pay such **Loss** or **Voluntary Compliance Costs** (subject to such Limit of Liability) in the following priority:

1. first, the Insurer shall pay such amounts on behalf of any **Insured Person**; and

2. then, only after payment has been made pursuant to paragraph 1. above, the Insurer shall pay such amounts on behalf of any **Plan**; and

3. then, only after payment has been made pursuant to paragraph 1. and 2. above, the Insurer shall pay such amounts on behalf of any **Insured Entity**.

The bankruptcy or insolvency of any **Insured Entity** or any **Insured Person** shall not relieve the Insurer of any of its obligations to prioritize payment of covered **Loss** under this Policy pursuant to this Section.

## XXV. HEADINGS

The descriptions in the headings of this Policy are solely for convenience, and form no part of the terms and conditions of coverage.

## XXVI. VALUATION

All premiums, limits, retentions, **Loss**, **Voluntary Compliance Costs** and other amounts under this Policy are expressed and payable in United States of America currency. If any judgment, settlement or any part of **Loss** or **Voluntary Compliance Costs** is expressed or calculated in any other currency, payment of such **Loss** or **Voluntary Compliance Costs** due under this Policy will be made in the currency of the United States of America, at the rate of exchange published in The Wall Street Journal on the date the Insurer's obligation to pay such **Loss** or **Voluntary Compliance Costs** is established, or, if not published on that date, on the date of next publication.

## XXVII. TRADE AND ECONOMIC SANCTIONS

This Policy does not provide coverage for an **Insured**, transaction or that part of **Loss** that is uninsurable under the laws or regulations of the United States concerning trade or economic sanctions.

IN WITNESS WHEREOF, the Insurer has caused this Policy to be executed by its Chairman and Secretary, but this Policy shall not be binding upon the Insurer unless completed by the attachment of the Declarations.

Chairman                                    Secretary



**AMEND PRIOR NOTICE EXCLUSION**

It is understood and agreed that the Section entitled **EXCLUSIONS**, the exclusion entitled **Prior Notice** is deleted in its entirety and replaced as follows:

based upon or arising out of:

a.  any **Wrongful Act** or any matter, fact, circumstance, situation, transaction, or event notice of which was given by the **Insured** and accepted by an insurer under a prior fiduciary liability policy of which this Policy is a direct or indirect renewal or replacement; or

b.  any other **Wrongful Act** whenever occurring, which, together with a **Wrongful Act** described in a. above, would constitute **Interrelated Wrongful Acts**;

All other terms and conditions of the Policy remain unchanged.

This endorsement, which forms a part of and is for attachment to the Policy issued by the designated Insurers, takes effect on the effective date of said Policy at the hour stated in said Policy, unless another effective date is shown below, and expires concurrently with said Policy.

---

CNA78173XX (3-14)
Page 1
Continental Casualty Company
Insured Name: John P. Morrison MD LLC

Policy No:   596433932
Endorsement No:   1
Effective Date:   11/01/2023

© CNA  All Rights Reserved.

**Exhibit 1**



**STATE AMENDATORY INCONSISTENT**

It is understood and agreed that in the event there is an inconsistency between a state amendatory endorsement attached to this Policy and any term or condition of this Policy, then, where permitted by law, the Insurer shall apply those terms and conditions of either the amendatory endorsement or the Policy which are more favorable to the **Insured**.

All other terms and conditions of the Policy remain unchanged.

This endorsement, which forms a part of and is for attachment to the Policy issued by the designated Insurers, takes effect on the effective date of said Policy at the hour stated in said Policy, unless another effective date is shown below, and expires concurrently with said Policy.

CNA78150XX (3-14)                                                    Policy No:    596433932
Page 1                                                              Endorsement No:  2
Continental Casualty Company                                         Effective Date:  11/01/2023
Insured Name: Jackson Morris Obianyo MD LLC

© CNA  All Rights Reserved.

**Exhibit 1**



**AMENDATORY ENDORSEMENT – MISSOURI**

It is understood and agreed that the Policy is amended to add the following to this Policy:

If you have any questions regarding this Policy please call 1-312-822-5000, located at 151 North Franklin Street, Chicago, IL 60606 for assistance.

All other terms and conditions of the Policy remain unchanged.

This endorsement, which forms a part of and is for attachment to the Policy issued by the designated Insurers, takes effect on the effective date of said Policy at the hour stated in said Policy, unless another effective date is shown below, and expires concurrently with said Policy.

CNA78446MO (4-14)
Page 1
Continental Casualty Company
Insured Name: Carolyn Morrison, MD LLC

Policy No: 596433932
Endorsement No: 3
Effective Date: 11/01/2023

© CNA  All Rights Reserved.

**Exhibit 1**

Electronically Filed - Greene - August 15, 2025 - 04:04 PM



**AMENDMENT TO EXTENDED REPORTING PERIOD VARIOUS OPTIONS ENDORSEMENT - MISSOURI**

It is understood and agreed that the Section entitled **EXTENDED REPORTING PERIOD**, the paragraph entitled **Optional Extended Reporting Period** is deleted in its entirety and replaced with the following:

**Optional Extended Reporting Period**

If the **Named Insured** cancels or if the Insurer or the **Named Insured** non-renews this Policy, the **Named Insured** shall have the right to purchase, upon payment of the respective additional premium listed below, an extension of this Policy in which to report **Claims** first made or deemed to be first made during one of the periods listed below, but only to the extent that such **Claims** are for **Wrongful Acts** committed before the earlier of the end of the **Policy Period** or the effective date of any **Takeover**.

**EXTENDED REPORTING PERIOD OPTIONS AND ADDITIONAL PREMIUM CHARGES**

1 year - 125% of Annual Premium

3 years - 150% of Annual Premium

6 years - 175% of Annual Premium

All other terms and conditions of the Policy remain unchanged.

---

This endorsement, which forms a part of and is for attachment to the Policy issued by the designated Insurers, takes effect on the effective date of said Policy at the hour stated in said Policy, unless another effective date is shown below, and expires concurrently with said Policy.

---

CNA78190MO (4-14)
Page 1
Continental Casualty Company
Insured Name: Jackson Morris Foods MO LLC

Policy No:      596433932
Endorsement No:   4
Effective Date:   11/01/2023

© CNA  All Rights Reserved.

**Exhibit 1**



**NO RETENTION FOR VOLUNTARY COMPLIANCE COSTS ENDORSEMENT**

It is understood and agreed that no Retention applies with respect to **Voluntary Compliance Costs**.

All other terms and conditions of the Policy remain unchanged.

This endorsement, which forms a part of and is for attachment to the Policy issued by the designated Insurers, takes effect on the effective date of said Policy at the hour stated in said Policy, unless another effective date is shown below, and expires concurrently with said Policy.

CNA83296XX (8-15)                                                                    Policy No:    596433932
Page 1                                                                          Endorsement No:   5
Continental Casualty Company                                                    Effective Date:  11/01/2023
Insured Name: Peachtree Providers MD LLC

© CNA  All Rights Reserved.

**Exhibit 1**



**PRIOR OR PENDING DATE APPLICABLE TO INCREASED LIMITS ENDORSEMENT**

It is understood and agreed that the Section entitled **LIMIT OF LIABILITY/RETENTION/PRESUMPTIVE INDEMNIFICATION**, the paragraph entitled **Aggregate Limit of Liability** is amended to add the following:

- $5,000,000 shall be the maximum Limit of Liability available for all covered **Claims** made against the **Insureds** based upon, directly or indirectly arising out of, or in any way involving any civil, criminal, administrative or regulatory proceeding, investigation or arbitration pending after the Prior or Pending Date in the Declarations, but before 8/1/2016.

- Such Limit of Liability shall be part of, and not in addition to, the Limit of Liability set forth in the Declarations, and in no way shall this increase the Insurer's maximum Limit of Liability under the Policy.

All other terms and conditions of the Policy remain unchanged.

This endorsement, which forms a part of and is for attachment to the Policy issued by the designated Insurers, takes effect on the effective date of said Policy at the hour stated in said Policy, unless another effective date is shown below, and expires concurrently with said Policy.

---

CNA78182XX (3-14)
Page 1
Continental Casualty Company
Insured Name: Jackson Morris Food LLC

Policy No: 596433932
Endorsement No: 6
Effective Date: 11/01/2023

© CNA  All Rights Reserved.

**Exhibit 1**

Electronically Filed - Greene - August 15, 2025 - 04:04 PM



Electronically Filed - Greene - August 15, 2025 - 04:04 PM

CNA

# ADDITIONAL SUBSIDIARY ENDORSEMENT
# (PRIOR OR PENDING DATE)

It is understood and agreed that the section entitled **DEFINITIONS**, the definition of **Subsidiary** is amended by the addition of the following:

**Subsidiary** also means the following entities listed below; provided, however, that the Prior or Pending Date set forth in the Declarations is amended as set forth below with respect to such **Subsidiary** and its **Insured Persons**:

| **Name of Entity:** | **Prior or Pending Date:** |
|---|---|
| Cabela's Incorporated | 09/25/2018 |
| Floridian Holdings, LLC | 11/01/2021 |
| Ozark Mill, LLC | 11/01/2021 |
| American Sportsman Realty Holdings, LLC | 11/01/2021 |

All other terms and conditions of the Policy remain unchanged.

This endorsement, which forms a part of and is for attachment to the Policy issued by the designated Insurers, takes effect on the effective date of said Policy at the hour stated in said Policy, unless another effective date is shown below, and expires concurrently with said Policy.

© CNA All Rights Reserved.



**AMEND DEFINITION OF APPLICATION ENDORSEMENT**

It is understood and agreed that the section entitled **DEFINITIONS** is amended to delete the definition of **Application** and replace it with the following:

> **Application** means all signed applications, any attachments to such applications, other materials submitted therewith or incorporated therein, and any other documents submitted in connection with the underwriting of this Policy.

All other terms and conditions of the Policy remain unchanged.

---

This endorsement, which forms a part of and is for attachment to the Policy issued by the designated Insurers, takes effect on the effective date of said Policy at the hour stated in said Policy, unless another effective date is shown below, and expires concurrently with said Policy.

---

CNA78154XX (3-14)                                                          Policy No:      596433932
Page 1                                                                     Endorsement No:   8
Continental Casualty Company                                               Effective Date:  11/01/2023
Insured Name:

© CNA  All Rights Reserved.

**Exhibit 1**



**AMEND INSURER'S RIGHT TO CANCEL ENDORSEMENT**
**(20 DAYS' NOTICE PROVISION)**

It is understood and agreed that the Section entitled **CANCELLATION**, the paragraph entitled **Insurer's Right to Cancel** is deleted in its entirety and replaced with the following:

**Insurer's Right to Cancel**

The Insurer shall not cancel this Policy except for non-payment of any premium when due. The Insurer shall provide to the **Named Insured** written notice of such cancellation stating when, not less than 20 days thereafter, such cancellation shall be effective.

All other terms and conditions of the Policy remain unchanged.

This endorsement, which forms a part of and is for attachment to the Policy issued by the designated Insurers, takes effect on the effective date of said Policy at the hour stated in said Policy, unless another effective date is shown below, and expires concurrently with said Policy.

CNA78193XX (3-14)
Page 1
Continental Casualty Company
Insured Name: Johnson Morris GQ2750 MD LLC

Policy No: 596433932
Endorsement No: 9
Effective Date: 11/01/2023

Case 6:25-cv-09275-MDH    Document 1-1    Filed 09/25/25    Page 46 of 166
© CNA  All Rights Reserved.
**Exhibit 1**

Electronically Filed - Greene - August 15, 2025 - 04:04 PM

Electronically Filed - Greene - August 15, 2025 - 04:04 PM



**AMEND CLAIM ENDORSEMENT**
**(INTERNAL APPEAL)**

In consideration of the premium, the Policy is amended as follows:

I.    Section II, Definitions is amended as follows:

    A.    The definition of **Claim** is amended to add the following:

        **Claim** also includes an **Internal Appeal**, which will be deemed made on the date which it is first reported to the Insurer.

    B.    The following definitions are added:

        **Internal Appeal** means an appeal of an adverse benefits determination by an **Insured** provided such appeal process is in compliance with 29 C.F.R. Section 2560.503-1(h) or similar claim procedures mandated by law. Notwithstanding anything to the contrary in the Policy, an **Internal Appeal** does not require an allegation of a **Wrongful Act**.

        **Litigated Matter** means any civil, criminal or arbitration proceeding for monetary or non-monetary relief (including injunctive relief) which is commenced by the service of complaint or similar pleading in a civil proceeding or a return of indictment, information, or similar document in a criminal proceeding.

II.    Solely with respect the coverage afforded by the endorsement, paragraph 1, Notice of Claim of Section VI, Notice of Claim/Circumstance and Interrelated Claim Clause is amended to add the following:

        Notwithstanding the above paragraph and solely with respect to an **Internal Appeal**, it is within the **Insured's** sole discretion to request coverage for an **Internal Appeal**. In the event that that the **Insured** seeks coverage for an **Internal Appeal**, the **Insured** will be obligated to provide written notice to the Insurer of such **Internal Appeal**, within the time period prescribed by this Section VI for all other **Claims**, after the earliest of the following events occurring: (i) such **Internal Appeal** becomes a **Litigated Matter**; (ii) any investment loss within a **Plan** is alleged; or (iii) any **Insured** has incurred any **Loss** including **Defense Costs** for which coverage is being sought.

All other terms and conditions of the Policy remain unchanged.

---

This endorsement, which forms a part of and is for attachment to the Policy issued by the designated Insurers, takes effect on the effective date of said Policy at the hour stated in said Policy, unless another effective date is shown below, and expires concurrently with said Policy.

---

CNA92116XX (4-19)
Page 1
Continental Casualty Company
Insured Name: Jackson & Morris PC/Jackson MD LLC

Policy No:    596433932
Endorsement No:    10
Effective Date:    11/01/2023

Case 6:25-cv-03275-MDH    Document 1-1    Filed 09/25/25    Page 47 of 166
© CNA  All Rights Reserved.

**Exhibit 1**



**AMEND CLAIM ENDORSEMENT**
**(FACT FINDING INVESTIGATION)**

In consideration of the premium, the Policy is amended as follows:

I.        Section II, Definitions is amended as follows:

        A.        The definition of **Claim** is amended as follows:

                1.        Paragraph 2 is deleted.

                2.        The following is added:

                        **Claim** also includes a **Fact Finding Investigation**, which will be deemed first made upon the date of receipt by any **Insured** of written notice from the investigating authority identifying the **Insured** as an individual or entity against whom a proceeding may be commenced.

        B.        The following definitions are added:

                **Fact Finding Investigation** means a fact finding investigation by the U.S. Department of Labor or the U.S. Pension Benefit Guaranty Corporation, or any similar governmental authority located outside the United States. Notwithstanding anything to the contrary in the Policy, a **Fact Finding Investigation** does not require an allegation of a **Wrongful Act**.

                **Litigated Matter** means any civil, criminal or arbitration proceeding for monetary or non-monetary relief (including injunctive relief) which is commenced by the service of complaint or similar pleading in a civil proceeding or a return of indictment, information, or similar document in a criminal proceeding.

II.      Solely with respect the coverage afforded by the endorsement, paragraph 1, Notice of Claim of Section VI, Notice of Claim/Circumstance and Interrelated Claim Clause is amended to add the following:

        Notwithstanding the above paragraph and solely with respect to a **Fact Finding Investigation**, it is within the **Insured's** sole discretion to request coverage for a **Fact Finding Investigation**. In the event that that the **Insured** seeks coverage for a **Fact Finding Investigation**, the **Insured** will be obligated to provide written notice to the Insurer of such **Fact Finding Investigation**, within the time period prescribed by this Section VI for all other **Claims**, after the earliest of the following events occurring: (i) such **Fact Finding Investigation** becomes a **Litigated Matter**; (ii) any **Insured** has incurred **Loss** including **Defense Costs** for which coverage is being sought; or (iii) a **Wrongful Act** is alleged by the investigating authority.

All other terms and conditions of the Policy remain unchanged.

---

This endorsement, which forms a part of and is for attachment to the Policy issued by the designated Insurers, takes effect on the effective date of said Policy at the hour stated in said Policy, unless another effective date is shown below, and expires concurrently with said Policy.

---

CNA92117XX (4-19)  
Page 1  
Continental Casualty Company  
Insured Name: Jackson 25 Morris OQ250-MDHC      Policy No: 596433932  
Endorsement No: 11  
Effective Date: 11/01/2023

© CNA All rights Reserved.

**Exhibit 1**



**AMEND APPLICATION SECTION TO BAR COVERAGE AND MAKE NON-RESCINDABLE ENDORSEMENT**

It is understood and agreed that the section entitled **APPLICATION** is deleted in its entirety and is replaced with the following:

**APPLICATION**

The **Application** shall be considered as a separate application for each **Insured Person**. The Insurer has relied on the accuracy and completeness of the statements, information and representations contained in the **Application**. All such statements, information and representations are the basis of this Policy and are to be considered as incorporated into and constituting a part of this Policy.

If the statements, information or representations in the **Application** were not accurate and complete, and such inaccuracy or incomplete disclosure materially affected either the acceptance of the risk or the hazard assumed by the Insurer under the Policy, then the Insurer shall not be liable to make any payment for **Loss** in connection with any **Claim** or for **Voluntary Compliance Costs** in connection with any **Voluntary Compliance Program** based upon, arising out of or in consequence of the facts that were not accurately or completely disclosed in the **Application**:

1.    with respect to any **Insured Persons** who knew of such misrepresentation or omission. Such knowledge shall not be imputed to any other **Insured Persons**;

2.    with respect to any **Insured Entity** or **Plan** to the extent it indemnifies an **Insured Person** who knew as of the effective date of this Policy the facts that were misrepresented or omitted; and

3.    with respect to any **Insured Entity** or **Plan** if the Chief Executive Officer, Chief Financial Officer or General Counsel of the **Named Insured** or the individual who signed the **Application** knew as of the effective date of the Policy the facts that were misrepresented or omitted.

The Insurer shall not be entitled under any circumstances to void or rescind this Policy with respect to any **Insured**.

All other terms and conditions of the Policy remain unchanged.

This endorsement, which forms a part of and is for attachment to the Policy issued by the designated Insurers, takes effect on the effective date of said Policy at the hour stated in said Policy, unless another effective date is shown below, and expires concurrently with said Policy.



CNA92154XX (5-18)
Page 1
Continental Casualty Company
Insured Name: Jackson Morris Group MD LLC

Policy No:    596433932
Endorsement No:   12
Effective Date:   11/01/2023

Case 1:25-cv-00275-MOC   Document 1-1   Filed 09/25/25   Page 49 of 166
© CNA  All Rights Reserved.

Exhibit 1

Electronically Filed - Greene - August 15, 2025 - 04:04 PM



**AMEND LOSS ENDORSEMENT**
**(RETENTION)**

In consideration of the premium, it is understood that Paragraph 2 in the definition of **Loss** in Section II, Definitions of the Policy is amended by adding the following to the subparagraph that begins with "provided, however with respect to c. through g., above":

    iii.      notwithstanding anything to the contrary in this Policy, no retention shall apply to such **Loss**.

All other terms and conditions of the Policy remain unchanged.

---

This endorsement, which forms a part of and is for attachment to the Policy issued by the designated Insurers, takes effect on the effective date of said Policy at the hour stated in said Policy, unless another effective date is shown below, and expires concurrently with said Policy.

---

CNA92133XX (5-18)                                       Policy No:    596433932
Page 1                                              Endorsement No:  13
Continental Casualty Company                          Effective Date:   11/01/2023
Insured Name: Zachary Morris Johnson LLC

© CNA All Rights Reserved.

**Exhibit 1**



Electronically Filed - Greene - August 15, 2025 - 04:04 PM

**HEALTHCARE EXCHANGE ENDORSEMENT**

In consideration of the premium, it is understood that Section II, Definitions of the Policy is amended as follows:

1.      The definition of **Wrongful Act** is deleted and replaced with the following:

        **Wrongful Act** means:

        1.      any actual or alleged act, error, or omission by the **Insured**:

            a.      in the **Insured's** performance of fiduciary duties for a **Plan**, including, but not limited to, a breach of duty imposed upon the **Insured** by **ERISA or any Similar Act**;

            b.      solely in the **Insured's** capacity as an **Administrator**;

            c.      solely in the **Insured's** capacity as a settlor of a **Plan**; or

            d.      committed or attempted in connection with the purchase of insurance through a **Healthcare Exchange**;

        2.      any matter claimed against an **Insured** solely by reason of his, her or its status as a fiduciary of a **Plan**.

II.     The following definition is included:

        **Healthcare Exchange** means any public, private, or government sponsored entity set up to facilitate the purchase of health insurance.

All other terms and conditions of the Policy remain unchanged.

> This endorsement, which forms a part of and is for attachment to the Policy issued by the designated Insurers, takes effect on the effective date of said Policy at the hour stated in said Policy, unless another effective date is shown below, and expires concurrently with said Policy.

CNA92126XX (11-18)
Page 1
Continental Casualty Company
Insured Name: Jordan B Morris DO PC LLC

Policy No: 596433932
Endorsement No:  14
Effective Date:  11/01/2023

Case 6:25-cv-03205-MDH     Document 1-1     Filed 09/25/25     Page 51 of 166
© CNA  All Rights Reserved.

Exhibit 1



**MASS OR CLASS OR COLLECTIVE ACTION RETENTION ENDORSEMENT**

In consideration of the premium, the Policy is amended as follows:

I.      Section II, Definitions is amended to include the following definition:

**Mass or Class Action Claim** means a **Claim** brought:

(i)     by or on behalf of five (5) or more natural persons litigating on behalf of a group of similarly situated persons, whether or not such natural persons are represented by one or more legal counsel;

(ii)    by one (1) person or group of persons seeking certification as a class or collective action under any foreign, federal or state law, regulation or procedural rule;

(iii)   by a government entity, department or agency seeking to enforce and/or investigate ERISA requirements on behalf of a class or group of complainants.

II.     Paragraph 2, Retention, Section IV, Limit of Liability/Retention/Presumptive Indemnification is amended to include the following paragraph:

A separate Retention of $1,500,000 will apply to each **Mass or Class Action Claim**.

All other terms and conditions of the Policy remain unchanged.

> This endorsement, which forms a part of and is for attachment to the Policy issued by the designated Insurers, takes effect on the effective date of said Policy at the hour stated in said Policy, unless another effective date is shown below, and expires concurrently with said Policy.

© CNA  All Rights Reserved.

**Exhibit 1**

Electronically Filed - Greene - August 15, 2025 - 04:04 PM

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION**

| | |
|---|---|
| NORA RUIZ, individually and on behalf of all others similarly situated, | |
| **Plaintiff,** | Case No. |
| v. | |
| BASS PRO GROUP LLC, and BPS DIRECT LLC, d/b/a BASS PRO SHOPS, | Jury Trial Demanded |
| **Defendants.** | |

## CLASS ACTION COMPLAINT

Plaintiff Nora Ruiz ("Plaintiff") brings this class action complaint against Bass Pro Group LLC and BPS Direct LLC, both doing business as Bass Pro Shops ("Bass Pro" or "Defendants"), on behalf of herself and all others similarly situated. Plaintiff makes the following allegations based upon personal knowledge as to her own actions and upon information and belief as to all other matters.

## NATURE OF THE ACTION

1. Bass Pro is an outdoor and sporting goods retailer operating throughout the United States and having more than 40,000 employees. It operates its stores, restaurants, and resorts and conducts business under various trade names, including but not limited to Bass Pro Shops, Cabela's, White River Marine Group, Tracker Marine Group, Tracker Marine Boating Center, Fishing Holdings, and Big Cedar Lodge.

2. Upon information and belief, all regular employees and eligible dependents can receive health insurance coverage by participating in a medical plan sponsored and administered by Bass Pro. These medical plans operate under the plan name Bass Pro Group LLC Health and Welfare Benefit Plans (hereafter "the Plan").

**Exhibit 2**

3.     For those employees and their dependents to participate in the Plan, they must declare whether they are a tobacco user.  Those who do use tobacco products are required to pay an additional fee of $40 per week—or $2,080 per year—to maintain coverage.

4.     Fees of this sort, frequently referred to as "tobacco surcharges", have proliferated in recent years. But to be legal, they must strictly comply with the terms of the Employee Retirement Income Security Act (ERISA), applied to medical plans by the Patient Protection and Affordable Care Act, and implementing regulations. Bass Pro did not do so, and therefore collected the tobacco surcharge in violation of the law and in violation of its duties to plan participants and the Plan.

5.     More specifically, ERISA's anti-discrimination provisions prohibit any medical plan from charging an extra premium or fee based on any health status related factor, including tobacco use, unless that fee is part of a *bona fide* "wellness program". And to qualify as a compliant wellness program, a company must offer a "reasonable alternative standard", usually in the form of a smoking/tobacco cessation program, completion of which allows participants to avoid the surcharge.

6.     Although Bass Pro encouraged its tobacco-using employees to complete a tobacco cessation program called Quit for Life, the completion of that program did not result in the surcharge being removed. Instead, a tobacco user could only avoid the surcharge if the participant ceased using tobacco products and then stayed tobacco-free for 90 days. As such, the company simply did not provide any alternative standard to its participants; instead, it required participants to meet the original standard—not being a tobacco user.  Bass Pro's decision to charge a discriminatory fee without offering any form of a reasonable alternative standard is a plain violation of ERISA.

7.     Additionally, even if offering a tobacco cessation program that required the tobacco user to be tobacco free could constitute a reasonable alternative standard (it cannot), a compliant wellness program's reasonable alternative standard must allow participants to receive the program's "full reward"; that is, avoid the surcharge for the entire plan year upon completion of

the alternative standard, and must provide notice that such an alternative program exists in every communication regarding the surcharge. This notice must also include a statement that recommendations of an individual's personal physician in formulating a reasonable alternative standard will be accommodated.

8.      But a Bass Pro plan participant who ceased tobacco use would only be eligible to avoid the surcharge on a going-forward basis, and thus could not earn the "full reward"—*i.e.*, avoiding the surcharge for the entire plan year. Further, Bass Pro's plan materials used for communicating information about the surcharge with participants make no mention of an opportunity to earn the full reward for the entire plan year by completing a reasonable alternative standard. And those materials do not include a disclosure that the recommendations of an individual's personal physician would be accommodated. Thus, the surcharge violates ERISA's anti-discrimination requirements, and its collection by Bass Pro was and remains unlawful.

9.      Nora Ruiz is a regular, full-time Bass Pro employee working as an outfitter support specialist who was required to pay the illegal tobacco surcharge to maintain health insurance coverage. She brings this lawsuit on behalf of herself and all similarly situated plan participants and beneficiaries, seeking to have these unlawful fees returned, and for plan-wide relief under 29 U.S.C. § 1109.

## PARTIES, JURISDICTION, AND VENUE

10.     Plaintiff Nora Ruiz is a citizen of the state of Missouri. At all times relevant to this suit, she has been employed by Bass Pro within the State of Missouri and has paid the Plan's premiums and tobacco surcharge within the State of Missouri.

11.     Defendant Bass Pro Group LLC is a limited liability company conducting business under the name Bass Pro Shops. It is organized under the laws of the State of Delaware and has its principal place of business in Springfield, Greene County, Missouri.

12.     Defendant BPS Direct LLC is a limited liability company conducting business under the name Bass Pro Shops. It is organized under the laws of the State of Delaware and has its principal place of business in Springfield, Greene County, Missouri.

3

**Exhibit 2**

13.     At all times relevant to this lawsuit, Defendants operated the Bass Pro Group LLC Health and Welfare Benefit Plans (hereafter "the Plan"), which were available for Bass Pro employees and their dependents. The Plan is an employee benefit plan subject to the provisions and statutory requirements of ERISA pursuant to 29 U.S.C. § 1003(a).

14.     Plaintiff is a participant in the Plan pursuant to 29 U.S.C. § 1102(7).

15.     This Court possesses subject matter jurisdiction pursuant to 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331, as this suit seeks relief under ERISA, a federal statute. This Court also possesses subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a proposed class action in which: (1) there are at least 100 class members; (2) the amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (3) Defendants and at least one class member are citizens of different states, and/or are a citizen or subject of a foreign state, and at least one class member is a citizen of a state.

16.     This Court possesses personal jurisdiction over Defendants in this case because their principal place of business is in Missouri and are thus "at home" within the state. Additionally, the claims of Plaintiff and all others similarly situated arise from the acts and omissions of Defendants with respect to their activities and conduct concerning Plaintiff within the state of Missouri, and Defendants have purposefully availed themselves of the privilege of conducting business within the state of Missouri. Further, ERISA authorizes nationwide service of process. 29 U.S.C. § 1132(e)(2).

17.     Venue is proper in this District under 29 U.S.C. § 1132(e)(2) because this is the District where Defendants administer and sponsor the Plan and where Defendants' unlawful acts occurred.

<u>FACTUAL ALLEGATIONS</u>

a.  **Bass Pro's Tobacco Surcharge is a *Prima Facie* Violation of ERISA's Anti-Discrimination Rule.**

18.     As a baseline rule, and to broaden access to affordable health insurance coverage, the Patient Protection and Affordable Care Act amended ERISA to prohibit any health insurer or

**Exhibit 2**

medical plan from discriminating against any participant in providing coverage or charging premiums based on a "health status-related factor", including the use of tobacco. Pursuant to this rule, a plan "may not require any individual (as a condition of enrollment or continued enrollment under the plan) to pay a premium or contribution which is greater than such premium or contribution for a similarly situated individual enrolled in the plan on the basis of any health status-related factor in relation to the individual or to an individual enrolled under the plan as a dependent of the individual." 29 U.S.C. § 1182(b)(1); 42 U.S.C. § 300gg-4(b)(1).

19.     On its face, Bass Pro's tobacco surcharge violates this provision. Plaintiff and all others similarly situated were, for plan years 2023 and earlier required to pay an additional "premium or contribution" of $30 per week, or $1,560 per year, based on a "health status-related factor", that being their use of tobacco products. For plan year 2024, that additional charge was raised to $40 per week, or $2,080 per year.

20.     Specifically, at all times relevant to this lawsuit, pursuant to Bass Pro's enrollment rules for the Plan, any employee or covered dependent who used use any form of tobacco or vaping products were required to declare themselves to be tobacco users as part of the enrollment process and were subsequently required to pay the tobacco surcharge to maintain coverage.

21.     Payment of the tobacco surcharge was required for Plaintiff and all others similarly situated to remain insured under the Plan. Plaintiff and all others similarly situated have in fact paid the surcharge.

22.     Bass Pro is and has been required to make contributions to the Plan to ensure that it remains adequately funded. By collecting the tobacco surcharge, Bass Pro has reduced the amount of its own contributions, thereby increasing its profits.

23.     At all times relevant to this lawsuit, Bass Pro has maintained sole control of the tobacco surcharge program, including by determining which participants are required to pay the surcharge, withholding participants' funds from their paychecks to pay the surcharge, and determining which employees (if any) are reimbursed for their payment of the tobacco surcharge.

5

**Exhibit 2**

b. **Bass Pro Cannot Avail Itself to ERISA's Safe Harbor for Wellness Programs.**

24.     As an exception to its anti-discrimination rule, ERISA carves out protection for "programs of health promotion and disease prevention", also known as "wellness programs." 29 U.S.C. § 1182(b)(2)(B); 42 U.S.C. § 300gg-4(b)(2)(B).

25.     But to qualify as a lawful wellness program, a plan must fully comply with a set of statutory and regulatory requirements. Those requirements concern (1) the frequency of the opportunity for a participant to qualify for the reward; (2) the size of the reward; (3) reasonable design of the program; (4) uniform availability and reasonable alternative standards; and (5) notice of the availability of a reasonable alternative standard. 29 C.F.R. § 2590.702(f). These regulations "set forth criteria for an *affirmative defense* that can be used by plans and issuers in response to a claim that the plan or issuer discriminated under the [] nondiscrimination provisions." *Incentives for Nondiscriminatory Wellness Programs in Group Health Plans*, 78 Fed. Reg. 33158 at 33160 (June 3, 2013) (emphasis added). Every one of the requirements "must be satisfied in order for the plan or issuer to qualify for an exception to the prohibition on discrimination based on health status." *Id.*

26.     Bass Pro's tobacco surcharge program did not and does not satisfy the requirements that it provide a reasonable alternative standard, nor does it provide notice of a reasonable alternative standard. As a result, it cannot meet each element of its affirmative defense.

27.     Consequently, Bass Pro is not entitled to safe harbor protection for operating a compliant wellness program and its assessment of its tobacco surcharge constitutes unlawful discrimination based on a health status-related factor.

c. **Bass Pro's Tobacco Surcharge Program Did Not Provide for a Reasonable Alternative Standard**

28.     *First,* by law, a tobacco surcharge is an example of an "outcome-based" and "health contingent" wellness program. 78 Fed. Reg. 33158 at 33161 ("An outcome-based wellness program is a type of health-contingent wellness program that requires an individual to attain or maintain a specific health outcome (such as not smoking . . .) in order to obtain a reward."); *see*

*also id*. at 33159 ("Examples of health-contingent wellness programs in the proposed regulations included a program that imposes a premium surcharge based on tobacco use")

29.     To be lawful, such a program must provide for "[u]niform availability and reasonable alternative standards." 29 C.F.R. § 2590.702(f)(4)(iv). "[A] reasonable alternative standard must be provided to all individuals who do not meet the initial standard, to ensure that the program is reasonably designed to improve health and is not a subterfuge for underwriting or reducing benefits based on health status." 78 Fed. Reg. 33158 at 33160.

30.     A common means by which plan administrators attempt to provide a reasonable alternative standard to a tobacco surcharge is to permit participants to avoid the surcharge by completing a tobacco cessation program.

31.     But as the Department of Labor's regulations make clear, a putative alternative that requires the participant to actually quit smoking in order to receive the reward is necessarily not a "reasonable alternative standard." One example offered by the Department states that:

> Example 7—Tobacco use surcharge with alternative program requiring actual cessation. (i) Facts. Same facts as Example 6, except the plan does not provide participant F with the reward in subsequent years **unless F actually stops smoking after participating in the tobacco cessation program**.
>
> (ii) Conclusion. In this Example 7, **the program is not reasonably designed under paragraph (f)(4)(iii) of this section and does not provide a reasonable alternative standard as required under paragraph (f)(4)(iv) of this section**. The plan cannot cease to provide a reasonable alternative standard merely because the participant did not stop smoking after participating in a smoking cessation program.

29 C.F.R. § 2590.702, Example 7 (emphasis added).

32.     Yet actual cessation is precisely what Bass Pro requires. Defendants' Plan materials plainly state that employees and their dependents can remove the surcharge only if they quit smoking for ninety days and remain tobacco-free. Bass Pro's open enrollment benefits guide for plan year 2024 includes the following statements:

- **Tobacco use** — If you or anyone you cover on your Medical plan uses any form of tobacco or vaping products, add $40 per week. You must answer "yes" on the tobacco use question in Workday. You may remove the tobacco use premium differential if all covered members have quit for 90 days and remain tobacco free.

11

## INCREASE IN TOBACCO PREMIUM DIFFERENTIAL

It is well documented that tobacco use contributes to a number of long-term chronic conditions and increasingly costly treatments. We will increase the tobacco use premium differential from $30 to $40 per week beginning January 1, 2024. At the same time, we offer resources to help you quit. Tobacco users who kick the habit for 90 days and remain tobacco free may have the premium differential removed. [See page 11 for more details.]



## Time to quit tobacco?

Resources are available from Vida Health to help you quit at no cost to you. The tobacco use premium differential can be removed if you and any dependents you cover on your Medical plan quit for 90 days and remain tobacco free.

Contact Vida Health at **vida.com/basspro**.

33.     Because Bass Pro did not provide Plan participants with an alternative program by which they could avoid payment of the surcharge, it has failed to meet the requirements for a

8

**Exhibit 2**

"reasonable alternative standard", and consequently cannot avail itself of the safe harbor for wellness programs set out by ERISA.

34.     *Second*, for a putative alternative standard (such as attending a tobacco cessation program) to be deemed "reasonable" under the law, "[t]he full reward under the outcome-based wellness program must be available to all similarly situated individuals." 29 C.F.R. § 2590.702(f)(4)(iv). Thus, a participant who meets the alternative standard must be eligible to avoid the surcharge in its entirety for a given plan year.

35.     The applicable regulatory guidelines state that "while an individual may take some time to request, establish, and satisfy a reasonable alternative standard, the same, full reward must be provided to that individual as is provided to individuals who meet the initial standard for that plan year. (For example, if a calendar year plan offers a health-contingent wellness program with a premium discount and an individual who qualifies for a reasonable alternative standard satisfies that alternative on April 1, *the plan or issuer must provide the premium discounts for January, February, and March to that individual*.) Plans and issuers have flexibility to determine how to provide the portion of the reward corresponding to the period before an alternative was satisfied (e.g., payment for the retroactive period or pro rata over the remainder of the year) as long as the method is reasonable and the *individual receives the full amount of the reward*." 78 Fed. Reg. 33158 at 33163 (emphasis added).

36.     But, upon information and belief, a Bass Pro employee who completed the alternative standard (unlawful as it may be) during a given plan year would not be eligible to avoid the entire $2,080 (or formerly $1,560) tobacco surcharge. Instead, he or she could avoid the surcharge on a going-forward basis only and would not be eligible to receive a reimbursement for surcharge payments already made in that plan year.

37.     Because a Plan participant could not receive a retroactive reimbursement to avoid the tobacco surcharge in its entirety, Bass Pro does not permit participants to receive the "full reward" and therefore does not provide for a "reasonable alternative standard."

**Exhibit 2**

**b. Bass Pro Failed to Provide Notice of Availability of a Reasonable Alternative Standard**

38.     *Third*, to be deemed a lawful wellness program, "[t]he plan or issuer must disclose *in all plan materials describing the terms of an outcome-based wellness program* . . . the availability of a reasonable alternative standard to qualify for the reward." 29 C.F.R. § 2590.702 (emphasis added); 42 U.S.C. § 300gg-4(j)(3)(E). "[A] plan disclosure that references a premium differential based on tobacco use . . . must include this disclosure." 78 Fed. Reg.  33158-01 at 33166.

39.     But Plan materials discussing the tobacco surcharge do not disclose the existence of a reasonable alternative standard by which it can be avoided. Though some of the materials note that a participant may enroll in a tobacco cessation program, they do not disclose that such a program is an alternative standard by which a participant may qualify for the award (that is, avoid the surcharge).

40.     For instance, as alleged *infra*, the 2024 plan year open enrollment guide fails to provide legally adequate notice in that it (1) fails to disclose the existence of a reasonable alternative standard by which a participant may avoid the surcharge; and (2) fails to disclose that a participant who completed the cessation program would be eligible for retroactive reimbursement for surcharge payments made during that plan year.

41.     Other Plan materials are to the same effect. For instance, the employee portal on Bass Pro's website contains the following statement, which references the tobacco surcharge without the availability of a reasonable alternative standard to qualify for the reward.

> **Adopt healthy habits with Rally®**
>
> **Quit tobacco**
>
> If you or a family member enrolled in the Bass Pro medical plan is a tobacco user that's ready to quit, take advantage of Quit For Life®, a smoking cessation program available at no cost to you, as part of your benefits. Join now for personalized support and tools to help you quit tobacco for good, including:
>
> - Nicotine patches or gum to help curb your nicotine cravings.
> - One-on-one coaching from trained experts who understand what you're going through.
> - Print and online tools to help you live tobacco-free.
>
> Complete the program and stay tobacco-free for 90 days and you can stop paying the tobacco surcharge, too. Enroll by calling **1-866-QUIT-4-LIFE (1-866-784-8454)**.
>
> **Learn more at quitnow.net.**

42.    *Fourth*, under the applicable regulations, "[t]he plan or issuer must disclose in all plan materials describing the terms of an activity-only wellness program . . . contact information for obtaining a reasonable alternative standard and a *statement that recommendations of an individual's personal physician will be accommodated*. 29 C.F.R. § 2590.702(f)(4)(v).

43.    The foregoing Plan materials cited *infra* do not include a statement that the recommendations of an individual's physician will be accommodated. Upon information and belief, none of Bass Pro's other written Plan materials referencing the tobacco surcharge include this disclosure either.

44.    Bass Pro, then, has not complied with the requirement that it provide notice of the availability of a reasonable alternative standard by which a Plan participant could avoid the tobacco surcharge and receive the full reward, or that the recommendations of his or her personal physician would be accommodated. The company cannot then avail itself of the regulatory safe harbor for operating a lawful wellness program.

## CLASS ACTION ALLEGATIONS

45.  <u>Class Definition</u>: Plaintiff brings this action individually and on behalf of all other similarly situated individuals. Pursuant to Federal Rules of Civil Procedure 23(b)(3), 23(b)(1)(B), 23(b)(2), and/or 23(c)(4), Plaintiff seeks certification of a class consisting of:

> All Plan participants within the United States who paid Bass Pro's tobacco surcharge at any time from six years prior to the filing of the Complaint to the present.

46.  Excluded from the Class are the Court and its officers, employees, and relatives; Bass Pro and its subsidiaries, officers, and directors; and governmental entities.

47.  <u>Numerosity</u>: the Class consists of members so numerous and geographically dispersed that joinder of all members is impracticable, as Bass Pro employs thousands of similarly situated individuals across the United States.

48.  All members of the Class are ascertainable by reference to objective criteria, as Bass Pro has access to addresses and other contact information for Class members that can be used for notice purposes.

49.  <u>Common Questions of Law and Fact Predominate</u>: There are many questions of law and fact common to Plaintiff and the Class, and those questions substantially predominate over any questions that may affect individual members of the Class. Indeed, the claims of *every* class member will rise or fall on the question of whether the tobacco surcharge is compliant with all legal requirements, and therefore lawful.  Common questions include:

    a.  Whether Bass Pro's tobacco surcharge discriminates against Plan participants and beneficiaries based on a health status-related factor;

    b.  Whether Bass Pro's tobacco surcharge program qualifies for statutory safe harbor protection as a compliant wellness program;

    c.  Whether Bass Pro can meet every element of its statutory affirmative defense for operating a compliant wellness program;

    d.  Whether Bass Pro offered a reasonable alternative standard when it required tobacco users to actually quit smoking and remain tobacco-free for ninety days to remove the surcharge;

**Exhibit 2**

e.  Whether Bass Pro would allow a participant to be retroactively reimbursed for surcharge payments previously made in a given plan year;

f.  Whether all of Bass Pro's Plan materials describing the tobacco surcharge give notice of a reasonable alternative standard by which a plan participant may receive the full reward;

g.  Whether a plan document that describes the tobacco surcharge and notes the existence of a smoking cessation program, but does not disclose that enrollment in a smoking cessation program will allow a plan participant to avoid the surcharge gives adequate notice of a reasonable alternative standard;

h.  Whether a plan document that describes the tobacco surcharge but does not disclose an alternative program by which a participant can earn the full reward for the plan year gives notice of a reasonable alternative standard;

i.  Whether a plan document that describes the tobacco surcharge but does not disclose a statement that recommendations of an individual's personal physician will be accommodated gives notice of a reasonable alternative standard

j.  Whether Bass Pro's tobacco surcharge violates the law; and

k.  Whether Bass Pro breached its fiduciary duties with respect to its collection and retention of the tobacco surcharge.

50.  <u>Typicality</u>: Plaintiff's claims are typical of other members of the Class because all the claims arise from the same course of conduct by Bass Pro—its collection of an unlawful surcharge—and are based on the same legal theories.

51.  <u>Adequacy of Representation</u>: Plaintiff is an adequate class representative because her interests do not conflict with the interests of the Class members whom she seeks to represent. Plaintiff has retained counsel with substantial experience in prosecuting complex class action litigation. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of Class members and have the financial resources to do so. The Class members' interests will be fairly and adequately protected by Plaintiff and her counsel.

**Exhibit 2**

52.     <u>Superiority of Class Action</u>: Class treatment is superior to individual treatment, as it will permit a large number of similarly situated persons to prosecute their respective class claims in a single forum, simultaneously, efficiently, and without unnecessary duplication of evidence, effort, and expense that numerous individual actions would produce.

53.     To the extent not all issues or claims, including the amount of damages, can be resolved on a class-wide basis, Plaintiff invokes Federal Rule of Civil Procedure 23(c)(4), reserving the right to seek certification of a class action with respect to particular issues, and Federal Rule of Civil Procedure 23(c)(5), reserving the right to divide the class into subclasses.

<div align="center">

**<u>COUNT I – ERISA STATUTORY VIOLATION</u>**
**Unlawful Surcharge – Failure to Provide a Reasonable Alternative Standard**
*<u>By Plaintiff and the Class</u>*

</div>

54.     Plaintiff hereby repeats, reiterates, and incorporates by reference each of the foregoing allegations with the same force and effect as if set forth herein.

55.     To enroll in the Plan, Plaintiff and class members were required to pay a tobacco surcharge in the amount of $40 per week, or $2,080 per year beginning in plan year 2024, and $30 per week, or $1,560 in prior plan years.

56.     Bass Pro's tobacco surcharge is not and was not a permissible wellness program, because it did not provide for a reasonable alternative standard, in that:

      a.   A tobacco user could not avoid the surcharge by simply completing a designated smoking cessation program; rather, he or she was required to actually quit smoking for a period of ninety days, and to remain tobacco-free, before the surcharge would be removed; and

      b.   A tobacco user who stopped smoking for a period of ninety days would be eligible to have the surcharge removed going forward but would not be reimbursed for surcharge payments already made during that plan year, and thus would not be eligible to receive the "full reward" of the tobacco surcharge

<div align="center">14</div>

**Exhibit 2**

program, that being a $1,560 or $2,080 reduction in premium costs to maintain medical coverage.

57.    Bass Pro cannot meet every element of its affirmative defense for operating a lawful, compliant wellness program, and is therefore not entitled to statutory safe harbor protection.

58.    Bass Pro's tobacco surcharge has discriminated against, and continues to discriminate against, Plan participants based on a health status-related factor is assessing premiums or contributions, in violation of 29 U.S.C. § 1182(b).

59.    29 U.S.C. § 1182(b) is a provision of ERISA that Plaintiff and class members may enforce pursuant to 29 U.S.C. § 1132(a)(3).

60.    Plaintiff and class members were required to pay an illegal fee, and Bass Pro collected that fee from them in violation of the law. Equity requires that those funds be returned.

<u>**COUNT II – ERISA STATUTORY VIOLATION**</u>
**Unlawful Surcharge – Failure to Provide Required Notice**
<u>*By Plaintiff and the Class*</u>

61.    Plaintiff hereby repeats, reiterates, and incorporates by reference each of the foregoing allegations with the same force and effect as if set forth herein.

62.    To enroll in the Plan, Plaintiff and class members were required to pay a tobacco surcharge in the amount of $40 per week, or $2,080 per year beginning in plan year 2024, and $30 per week, or $1,560 in prior plan years.

63.    Bass Pro's tobacco surcharge is not and was not a permissible wellness program, because Bass Pro did not give statutorily required notice of reasonable alternative standard, in that:

    a.    The Plan's written materials discussed the tobacco surcharge, but did not disclose the availability of an alternative standard—such as a smoking cessation program—by which the surcharge could be avoided, and instead stated that the surcharge could be avoided only by actually quitting smoking for a period of ninety days and remaining tobacco-free;

**Exhibit 2**

b.  The Plan's written materials discussed the tobacco surcharge, but did not notify participants and beneficiaries that they would be eligible to receive the full reward of the tobacco surcharge program for the plan year, including the retroactive reimbursement of any surcharge fees already paid that plan year; and

c.  The Plan's written materials discussed the tobacco surcharge but did not include a statement that recommendations of an individual's personal physician will be accommodated in conjunction with the formation of a reasonable alternative standard.

64.  Bass Pro cannot meet every element of its affirmative defense for operating a lawful, compliant wellness program, and is therefore not entitled to statutory safe harbor protection.

65.  Bass Pro's tobacco surcharge has discriminated against, and continues to discriminate against, plan participants based on a health status-related factor is assessing premiums or contributions, in violation of 29 U.S.C. § 1182(b).

66.  29 U.S.C. § 1182(b) is a provision of ERISA that Plaintiff and class members may enforce pursuant to 29 U.S.C. § 1132(a)(3).

67.  Plaintiff and class members were required to pay an illegal fee, and Bass Pro collected that fee from them in violation of the law. Equity requires that those funds be returned.

**COUNT III – ERISA BREACH OF FIDUCIARY DUTY**
**29 U.S.C. § 1109**
*By Plaintiff and the Class, On Behalf of the Plan*

68.  Plaintiff hereby repeats, reiterates, and incorporates by reference each of the foregoing allegations with the same force and effect as if set forth herein.

69.  At all times relevant to this lawsuit, Bass Pro was the administrator of the Plan within the meaning of 29 U.S.C. § 1002(16) and was a fiduciary within the meaning of 29 U.S.C. § 1002(21), in that it exercised discretionary authority and discretionary control respecting

management of the medical benefits plans and disposition of their assets by holding in trust the funds collected from the tobacco surcharge, and had discretionary authority and discretionary responsibility in the administration of the medical plan.

70.     Bass Pro breached its fiduciary duty by assessing and collecting the tobacco surcharge in violation of the law and in violation of the terms of the Plan, as the receipt of additional funds reduced its own costs associated with funding the plan and forestalled its own obligations to make contributions thereto.

71.     Upon information and belief, Bass Pro's responsibility with respect to the funding of the Plan's claims and administrative expenses relating to the Plan's self-funded arrangements equaled the amount by which the Plan's claims and administrative expenses exceeded all participant contributions, including the tobacco surcharge funds, Bass Pro's collection of the tobacco surcharge diminished the amount it had to contribute to the plan, thereby benefiting itself and harming the Plan.

72.     As a result of the imposition of the tobacco surcharge, Bass Pro enriched itself at the expense of the Plan, thereby resulting in it receiving a windfall.

73.     Bass Pro breached its fiduciary duties under ERISA in that it:

    a.  failed to act solely in the interest of the participants and beneficiaries of the Plan and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of plan administration, in violation of ERISA. *See* 29 U.S.C. § 1104(a)(1)(A);

    b.  failed to discharge its duties in accordance with the documents and instruments governing the Plan insofar as the documents and instruments are consistent with ERISA, in violation of ERISA. *See* 29 U.S.C. § 1104(a)(1)(D);

    c.  caused the Plan to engage in transactions that Bass Pro knew or should have known constituted a direct or indirect transfer to, or use by or for the benefit of, a party in interest, of assets of the health plan, in violation of ERISA. *See* 29 U.S.C. § 1106(a)(1)(D);

d. dealt with assets of the Plan in Bass Pro's own interests in violation of ERISA. *See* 29 U.S.C. § 1106(b)(1);

e. acted on behalf of a party whose interests were averse to the interests of the Plan or the interests of its participants and beneficiaries, in violation of ERISA. *See* 29 U.S.C. § 1106(b)(2); and

f. caused the Plan to require participants to pay a premium or contribution which was greater than such premium or contribution for a similarly situated participant enrolled in the health plan on the basis of a health status-related factor in relation to the participant or to an individual enrolled under the health plan as a dependent of the individual, in violation of ERISA. *See* 29 U.S.C. § 1182(b).

74. As a result of these breaches, and pursuant to 29 U.S.C. § 1109, Bass Pro is liable to make good to the plan all losses to the Plan resulting from its breaches, disgorge all unjust enrichment and ill-gotten profits, and to restore to the Plan and/or a constructive trust all profits it acquired through its violations alleged herein and which it made through use of assets of the plan, and for such other equitable or remedial relief as is proper.

75. Plaintiff is authorized to bring this action on behalf of the plan pursuant to 29 U.S.C. § 1132(a)(2).

## REQUEST FOR RELIEF

Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that the Court enter judgment in her favor and against Bass Pro as follows:

A. That the Court certify this action as a class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiff is a proper class representative, and appoint Plaintiff's counsel as Class Counsel;

B. That the Court order Bass Pro to reimburse all persons who paid the tobacco surcharge within the relevant limitations period;

18

**Exhibit 2**

C. That the Court order disgorgement and/or restitution of all payments unlawfully assessed by Bass Pro, or, alternatively, the profits earned by Bass Pro in connection with its receipt of such unlawful fees;

D. That the Court grant a declaratory judgment holding that the acts of Bass Pro described herein violate ERISA and applicable law, as well as the terms of the plan;

E. That the Court enter a permanent injunction against Bass Pro prohibiting it from collecting a tobacco surcharge unless and until the company revises the surcharge to comply with all ERISA statutory requirements;

F. That the Court order Bass Pro to provide all accountings necessary to determine the amounts it must make good to the plan and to plan participants and beneficiaries;

G. That the Court surcharge against Bass Pro all funds it collected in violation of ERISA and the terms of the plan;

H. That the Court find and adjudge that Bass Pro is liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duties, to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty, and grant all other proper relief authorized by 29 U.S.C. § 1109, including removal and replacement of the fiduciary;

I. That the Court impose a constructive trust on profits received by Bass Pro as a result of fiduciary breaches committed by it or for which it is liable, upon which Plaintiff and the class can make claims for equitably vested benefits;

J. That the Court award Plaintiff and the class all damages available at law in an amount to be determined at trial;

K. That the Court award reasonable attorneys' fees, costs, and expenses as provided by law;

L. That the Court order the payment of interest to the extent it is allowed by law; and

M. That the Court grant all other equitable, remedial, and legal relief as it deems just and proper under the circumstances.

**Exhibit 2**

**DEMAND FOR JURY TRIAL**

Plaintiff hereby requests a trial by jury of all issues so triable.

Dated:  April 26, 2024                    Respectfully submitted,

**STUEVE SIEGEL HANSON LLP**

*/s/ Alexander T. Ricke*
George A. Hanson, MO. Bar No. 43450
Alexander T. Ricke, MO. Bar No. 65132
Caleb J. Wagner, MO Bar No. 68458
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone:      (816) 714-7100
Facsimile:      (816) 714-7101
hanson@stuevesiegel.com
ricke@stuevesiegel.com
wagner@stuevesiegel.com

**McCLELLAND LAW FIRM, P.C.**
Ryan L. McClelland, MO Bar No. 59343
The Flagship Building
200 Westwoods Drive
Liberty, Missouri 64068-1170
Telephone:      (816) 781-0002
Facsimile:      (816) 781-1984
ryan@mcclellandlawfirm.com

*Attorneys for Plaintiff*
*and the Proposed Class*

20

**Exhibit 2**

JS 44 (Rev 09/10)

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MISSOURI

## CIVIL COVER SHEET

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use <u>only</u> in the Western District of Missouri.

**The completed cover sheet must be saved as a pdf document and filed as an attachment to the Complaint or Notice of Removal.**

| **Plaintiff(s):** | **Defendant(s):** |
|---|---|
| <span style="color:red">First Listed Plaintiff:</span> | <span style="color:red">First Listed Defendant:</span> |
| Nora Ruiz ; | Bass Pro Group LLC ; |
| **County of Residence:** Outside This District | **County of Residence:** Greene County |
| | |
| | <span style="color:red">Additional Defendants(s):</span> |
| | BPS Direct LLC ; |

**County Where Claim For Relief Arose:** Greene County

**Plaintiff's Attorney(s):**                                        **Defendant's Attorney(s):**

George A. Hanson (Nora Ruiz)
Stueve Siegel Hanson LLP
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
**Phone:** (816) 714-7100
**Fax:** (816) 714-7101
**Email:** hanson@stuevesiegel.com

Alexander T. Ricke (Nora Ruiz)
Stueve Siegel Hanson LLP
460 Nichols Road
Kansas City, Missouri 64112
**Phone:** (816) 714-7100
**Fax:** (816) 714-7101
**Email:** ricke@stuevesiegel.com

Caleb J. Wagner (Nora Ruiz)

460 Nichols Road
Kansas City, Missouri 64112
**Phone:** (816) 714-7100
**Fax:** (816) 714-7101
**Email:** wagner@stuevesiegel.com

Ryan L. McClelland (Nora Ruiz)
McClelland Law Firm P.C.
200 Westwoods Drive
Liberty, Missouri 64068
**Phone:** (816) 781-0002

<div align="right">

**Exhibit 2**
</div>

Electronically Filed - Greene - August 15, 2025 - 04:04 PM

Electronically Filed - Greene - August 15, 2025 - 04:04 PM

**Fax:** (816) 781-1984
**Email:** ryan@mcclellandlawfirm.com

**Basis of Jurisdiction:** 3. Federal Question (U.S. not a party)

**Citizenship of Principal Parties** (Diversity Cases Only)

    **Plaintiff:** N/A

    **Defendant:** N/A

**Origin:** 1. Original Proceeding

**Nature of Suit:** 791 ERISA

**Cause of Action:** 29 U.S.C. § 1132, collection of an unlawful surcharge in violation of the Employee Retirement Income Security Act

**Requested in Complaint**

    **Class Action:**  Class Action Under FRCP23

    **Monetary Demand (in Thousands):**  $5,000,001

    **Jury Demand:**  Yes

    **Related Cases:**  Is NOT a refiling of a previously dismissed action

---

**Signature:** /s/ George A. Hanson

**Date:**  4/25/2024

If any of this information is incorrect, please close this window and go back to the Civil Cover Sheet Input form to make the correction and generate the updated JS44. Once corrected, print this form, sign and date it, and submit it with your new civil action.

**Exhibit 2**

Electronically Filed - Greene - August 15, 2025 - 04:04 PM

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

|  |  |
|---|---|
| NORA RUIZ, individually and on behalf of all others similarly situated, | |
| **Plaintiff,** | Case No. 6:24-cv-03122-MDH |
| **v.** | |
| BASS PRO GROUP LLC, and BPS DIRECT LLC, d/b/a BASS PRO SHOPS, and BASS PRO GROUP LLC HEALTH AND WELFARE PLAN, | **Jury Trial Demanded** |
| **Defendants.** | |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff Nora Ruiz ("Plaintiff") brings this class action complaint against Bass Pro Group LLC and BPS Direct LLC, both doing business as Bass Pro Shops ("Bass Pro"), along with the medical plan they operate, the Bass Pro Group LLC Health and Welfare Benefit Plan ("the Plan") (collectively "Defendants") on behalf of herself and all others similarly situated. Plaintiff makes the following allegations based upon personal knowledge as to her own actions and upon information and belief as to all other matters.

## NATURE OF THE ACTION

1.      Bass Pro is an outdoor and sporting goods retailer operating throughout the United States and having more than 40,000 employees. It operates its stores, restaurants, and resorts and conducts business under various trade names, including but not limited to Bass Pro Shops, Cabela's, White River Marine Group, Tracker Marine Group, Tracker Marine Boating Center, Fishing Holdings, and Big Cedar Lodge.

2.      Upon information and belief, all regular employees and eligible dependents can receive health insurance coverage by participating in a medical plan sponsored and administered

by Bass Pro. These medical plans operate under the plan name Bass Pro Group LLC Health and Welfare Benefit Plan.

3.      For those employees and their dependents to participate in the Plan, they must declare whether they are a tobacco user.  Those who do use tobacco products are required to pay an additional fee of $40 per week—or $2,080 per year—to maintain coverage.

4.      Fees of this sort, frequently referred to as "tobacco surcharges", have proliferated in recent years. But to be legal, they must strictly comply with the terms of the Employee Retirement Income Security Act (ERISA), applied to medical plans by the Patient Protection and Affordable Care Act, and implementing regulations. Bass Pro did not do so, and therefore collected the tobacco surcharge in violation of the law and in violation of its duties to plan participants and the Plan.

5.      More specifically, ERISA's anti-discrimination provisions prohibit any medical plan from charging an extra premium or fee based on any health status related factor, including tobacco use, unless that fee is part of a *bona fide* "wellness program". And to qualify as a compliant wellness program, a company must offer a "reasonable alternative standard", usually in the form of a smoking/tobacco cessation program, completion of which allows participants to avoid the surcharge.

6.      Although Defendants encouraged their tobacco-using employees to complete a tobacco cessation program called Quit for Life, the completion of that program did not result in the surcharge being removed. Instead, a tobacco user could only avoid the surcharge if the participant ceased using tobacco products and then stayed tobacco-free for 90 days. As such, the company simply did not provide any alternative standard to its participants; instead, it required participants to meet the original standard—not being a tobacco user.  Defendants' decision to charge a discriminatory fee without offering any form of a reasonable alternative standard is a plain violation of ERISA.

7.      Additionally, even if offering a tobacco cessation program that required the tobacco user to be tobacco free could constitute a reasonable alternative standard (it cannot), a compliant

**Exhibit 3**

wellness program's reasonable alternative standard must allow participants to receive the program's "full reward"; that is, avoid the surcharge for the entire plan year upon completion of the alternative standard, and must provide notice that such an alternative program exists in every communication regarding the surcharge. This notice must also include a statement that recommendations of an individual's personal physician in formulating a reasonable alternative standard will be accommodated.

8.     But a Bass Pro plan participant who ceased tobacco use would only be eligible to avoid the surcharge on a going-forward basis, and thus could not earn the "full reward"—*i.e.*, avoiding the surcharge for the entire plan year. Further, Bass Pro's plan materials used for communicating information about the surcharge with participants make no mention of an opportunity to earn the full reward for the entire plan year by completing a reasonable alternative standard. And those materials do not include a disclosure that the recommendations of an individual's personal physician would be accommodated. Thus, the surcharge violates ERISA's anti-discrimination requirements, and its collection by Defendants was and remains unlawful.

9.     Nora Ruiz is a regular, full-time Bass Pro employee working as an outfitter support specialist who was required to pay the illegal tobacco surcharge to maintain health insurance coverage. She brings this lawsuit on behalf of herself and all similarly situated plan participants and beneficiaries, seeking to have these unlawful fees returned, and for plan-wide relief under 29 U.S.C. § 1109.

## PARTIES, JURISDICTION, AND VENUE

10.     Plaintiff Nora Ruiz is a citizen of the state of Missouri. At all times relevant to this suit, she has been employed by Bass Pro within the State of Missouri and has paid the Plan's premiums and tobacco surcharge within the State of Missouri.

11.     Defendant Bass Pro Group LLC is a limited liability company conducting business under the name Bass Pro Shops. It is organized under the laws of the State of Delaware and has its principal place of business in Springfield, Greene County, Missouri.

12.     Defendant BPS Direct LLC is a limited liability company conducting business under the name Bass Pro Shops. It is organized under the laws of the State of Delaware and has its principal place of business in Springfield, Greene County, Missouri.

13.     At all times relevant to this lawsuit, Defendants operated the Bass Pro Group LLC Health and Welfare Benefit Plan, which was available for Bass Pro employees and their dependents. The Plan is an employee benefit plan subject to the provisions and statutory requirements of ERISA pursuant to 29 U.S.C. § 1003(a).

14.     Defendant Bass Pro Group LLC Health and Welfare Plan is a juridical entity authorized to sue and be sued under ERISA. 29 U.S.C. § 1132(d)(1). The Plan may be served with process at Bass Pro Group, LLC, Attn: Group Vice President and General Counsel, 2500 E. Kearney Street, Springfield, MO 65898 in accordance with 29 U.S.C. § 1132(d)(1).

15.     Plaintiff is a participant in the Plan pursuant to 29 U.S.C. § 1102(7).

16.     This Court possesses subject matter jurisdiction pursuant to 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331, as this suit seeks relief under ERISA, a federal statute. This Court also possesses subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a proposed class action in which: (1) there are at least 100 class members; (2) the amount in controversy exceeds$5,000,000, exclusive of interest and costs; and (3) Defendants and at least one class member are citizens of different states, and/or are a citizen or subject of a foreign state, and at least one class member is a citizen of a state.

17.     This Court possesses personal jurisdiction over Defendants in this case because their principal place of business is in Missouri and are thus "at home" within the state. Additionally, the claims of Plaintiff and all others similarly situated arise from the acts and omissions of Defendants with respect to their activities and conduct concerning Plaintiff within the state of Missouri, and Defendants have purposefully availed themselves of the privilege of conducting business within the state of Missouri. Further, ERISA authorizes nationwide service of process. 29 U.S.C. § 1132(e)(2).

**Exhibit 3**

18.     Venue is proper in this District under 29 U.S.C. § 1132(e)(2) because this is the District where Defendants administer and sponsor the Plan and where Defendants' unlawful acts occurred.

19.     Bass Pro is represented by counsel in this lawsuit and can be served with this First Amended Complaint through its counsel of record.

## FACTUAL ALLEGATIONS

a. **Defendants' Tobacco Surcharge is a *Prima Facie* Violation of ERISA's Anti-Discrimination Rule.**

20.     As a baseline rule, and to broaden access to affordable health insurance coverage, the Patient Protection and Affordable Care Act amended ERISA to prohibit any health insurer or medical plan from discriminating against any participant in providing coverage or charging premiums based on a "health status-related factor", including the use of tobacco. Pursuant to this rule, a plan "may not require any individual (as a condition of enrollment or continued enrollment under the plan) to pay a premium or contribution which is greater than such premium or contribution for a similarly situated individual enrolled in the plan on the basis of any health status-related factor in relation to the individual or to an individual enrolled under the plan as a dependent of the individual." 29 U.S.C. § 1182(b)(1); 42 U.S.C. § 300gg-4(b)(1).

21.     On its face, Defendants' tobacco surcharge violates this provision. Plaintiff and all others similarly situated were, for plan years 2023 and earlier required to pay an additional "premium or contribution" of $30 per week, or $1,560 per year, based on a "health status-related factor", that being their use of tobacco products. For plan year 2024, that additional charge was raised to $40 per week, or $2,080 per year.

22.     Specifically, at all times relevant to this lawsuit, pursuant to Bass Pro's enrollment rules for the Plan, any employee or covered dependent who used use any form of tobacco or vaping products were required to declare themselves to be tobacco users as part of the enrollment process and were subsequently required to pay the tobacco surcharge to maintain coverage.

23.     Payment of the tobacco surcharge was required for Plaintiff and all others similarly situated to remain insured under the Plan. Plaintiff and all others similarly situated have in fact paid the surcharge.

24.     Bass Pro is and has been required to make contributions to the Plan to ensure that it remains adequately funded. By collecting the tobacco surcharge, Bass Pro has reduced the amount of its own contributions, thereby increasing its profits.

25.     At all times relevant to this lawsuit, Defendants have maintained sole control of the tobacco surcharge program, including by determining which participants are required to pay the surcharge, withholding participants' funds from their paychecks to pay the surcharge, and determining which employees (if any) are reimbursed for their payment of the tobacco surcharge.

> **b.   Defendants Cannot Avail Themselves to ERISA's Safe Harbor for Wellness Programs.**

26.     As an exception to its anti-discrimination rule, ERISA carves out protection for "programs of health promotion and disease prevention", also known as "wellness programs."  29 U.S.C. § 1182(b)(2)(B); 42 U.S.C. § 300gg-4(b)(2)(B).

27.     But to qualify as a lawful wellness program, a plan must fully comply with a set of statutory and regulatory requirements. Those requirements concern (1) the frequency of the opportunity for a participant to qualify for the reward; (2) the size of the reward; (3) reasonable design of the program; (4) uniform availability and reasonable alternative standards; and (5) notice of the availability of a reasonable alternative standard. 29 C.F.R. § 2590.702(f). These regulations "set forth criteria for an *affirmative defense* that can be used by plans and issuers in response to a claim that the plan or issuer discriminated under the [] nondiscrimination provisions." *Incentives for Nondiscriminatory Wellness Programs in Group Health Plans*, 78 Fed. Reg. 33158 at 33160 (June 3, 2013) (emphasis added). Every one of the requirements "must be satisfied in order for the plan or issuer to qualify for an exception to the prohibition on discrimination based on health status." *Id.*

**Exhibit 3**

28.     Defendants' tobacco surcharge program did not and does not satisfy the requirements that it provide a reasonable alternative standard, nor does it provide notice of a reasonable alternative standard. As a result, it cannot meet each element of its affirmative defense.

29.     Consequently, Defendants are not entitled to safe harbor protection for operating a compliant wellness program and its assessment of its tobacco surcharge constitutes unlawful discrimination based on a health status-related factor.

     **c.     Defendants' Tobacco Surcharge Program Did Not Provide for a Reasonable Alternative Standard**

30.     *First,* by law, a tobacco surcharge is an example of an "outcome-based" and "health contingent" wellness program. 78 Fed. Reg. 33158 at 33161 ("An outcome-based wellness program is a type of health-contingent wellness program that requires an individual to attain or maintain a specific health outcome (such as not smoking . . .) in order to obtain a reward."); *see also id*. at 33159 ("Examples of health-contingent wellness programs in the proposed regulations included a program that imposes a premium surcharge based on tobacco use")

31.     To be lawful, such a program must provide for "[u]niform availability and reasonable alternative standards." 29 C.F.R. § 2590.702(f)(4)(iv). "[A] reasonable alternative standard must be provided to all individuals who do not meet the initial standard, to ensure that the program is reasonably designed to improve health and is not a subterfuge for underwriting or reducing benefits based on health status." 78 Fed. Reg. 33158 at 33160.

32.     A common means by which plan administrators attempt to provide a reasonable alternative standard to a tobacco surcharge is to permit participants to avoid the surcharge by completing a tobacco cessation program.

33.     But as the Department of Labor's regulations make clear, a putative alternative that requires the participant to actually quit smoking in order to receive the reward is necessarily not a "reasonable alternative standard." One example offered by the Department states that:

     Example 7—Tobacco use surcharge with alternative program requiring actual cessation. (i) Facts. Same facts as Example 6, except the plan does not provide

participant F with the reward in subsequent years **unless F actually stops smoking after participating in the tobacco cessation program**.

(ii) Conclusion. In this Example 7, **the program is not reasonably designed under paragraph (f)(4)(iii) of this section and does not provide a reasonable alternative standard as required under paragraph (f)(4)(iv) of this section. The** plan cannot cease to provide a reasonable alternative standard merely because the participant did not stop smoking after participating in a smoking cessation program.

29 C.F.R. § 2590.702, Example 7 (emphasis added).

34.     Yet actual cessation is precisely what Defendants require. Defendants' Plan materials plainly state that employees and their dependents can remove the surcharge only if they quit smoking for ninety days and remain tobacco-free. Bass Pro's open enrollment benefits guide for plan year 2024 includes the following statements:

> • **Tobacco use** — If you or anyone you cover on your Medical plan uses any form of tobacco or vaping products, add $40 per week. You must answer "yes" on the tobacco use question in Workday. You may remove the tobacco use premium differential if all covered members have quit for 90 days and remain tobacco free.
>
>                                                                    11

### INCREASE IN TOBACCO PREMIUM DIFFERENTIAL

It is well documented that tobacco use contributes to a number of long-term chronic conditions and increasingly costly treatments. We will increase the tobacco use premium differential from $30 to $40 per week beginning January 1, 2024. At the same time, we offer resources to help you quit. Tobacco users who kick the habit for 90 days and remain tobacco free may have the premium differential removed. [See page 11 for more details.]

**Exhibit 3**



**Time to quit tobacco?**

Resources are available from Vida Health to help you quit at no cost to you. The tobacco use premium differential can be removed if you and any dependents you cover on your Medical plan quit for 90 days and remain tobacco free.

Contact Vida Health at **vida.com/basspro**.

35. Because Defendants did not provide Plan participants with an alternative program by which they could avoid payment of the surcharge, it has failed to meet the requirements for a "reasonable alternative standard", and consequently cannot avail itself of the safe harbor for wellness programs set out by ERISA.

36. *Second*, for a putative alternative standard (such as attending a tobacco cessation program) to be deemed "reasonable" under the law, "[t]he full reward under the outcome-based wellness program must be available to all similarly situated individuals." 29 C.F.R. § 2590.702(f)(4)(iv). Thus, a participant who meets the alternative standard must be eligible to avoid the surcharge in its entirety for a given plan year.

37. The applicable regulatory guidelines state that "while an individual may take some time to request, establish, and satisfy a reasonable alternative standard, the same, full reward must be provided to that individual as is provided to individuals who meet the initial standard for that plan year. (For example, if a calendar year plan offers a health-contingent wellness program with a premium discount and an individual who qualifies for a reasonable alternative standard satisfies that alternative on April 1, *the plan or issuer must provide the premium discounts for January, February, and March to that individual*.) Plans and issuers have flexibility to determine how to provide the portion of the reward corresponding to the period before an alternative was satisfied (e.g., payment for the retroactive period or pro rata over the remainder of the year) as long as the

9

**Exhibit 3**

method is reasonable and the *individual receives the full amount of the reward*." 78 Fed. Reg. 33158 at 33163 (emphasis added).

38.     But, upon information and belief, a Plan participant who completed the alternative standard (unlawful as it may be) during a given plan year would not be eligible to avoid the entire $2,080 (or formerly $1,560) tobacco surcharge. Instead, he or she could avoid the surcharge on a going-forward basis only and would not be eligible to receive a reimbursement for surcharge payments already made in that plan year.

39.     Because a Plan participant could not receive a retroactive reimbursement to avoid the tobacco surcharge in its entirety, Defendants do not permit participants to receive the "full reward" and therefore do not provide for a "reasonable alternative standard."

**b.  Defendants Failed to Provide Notice of Availability of a Reasonable Alternative Standard**

40.     *Third*, to be deemed a lawful wellness program, "[t]he plan or issuer must disclose *in all plan materials describing the terms of an outcome-based wellness program* . . . the availability of a reasonable alternative standard to qualify for the reward." 29 C.F.R. § 2590.702 (emphasis added); 42 U.S.C. § 300gg-4(j)(3)(E). "[A] plan disclosure that references a premium differential based on tobacco use . . . must include this disclosure." 78 Fed. Reg.  33158-01 at 33166.

41.     But Plan materials discussing the tobacco surcharge do not disclose the existence of a reasonable alternative standard by which it can be avoided. Though some of the materials note that a participant may enroll in a tobacco cessation program, they do not disclose that such a program is an alternative standard by which a participant may qualify for the award (that is, avoid the surcharge).

42.     For instance, as alleged *infra*, the 2024 plan year open enrollment guide fails to provide legally adequate notice in that it (1) fails to disclose the existence of a reasonable alternative standard by which a participant may avoid the surcharge; and (2) fails to disclose that

a participant who completed the cessation program would be eligible for retroactive reimbursement for surcharge payments made during that plan year.

43. Other Plan materials are to the same effect. For instance, the employee portal on Bass Pro's website contains the following statement, which references the tobacco surcharge without the availability of a reasonable alternative standard to qualify for the reward.



44. *Fourth*, under the applicable regulations, "[t]he plan or issuer must disclose in all plan materials describing the terms of an activity-only wellness program . . . contact information for obtaining a reasonable alternative standard and a *statement that recommendations of an individual's personal physician will be accommodated*. 29 C.F.R. § 2590.702(f)(4)(v).

45. The foregoing Plan materials cited *infra* do not include a statement that the recommendations of an individual's physician will be accommodated. Upon information and belief, none of Defendants' other written Plan materials referencing the tobacco surcharge include this disclosure either.

46.     Defendants, then, have not complied with the requirement that it provide notice of the availability of a reasonable alternative standard by which a Plan participant could avoid the tobacco surcharge and receive the full reward, or that the recommendations of his or her personal physician would be accommodated. The company cannot then avail itself of the regulatory safe harbor for operating a lawful wellness program.

47.     The Plan is jointly and severally liable as a separate entity for all actions taken on its behalf by its administrator, Bass Pro. The Plan acted at the direction of Bass Pro and directly participated in the imposition and collection of the unlawful tobacco surcharge, receiving funding from the same. As such, the Plan knowingly participated in, enabled, and failed to remedy the imposition and collection of the unlawful tobacco surcharge.

48.     Plaintiff and the Class assert simultaneous claims against the Plan as a Defendant and on behalf of the Plan against its fiduciary Bass Pro, as is authorized by statute. The remedies sought by Plaintiff and the Class are not inconsistent or contradictory; rather, they are cumulative. Specifically, Plaintiff and the Class seek an order requiring Bass Pro and the Plan to return to them the funds unlawfully collected from them in conjunction with the imposition of their tobacco surcharge. They also seek, on behalf of the Plan in accordance with ERISA §§ 1109 and 502(a)(2), an order requiring Bass Pro to disgorge all unjust enrichment and ill-gotten profits, and to restore to the Plan and/or a constructive trust all profits it made through use of assets of the Plan, namely by using the funds collected from the unlawful tobacco surcharge to offset its own funding obligations. Such a remedy benefitting the Plan does not conflict with or detract from any remedy flowing to Plaintiff and the Class. And to the extent it would, Plaintiff is authorized to plead alternative or inconsistent claims and remedies under Federal Rule of Civil Procedure 8.

## CLASS ACTION ALLEGATIONS

49.     <u>Class Definition</u>: Plaintiff brings this action individually and on behalf of all other similarly situated individuals. Pursuant to Federal Rules of Civil Procedure 23(b)(3), 23(b)(1)(B), 23(b)(2), and/or 23(c)(4), Plaintiff seeks certification of a class consisting of:

**Exhibit 3**

All Plan participants and beneficiaries within the United States who paid Defendants' tobacco surcharge at any time during the relevant limitation period.

50.     Excluded from the Class are the Court and its officers, employees, and relatives; Bass Pro and its subsidiaries, officers, and directors; and governmental entities.

51.     <u>Numerosity</u>: the Class consists of members so numerous and geographically dispersed that joinder of all members is impracticable, as Bass Pro employs thousands of similarly situated individuals across the United States.

52.     All members of the Class are ascertainable by reference to objective criteria, as Bass Pro has access to addresses and other contact information for Class members that can be used for notice purposes.

53.     <u>Common Questions of Law and Fact Predominate</u>: There are many questions of law and fact common to Plaintiff and the Class, and those questions substantially predominate over any questions that may affect individual members of the Class. Indeed, the claims of *every* class member will rise or fall on the question of whether the tobacco surcharge is compliant with all legal requirements, and therefore lawful. Common questions include:

   a.   Whether Defendants' tobacco surcharge discriminates against Plan participants and beneficiaries based on a health status-related factor;

   b.   Whether Defendants' tobacco surcharge program qualifies for statutory safe harbor protection as a compliant wellness program;

   c.   Whether Defendants can meet every element of its statutory affirmative defense for operating a compliant wellness program;

   d.   Whether Defendants offered a reasonable alternative standard when it required tobacco users to actually quit smoking and remain tobacco-free for ninety days to remove the surcharge;

   e.   Whether Defendants would allow a participant to be retroactively reimbursed for surcharge payments previously made in a given plan year;

   f.   Whether all of Bass Pro's Plan materials describing the tobacco surcharge give notice of a reasonable alternative standard by which a plan participant may receive the full reward;

**Exhibit 3**

g. Whether a plan document that describes the tobacco surcharge and notes the existence of a smoking cessation program, but does not disclose that enrollment in a smoking cessation program will allow a plan participant to avoid the surcharge gives adequate notice of a reasonable alternative standard;

h. Whether a plan document that describes the tobacco surcharge but does not disclose an alternative program by which a participant can earn the full reward for the plan year gives notice of a reasonable alternative standard;

i. Whether a plan document that describes the tobacco surcharge but does not disclose a statement that recommendations of an individual's personal physician will be accommodated gives notice of a reasonable alternative standard

j. Whether Defendants' tobacco surcharge violates the law; and

k. Whether Bass Pro breached its fiduciary duties with respect to its collection and retention of the tobacco surcharge.

54. <u>Typicality</u>: Plaintiff's claims are typical of other members of the Class because all the claims arise from the same course of conduct by Defendants—their collection of an unlawful surcharge—and are based on the same legal theories.

55. <u>Adequacy of Representation</u>: Plaintiff is an adequate class representative because her interests do not conflict with the interests of the Class members whom she seeks to represent. Plaintiff has retained counsel with substantial experience in prosecuting complex class action litigation. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of Class members and have the financial resources to do so. The Class members' interests will be fairly and adequately protected by Plaintiff and her counsel.

56. <u>Superiority of Class Action</u>: Class treatment is superior to individual treatment, as it will permit a large number of similarly situated persons to prosecute their respective class claims in a single forum, simultaneously, efficiently, and without unnecessary duplication of evidence, effort, and expense that numerous individual actions would produce.

57. To the extent not all issues or claims, including the amount of damages, can be resolved on a class-wide basis, Plaintiff invokes Federal Rule of Civil Procedure 23(c)(4),

**Exhibit 3**

reserving the right to seek certification of a class action with respect to particular issues, and Federal Rule of Civil Procedure 23(c)(5), reserving the right to divide the class into subclasses.

<div align="center">

**COUNT I – ERISA STATUTORY VIOLATION**
**Unlawful Surcharge – Failure to Provide a Reasonable Alternative Standard**
*By Plaintiff and the Class Against All Defendants*

</div>

58.     Plaintiff hereby repeats, reiterates, and incorporates by reference each of the foregoing allegations with the same force and effect as if set forth herein.

59.     To enroll in the Plan, Plaintiff and class members were required to pay a tobacco surcharge in the amount of $40 per week, or $2,080 per year beginning in plan year 2024, and $30 per week, or $1,560 in prior plan years.

60.     Defendants' tobacco surcharge is not and was not a permissible wellness program, because they did not provide for a reasonable alternative standard, in that:

    a.    A tobacco user could not avoid the surcharge by simply completing a designated smoking cessation program; rather, he or she was required to actually quit smoking for a period of ninety days, and to remain tobacco-free, before the surcharge would be removed; and

    b.    A tobacco user who stopped smoking for a period of ninety days would be eligible to have the surcharge removed going forward but would not be reimbursed for surcharge payments already made during that plan year, and thus would not be eligible to receive the "full reward" of the tobacco surcharge program, that being a $1,560 or $2,080 reduction in premium costs to maintain medical coverage.

61.     Defendants cannot meet every element of their affirmative defense for operating a lawful, compliant wellness program, and is therefore not entitled to statutory safe harbor protection.

**Exhibit 3**

62.    Defendants' tobacco surcharge has discriminated against, and continues to discriminate against, Plan participants based on a health status-related factor is assessing premiums or contributions, in violation of 29 U.S.C. § 1182(b).

63.    29 U.S.C. § 1182(b) is a provision of ERISA that Plaintiff and class members may enforce pursuant to 29 U.S.C. § 1132(a)(3).

64.    Plaintiff and class members were required to pay an illegal fee, and Defendants collected that fee from them in violation of the law. Equity requires that those funds be returned.

### COUNT II – ERISA STATUTORY VIOLATION
**Unlawful Surcharge – Failure to Provide Required Notice**
*By Plaintiff and the Class Against All Defendants*

65.    Plaintiff hereby repeats, reiterates, and incorporates by reference each of the foregoing allegations with the same force and effect as if set forth herein.

66.    To enroll in the Plan, Plaintiff and class members were required to pay a tobacco surcharge in the amount of $40 per week, or $2,080 per year beginning in plan year 2024, and $30 per week, or $1,560 in prior plan years.

67.    Defendants' tobacco surcharge is not and was not a permissible wellness program, because Defendants did not give statutorily required notice of reasonable alternative standard, in that:

   a.    The Plan's written materials discussed the tobacco surcharge, but did not disclose the availability of an alternative standard—such as a smoking cessation program—by which the surcharge could be avoided, and instead stated that the surcharge could be avoided only by actually quitting smoking for a period of ninety days and remaining tobacco-free;

   b.    The Plan's written materials discussed the tobacco surcharge, but did not notify participants and beneficiaries that they would be eligible to receive the full reward of the tobacco surcharge program for the plan year, including the

16

**Exhibit 3**

retroactive reimbursement of any surcharge fees already paid that plan year; and

c.  The Plan's written materials discussed the tobacco surcharge but did not include a statement that recommendations of an individual's personal physician will be accommodated in conjunction with the formation of a reasonable alternative standard.

68.  Defendants cannot meet every element of their affirmative defense for operating a lawful, compliant wellness program, and is therefore not entitled to statutory safe harbor protection.

69.  Defendants' tobacco surcharge has discriminated against, and continues to discriminate against, plan participants based on a health status-related factor is assessing premiums or contributions, in violation of 29 U.S.C. § 1182(b).

70.  29 U.S.C. § 1182(b) is a provision of ERISA that Plaintiff and class members may enforce pursuant to 29 U.S.C. § 1132(a)(3).

71.  Plaintiff and class members were required to pay an illegal fee, and Defendants collected that fee from them in violation of the law. Equity requires that those funds be returned.

**COUNT III – ERISA BREACH OF FIDUCIARY DUTY**
**29 U.S.C. § 1109**
*By Plaintiff and the Class, On Behalf of the Plan Against Bass Pro*

72.  Plaintiff hereby repeats, reiterates, and incorporates by reference each of the foregoing allegations with the same force and effect as if set forth herein.

73.  At all times relevant to this lawsuit, Bass Pro was the administrator of the Plan within the meaning of 29 U.S.C. § 1002(16) and was a fiduciary within the meaning of 29 U.S.C. § 1002(21), in that it exercised discretionary authority and discretionary control respecting management of the medical benefits plans and disposition of their assets by holding in trust the funds collected from the tobacco surcharge, and had discretionary authority and discretionary responsibility in the administration of the medical plan.

74.     Bass Pro breached its fiduciary duty by assessing and collecting the tobacco surcharge in violation of the law and in violation of the terms of the Plan, as the receipt of additional funds reduced its own costs associated with funding the plan and forestalled its own obligations to make contributions thereto.

75.     Upon information and belief, Bass Pro's responsibility with respect to the funding of the Plan's claims and administrative expenses relating to the Plan's self-funded arrangements equaled the amount by which the Plan's claims and administrative expenses exceeded all participant contributions, including the tobacco surcharge funds, Bass Pro's collection of the tobacco surcharge diminished the amount it had to contribute to the plan, thereby benefiting itself and harming the Plan.

76.     As a result of the imposition of the tobacco surcharge, Bass Pro enriched itself at the expense of the Plan, thereby resulting in it receiving a windfall.

77.     Bass Pro breached its fiduciary duties under ERISA in that it:

a.  failed to act solely in the interest of the participants and beneficiaries of the Plan and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of plan administration, in violation of ERISA. *See* 29 U.S.C. § 1104(a)(1)(A);

b.  failed to discharge its duties in accordance with the documents and instruments governing the Plan insofar as the documents and instruments are consistent with ERISA, in violation of ERISA. *See* 29 U.S.C. § 1104(a)(1)(D);

c.  caused the Plan to engage in transactions that Bass Pro knew or should have known constituted a direct or indirect transfer to, or use by or for the benefit of, a party in interest, of assets of the health plan, in violation of ERISA. *See* 29 U.S.C. § 1106(a)(1)(D);

d.  dealt with assets of the Plan in Bass Pro's own interests in violation of ERISA. *See* 29 U.S.C. § 1106(b)(1);

18

**Exhibit 3**

e.  acted on behalf of a party whose interests were averse to the interests of the Plan or the interests of its participants and beneficiaries, in violation of ERISA. *See* 29 U.S.C. § 1106(b)(2); and

f.  caused the Plan to require participants to pay a premium or contribution which was greater than such premium or contribution for a similarly situated participant enrolled in the health plan on the basis of a health status-related factor in relation to the participant or to an individual enrolled under the health plan as a dependent of the individual, in violation of ERISA. *See* 29 U.S.C. § 1182(b).

78.  As a result of these breaches, and pursuant to 29 U.S.C. § 1109, Bass Pro is liable to make good to the plan all losses to the Plan resulting from its breaches, disgorge all unjust enrichment and ill-gotten profits, and to restore to the Plan and/or a constructive trust all profits it acquired through its violations alleged herein and which it made through use of assets of the plan, and for such other equitable or remedial relief as is proper.

79.  Plaintiff is authorized to bring this action on behalf of the plan pursuant to 29 U.S.C. § 1132(a)(2).

**COUNT IV –ERISA § 502(a)(1)(B)**
**Violation of the Terms of the Plan**
*By Plaintiff and the Class Against All Defendants*

80.  Plaintiff hereby repeats, reiterates, and incorporates by reference each of the foregoing allegations with the same force and effect as if set forth herein.

81.  ERISA § 502(a)(1)(B); 29 U.S.C. § 1132(a)(1)(B) provides that a participant may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

82.  A participant's right to avoid paying an increased cost to maintain coverage under the terms of a plan is a "benefit" within the meaning of ERISA § 502(a)(1)(B); 29 U.S.C. § 1132(a)(1)(B).

83.     Defendants maintain a Plan Document, which constitutes the "written instrument" by which their medical plan is "established and maintained" as required by 29 U.S.C. § 1102(a)(1).

84.     Nothing in the Plan Document authorizes or permits Defendants to assess a tobacco surcharge on plan participants as a condition to maintain medical coverage. In fact, the Plan Document makes no mention of the tobacco surcharge at all.

85.     Indeed, to the contrary, Defendants' Summary Plan Descriptions set out only two bases on which a participant's contribution level is permitted to be increased, informing participants that "[y]our contribution amount depends on the Plan you select and the family members you choose to enroll."

86.     Enforcing the tobacco surcharge imposes a third, undisclosed factor affecting the "contribution amount" charged to participants that is not found in the Plan Document, that being the use of tobacco products. As a result, Defendants' assessment and collection of the tobacco surcharge violates the terms of the plan.

87.     Additionally, the terms of the plan explicitly require Defendants to comply with all legal requirements under ERISA. For instance, the Plan Document states that "The Plan Administrator [*i.e.*, Bass Pro] will administer the Plan in accordance with established policies, interpretations, practices, and procedures and in accordance with the requirements of ERISA."

88.     As alleged extensively herein, Defendants failed to comply with the requirements of ERISA by imposing a discriminatory nicotine surcharge in violation of 29 U.S.C. § 1182 and implementing regulations.

89.     As a result, Defendants have violated the terms of the plan and are liable to Plaintiff and the Class for all losses resulting therefrom pursuant to ERISA § 502(a)(1)(B); 29 U.S.C. § 1132(a)(1)(B).

90.     <u>Statute of Limitations:</u>  Plaintiff and the Class's action under ERISA § 502(a)(1)(B) did not accrue and/or the statute of limitations was otherwise tolled until such time as Plaintiff engaged counsel (who sent a request for a copy of the Plan Document in accordance with 29 U.S.C. § 1024(b)(4)) and received a copy of the Plan Document. Though Plaintiff was aware that she was

**Exhibit 3**

required to pay a tobacco surcharge to maintain health insurance coverage, she was not, and could not reasonably have been, aware that this surcharge was in violation of the terms of the plan. Though Bass Pro provides its employees with various written Plan materials, such as enrollment documents and summaries of material modifications to certain plan provisions, it does not provide participants copies of the Plan Document—the written instrument that sets out the binding "terms of the plan" within the meaning of ERISA § 502(a)(1)(B). Upon information and belief, the only means by which a Plan participant could access the Plan Document would be to invoke his or her legal rights under 29 U.S.C. § 1024(b)(4).

91. Defendants were aware that Plaintiff and Class Members did not know and could not reasonably have known that the tobacco surcharge was not authorized by the terms of the plan, and did not provide them with a copy of the binding and official terms of the plan so that they might have had the opportunity to correct that misunderstanding. Instead, the plan-related materials Defendants did disseminate to participants, such as enrollment materials, tended to suggest—incorrectly—that the tobacco surcharge was authorized under the terms of the plan. Defendants' superior knowledge, concealment of its violation of the terms of the plan, and failure to disclose the same to Plaintiff and the Class constitute fraudulent concealment and tolls the statute of limitations for Plaintiff and the Class.

92. Plaintiff did not discover, nor could she have discovered through reasonable diligence, the facts establishing Defendants' violation of the terms of the plan.

93. As a result of the date of accrual of the cause of action and/or tolling of the statute of limitations, all tobacco surcharge payments made in violation of the terms of the plan are timely recoverable by Plaintiff and the Class.

94. <u>Administrative Exhaustion</u>: A plaintiff asserting a claim under ERISA § 502(a)(1)(B); 29 U.S.C. § 1132(a)(1)(B) need not comply with the prudential and discretionary administrative exhaustion requirement if exhaustion would be futile, the remedy would be inadequate, the plan's claims procedure would be unreasonable, or there would be no meaningful

**Exhibit 3**

access to the internal review procedure. Each of these exceptions are met in this case for the following reasons, individually or in combination:

    a. Under the Plan's administrative claims appeals process, a claim can only be initiated after the receipt of a written notice of an adverse claims decision or denial notice, and Plaintiff and the Class were never provided such a notice;

    b. The subject matter of the claims of Plaintiff and the Class fall outside the scope of the plan's appeals process, which reviews questions of medical necessity, coverage, and the like, and not disputes concerning the costs borne by a participant to maintain coverage;

    c. The administrative remedies of Plaintiff and the Class are deemed exhausted by operation of law because Defendants' claims appeals procedures do not comply with all requirements established by 29 C.F.R. § 2590.715-2719, 29 C.F.R. § 2560.503-1, and other regulations governing internal claims procedures;

    d. Plaintiff and the Class are challenging a fixed, official, *de jure* policy established by Defendants on its face, as opposed to a discretionary interpretation of a policy made by a claims adjuster or other discrete decisionmaker, rendering an internal appeal futile;

    e. The claims of Plaintiff and the Class would require interpretation of ERISA's statutory requirements and implementing regulations; and

    f. Other reasons to be determined based on facts found through the course of discovery.

<u>**REQUEST FOR RELIEF**</u>

Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that the Court enter judgment in her favor and against Defendants as follows:

    A. That the Court certify this action as a class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiff is a proper class representative, and appoint Plaintiff's counsel as Class Counsel;

**Exhibit 3**

B.  That the Court order Defendants to reimburse all persons who paid the tobacco surcharge within the relevant limitations period;

C.  That the Court order disgorgement and/or restitution of all payments unlawfully assessed by Bass Pro, or, alternatively, the profits earned by Bass Pro in connection with its receipt of such unlawful fees;

D.  That the Court grant a declaratory judgment holding that the acts of Defendants described herein violate ERISA and applicable law, as well as the terms of the plan;

E.  That the Court enter a permanent injunction against Defendants prohibiting them from collecting a tobacco surcharge unless and until the company revises the surcharge to comply with all ERISA statutory requirements;

F.  That the Court order Bass Pro to provide all accountings necessary to determine the amounts it must make good to the Plan and to plan participants and beneficiaries;

G.  That the Court surcharge against Defendants all funds it collected in violation of ERISA and the terms of the plan;

H.  That the Court find and adjudge that Bass Pro is liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duties, to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty, and grant all other proper relief authorized by 29 U.S.C. § 1109, including removal and replacement of the fiduciary;

I.  That the Court impose a constructive trust on profits received by Bass Pro as a result of fiduciary breaches committed by it or for which it is liable, upon which Plaintiff and the class can make claims for equitably vested benefits;

J.  That the Court award Plaintiff and the class all damages available at law in an amount to be determined at trial;

K.  That the Court award reasonable attorneys' fees, costs, and expenses as provided by law;

L.  That the Court order the payment of interest to the extent it is allowed by law; and

M.  That the Court grant all other equitable, remedial, and legal relief as it deems just and

proper under the circumstances.

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiff hereby requests a trial by jury of all issues so triable.

Dated: October 10, 2024        Respectfully submitted,

**STUEVE SIEGEL HANSON LLP**

*/s/ Alexander T. Ricke*
George A. Hanson, MO. Bar No. 43450
Alexander T. Ricke, MO. Bar No. 65132
Caleb J. Wagner, MO Bar No. 68458
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone:    (816) 714-7100
Facsimile:    (816) 714-7101
hanson@stuevesiegel.com
ricke@stuevesiegel.com
wagner@stuevesiegel.com

**McCLELLAND LAW FIRM, P.C.**
Ryan L. McClelland, MO Bar No. 59343
The Flagship Building
200 Westwoods Drive
Liberty, Missouri 64068-1170
Telephone:    (816) 781-0002
Facsimile:    (816) 781-1984
ryan@mcclellandlawfirm.com

*Attorneys for Plaintiff*
*and the Proposed Class*

**Exhibit 3**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**SOUTHERN DIVISION**

**NORA RUIZ, individually and on behalf**
**of all others similarly situated,**

**Plaintiff,**

**v.**

**BASS PRO GROUP LLC, and BPS**
**DIRECT LLC, d/b/a BASS PRO SHOPS,**

**Defendants.**

Case No. 6:24-cv-03122-MDH

**CLASS ACTION SETTLEMENT AGREEMENT**

**Exhibit 4**

This Class Action Settlement Agreement (the "Agreement") is made and entered into by and between Plaintiff Nora Ruiz ("Named Plaintiff") and all members of the Settlement Class (defined below), on the one hand, and Defendants Bass Pro Group LLC, and BPS Direct LLC, d/b/a Bass Pro Shops ("Defendants") (collectively, the "Parties"), on the other hand, to resolve all claims and disputes at issue in the lawsuit filed by the Named Plaintiff with the U.S. District Court for the Western District of Missouri, *Ruiz v. Bass Pro Group LLC, et al.*, Case No. 6:24-cv-03122-MDH (the "Litigation").

<div align="center"><u>RECITALS</u></div>

WHEREAS, the Named Plaintiff filed a Complaint in this Litigation, individually and on behalf of all others similarly situated, alleging that Defendants breached their fiduciary duties and other provisions of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.,* ("ERISA") by maintaining a wellness program that discriminated against employees based on an impermissible health factor by failing to provide a reasonable alternative standard or notice of the same with respect to a tobacco surcharge associated with their group health plan. *See* Doc. 1;

WHEREAS, Defendants deny and continue to deny all of the allegations made by the Named Plaintiff, and deny, and continue to deny that they are liable or owe damages to anyone with respect to the alleged facts or causes of action alleged, or that any claims asserted by the Named Plaintiff may proceed on a class action basis. Nonetheless, without admitting or conceding any arguments, issues, liability, or damages whatsoever, including that any claims alleged may proceed on a class action basis, Defendants have agreed to settle the claims on the terms and conditions set forth in this Agreement to avoid the burden and expense of continuing to defend against litigation;

WHEREAS, Class Counsel (as defined below) has interviewed the Named Plaintiff and other members of the Settlement Class, and has reviewed and analyzed documents and data produced by Defendants;

WHEREAS, Class Counsel has analyzed and evaluated the merits of the claims made against Defendants, and the impact of this Agreement on the Named Plaintiff and the Settlement Class;

WHEREAS, based upon their analysis and evaluation of a number of factors, and recognizing the risks of litigation with respect to certain claims, including the possibility that any litigation might result in a recovery that is less favorable to the Settlement Class, and may not occur for several years, or at all, Class Counsel is satisfied that the terms and conditions of this Agreement are fair, reasonable, and adequate and that this Agreement is in the best interests of the Settlement Class;

WHEREAS, the Parties recognize that the outcome in the Litigation is uncertain and that achieving a final result through the litigation process would require substantial additional risk, discovery, time, and expense;

WHEREAS, the Parties desire to settle fully and finally the differences between them and have agreed to settle this case as to the Named Plaintiff as well as all individuals comprising the Settlement Class, as defined below; and

WHEREAS, the Parties agree to undertake their best efforts, including all steps and efforts that may become necessary by order of the Court, to effectuate the terms and purposes of this Agreement.

**Exhibit 4**

NOW, THEREFORE, in consideration of the mutual promises herein contained and other good and valuable consideration, the sufficiency of which is hereby acknowledged, the Parties agree, subject to approval of the Court, as follows:

<u>**AGREEMENT**</u>

I.     **DEFINITIONS**

A.     **"Agreement."** "Agreement" means this agreement, i.e., the Class Action Settlement Agreement, together with all of its attachments and exhibits, which the Parties understand and agree sets forth all material terms and conditions of the settlement between them, and which is subject to Court approval. It is understood and agreed that the obligations of the Defendants for payment under this Agreement are conditioned on, *inter alia*, the occurrence of the Effective Date.

B.     **"Class Counsel" or "Plaintiff's Counsel."** "Class Counsel" or "Plaintiff's Counsel" mean George A. Hanson and Alexander T. Ricke of Stueve Siegel Hanson LLP; and Ryan L. McClelland of McClelland Law Firm, P.C.

C.     **"Class Employees."** "Class Employees" means the group of individuals in the Nationwide ERISA Class.

D.     **"Class Member" or "Settlement Class."** "Class Member" or "Settlement Class" means the Named Plaintiff and all Class Employees who do not opt out of the Settlement by submitting Opt Outs pursuant to Paragraph III.B, and thus means all individuals who will become bound by the Released Claims portion of the Judgment if the Effective Date occurs.

E.     **"Class Representative."** "Class Representative" means Named Plaintiff Nora Ruiz.

**Exhibit 4**

F. **"Complaint."** "Complaint" means the Class Action Complaint dated April 26, 2024, filed by the Named Plaintiff in the Litigation. *See* ECF Doc. 1.

G. **"Counsel for Defendants" or "Defense Counsel."** "Counsel for Defendants" or "Defense Counsel" means Mark E. Schmidtke and Cristin J. Mack of Ogletree, Deakins, Nash, Smoak & Stewart, P.C.

H. **"Court."** "Court" refers to the Court having jurisdiction over the Litigation, at any stage; presently the U.S. District Court for the Western District of Missouri.

I. **"Defendants."** "Defendants" means the Defendants in the Litigation, Bass Pro Group LLC and BPS Direct LLC, d/b/a Bass Pro Shops.

J. **"Effective Date."** "Effective Date" means the date on which the Judgment becomes a Final Judgment.

K. **"Employer Payroll Taxes."** "Employer Payroll Taxes" means all taxes and withholdings an employer is required to make arising out of, or based upon, the payment of employment/wage compensation in this Litigation, including FICA, FUTA, and SUTA obligations.

L. **"Final Approval."** "Final Approval" means the date the Court enters an Order finally approving the Settlement and dismissing the Litigation against Defendants with prejudice, while still retaining continuing jurisdiction over the administration of the settlement.

M. **"Final Approval Order."** "Final Approval Order" means an order that finally and unconditionally grants final approval of the Agreement, grants final certification of the Settlement Class for settlement purposes only, authorizes payments to the Named Plaintiff and the Settlement Class as provided in this Agreement, and fully and finally extinguishes the Released Claims of the Settlement Class. The Parties shall submit a draft order, entitled "Order Granting Final Approval

Case 6:24-cv-03132-MDH   Document 37-2   Filed 09/05/25   Page 103 of 166
Case 6:24-cv-03132-MDH   Document 137-2   Filed 09/05/25   Page 08 of 146
**Exhibit 4**

of Class Settlement," substantially in the form attached hereto as Exhibit C, for the Court's review and approval.

N.    **"Final Judgment."** "Final Judgment" means fifteen (15) days after the latest of: (i) the date of final affirmance on an appeal of the Judgment, or the expiration of time for a petition for a writ of certiorari to review the Judgment and, if certiorari is granted, the date of final affirmance of the Judgment following review pursuant to that grant; (ii) the date of final dismissal with prejudice of the last pending appeal from the Judgment or the final dismissal of any proceeding on certiorari to review the Judgment; or (iii) if no appeal is filed, the expiration date of the time for the filing or noticing of any form of valid appeal from the Judgment.

O.    **"Final Settlement Approval Hearing."** "Final Settlement Approval Hearing" means a hearing set by the Court to take place at least thirty (30) days after the Opt Out Response Deadline, for the purpose of (i) determining the fairness, adequacy, and reasonableness of the Agreement terms and associated settlement pursuant to class action procedures and requirements; (ii) approving Class Counsel's attorneys' fees and costs; (iii) approving the payment of the Service Payment; and (iv) entering Judgment.

P.    **"Judgment."** "Judgment" means the judgment to be rendered by the Court pursuant to this Agreement.

Q.    **"Maximum Settlement Fund."** "Maximum Settlement Fund" means $4,950,000.00, which is the maximum amount that Defendants have agreed to pay to fully resolve and settle this Litigation, including any claim for attorneys' fees and costs approved by the Court; any and all amounts to be paid to Class Members; the Settlement Administration Costs; any Court-approved Service Payment; and the Reserve Fund. Defendants will not be required to pay under this Agreement any more than the gross total of $4,950,000.00, except for the Employer Payroll

Taxes, which Defendants shall pay independent of and in addition to the Maximum Settlement Fund.

R.      **"Named Plaintiff."** "Named Plaintiff" means Nora Ruiz.

S.      **"Nationwide ERISA Class."** "Nationwide ERISA Class" means all participants in Defendants' group health plan who had a tobacco surcharge deducted from their wages from April 26, 2018 through October 18, 2024.

T.      **"Net Settlement Amount."** "Net Settlement Amount" means the Settlement Amount less Class Counsel's attorneys' fees and costs, the Service Payment, the Settlement Administration Costs, and the Reserve Fund.

U.      **"Opt Out" or "Opt Outs."** "Opt Out" or "Opt Outs" means written and signed requests by Class Employees to be excluded from the Settlement Class, which are to be submitted in the manner and within the time set forth in the Proposed Settlement Notice.

V.      **"Opt Out Response Deadline."** "Opt Out Response Deadline" means the later of the date forty-five (45) days from the date the Settlement Administrator first mails the Proposed Settlement Notice to Class Employees, or thirty (30) days from the date the Settlement Administrator mails the Proposed Settlement Notice to a Class Employee's additional address, provided that under no circumstances will the Opt Out Response Deadline be more than seventy-five (75) days from date the Settlement Administrator first mails the Proposed Settlement Notice to Class Employees.

W.      **"Parties**." "Parties" shall refer to the Named Plaintiff and the Defendants.

X.      **"Preliminary Approval."** "Preliminary Approval" means the date on which the Court preliminarily approves the terms of the Parties' Agreement and certifies a class action for settlement purposes only, as provided in Paragraph IV.A.

Y. **"Preliminary Approval Order."** "Preliminary Approval Order" means an order to be executed and filed by the Court preliminarily approving the terms contained in this Agreement and certifying a class action for settlement purposes only as provided in Paragraph IV.A. The Parties shall submit a draft order, entitled "Order Granting Preliminary Approval of Class Action Settlement," substantially in the form attached hereto as Exhibit B, for the Court's review and approval.

Z. **"Proposed Settlement Notice."** "Proposed Settlement Notice" means the Notice Regarding Proposed Settlement of Class Action to be sent to Class Employees after the Court grants Preliminary Approval of the Agreement, substantially in the form attached to this Agreement as Exhibit A.

AA. **"Released Claims."** "Released Claims" means any and all actual or potential claims, actions, demands, rights, obligations, liabilities, damages, attorneys' fees, expenses, costs, and causes of action under federal, state, and local laws, including ERISA, that were or could have been asserted based on or relating to the facts alleged in the Complaint, whether known or unknown, and including claims arising out of or related to premiums paid for coverage under the Bass Pro Group LLC Health & Welfare Plan ("Plan") and allegedly improperly deducted wages as a result of tobacco use by participants and beneficiaries of the Plan, including claims for back wages, liquidated damages, punitive damages, attorneys' fees, costs, expenses, interest, and penalties, arising between April 26, 2018 up to the Date of Preliminary Approval. However, the Released Claims do not include any rights or claims (i) that may arise after the Date of Preliminary Approval, or (ii) which may not, as a matter of law, be infringed, limited, waived, released, or extinguished. The Released Claims include liquidated or punitive damages based on said claims

**Exhibit 4**

and are intended to include all claims described or identified herein through the date of Preliminary Approval.

BB.    **"Released Parties."** "Released Parties" means the Defendants and their present and former affiliates, divisions, members, joint venture partners, subsidiaries, parents, predecessors, any merged entity or merged entities and/or its or their present and former officers, partners, directors, employees, agents, attorneys, shareholders and/or successors, insurers or reinsurers, and employee benefit plans, including but not limited to the Bass Pro Group LLC Health & Welfare Plan (and the trustees, administrators, fiduciaries, agents, representatives, insurers and reinsurers of such plans), and their assigns, trustees, heirs, administrators, executors, representatives and/or principals, and all persons or entities acting by, through, under or in concert with any of them, and any individual or entity that could be jointly liable with any of them.

CC.    **"Reserve Fund."** "Reserve Fund" means a fund in the amount of $5,000.00, allocated from the Maximum Settlement Fund, that the Settlement Administrator may use, with approval from Defendants, to make payments to Class Employees who dispute their Settlement Check allocation amounts, to individuals who were not identified as Class Employees but have a good faith claim for participation in this settlement, or for any other reasonable purpose necessary to effectuate the settlement.

DD.    **"Service Payment."** "Service Payment" means the amount approved by the Court to be paid to the Named Plaintiff as described in Paragraph III.C, in addition to her Settlement Check as a Class Member, in recognition of her efforts in coming forward as the Named Plaintiff, assisting in the prosecution of the Litigation, or otherwise benefiting the Settlement Class.

EE.    **"Settlement Administrator."** "Settlement Administrator" refers to Analytics Consulting LLC, the settlement administrator selected by the Parties.

FF. **"Settlement Administration Costs."** "Settlement Administration Costs" means the fees and costs incurred by the Settlement Administrator in administering the settlement as described in this Agreement.

GG. **"Settlement Checks."** "Settlement Checks" means the checks issued to Class Members for their proportionate share of the Net Settlement Fund calculated in accordance with this Agreement.

## II. CERTIFICATION OF THE CLASS FOR PURPOSES OF SETTLEMENT ONLY

A. The stipulations in this Paragraph are made solely for purposes of this Agreement. The Parties agree that the stipulations and the terms of this Agreement are in no way an admission that class action certification is proper in this Litigation, and neither the existence nor the terms of this Agreement or its stipulations will be admissible in this or any other action or proceeding as evidence that (i) a determination or admission that any group of similarly situated employees exists to maintain a class action under Rule 23 of the Federal Rules of Civil Procedure (or comparable state laws or rules); (ii) an adjudication of the merits of the Litigation; (iii) Defendants are liable to the Named Plaintiff, Class Employees, or the Settlement Class; or (iv) an adjudication of any other matters released in this Agreement.

## III. PAYMENTS, SETTLEMENT FUND AND ALLOCATION

A. <u>Allocation of the Net Settlement Amount</u>: Each Nationwide ERISA Class member's estimated share of the Net Settlement Amount shall be calculated *pro rata* by comparing the amount of any tobacco surcharges that the Nationwide ERISA Class member had deducted from his or her pay from April 26, 2018 through October 18, 2024, against the total amount of tobacco surcharges that all Nationwide ERISA Class members had deducted from their pay from April 26, 2018 through October 18, 2024.

**Exhibit 4** 10

B. **Participation in Settlement by Class Employees.** Class Employees may elect to "opt out" of the Settlement Class and thus exclude themselves from the Litigation, the Settlement, and the Settlement Class. Class Employees who wish to exercise this option must comply with the instructions in the Proposed Settlement Notice attached hereto as Exhibit A which is incorporated herein by this reference as though set forth in full. If the required written notification of exercising the right to opt out is not received by the Settlement Administrator from a Class Employee and postmarked on or before the Opt Out Response Deadline, that Class Employee will be deemed to (a) have forever waived his or her right to opt out of the Settlement Class; (b) be a member of the Settlement Class; and (c) have forever released the Released Claims against the Defendants.

1. Eligible Class Employees who timely and properly exercise their right to opt out shall have no further role in the Litigation, and for all purposes shall be regarded as if they never were either a party to this Litigation or a Class Member, and thus they shall not be entitled to any benefit as a result of the Litigation, this Agreement and the settlement that it evidences, nor will they have released any claims they may have against the Released Parties.

2. Class Employees who do not opt out of the Settlement Class pursuant to Paragraph III.B, i.e., Class Members, may object to the Agreement by, subject to the Court's determination otherwise, submitting written objections to the Court and mailing copies of their written objection so that they are received by the Settlement Administrator and are postmarked no later than the Opt Out Response Deadline. Subject to the Court's determination otherwise, any objections must be timely submitted as required in this Paragraph or else they will be waived. The Proposed Settlement Notice shall advise Class Members of this option. The Settlement

**Exhibit 4**

Administrator shall immediately provide copies of any such objections to Class Counsel and Counsel for Defendants.

        3.      Defendants shall have the option to withdraw from the settlement if more than 5% of the Class Employees follow the procedure specified in the Class Notice approved by the Court to validly "opt out" of the Settlement. If Defendants wish to exercise this option, they must do so within 14 days of the close of the objection and exclusion period. If Defendants withdraw from the Settlement: (1) Defendants' obligations under the settlement will cease to have any force and effect; (2) this Agreement will be vacated, null, void, and cancelled; (3) the Parties will return to the status *quo ante*, as if they had not entered into the Settlement; and (4) the Settlement, and all negotiations and proceedings related to the Settlement, will be without prejudice to the rights of the Parties, and evidence of the Settlement, negotiations, and proceedings will be inadmissible, and will not be discoverable.

        C.      <u>Service Payment to Named Plaintiff.</u> The Service Payment to the Named Plaintiff Nora Ruiz shall not exceed the total amount of $10,000. The Service Payment is being sought in recognition of the Named Plaintiff's efforts to pursue the claims raised in this Litigation on behalf of the Settlement Class, including assisting Class Counsel with the prosecution and settlement of this Litigation. Defendants will not oppose the Named Plaintiff's request for the Service Payment. In the event that the Court does not approve the amount of the Service Payment to the Named Plaintiff, the settlement will proceed. This Agreement is not contingent upon the Court's approval of the request for the Service Payment in any amount. Any amount allocated as the Service Payment for Named Plaintiff under this Agreement, but not approved by the Court, shall be added to the Net Settlement Amount.

D. <u>Payment of Attorneys' Fees and Costs.</u> Class Counsel will apply to the Court for approval of attorneys' fees not to exceed thirty-three and one-third percent (33 1/3%) of the Maximum Settlement Fund, or $1,650,000, and costs and expenses not to exceed $35,000. Defendants will not oppose such application. In the event that the Court does not approve the amount of the requested attorneys' fees or costs, the settlement will proceed. This Agreement is not contingent upon the Court's approval of the requested attorneys' fees or costs in any amount. Any amounts allocated as attorney's fees or costs under this Agreement, but not approved by the Court, shall be added to the Net Settlement Amount.

E. <u>Release of Claims.</u> Upon the Effective Date and after Defendants have paid the Maximum Settlement Fund to the Qualified Settlement Fund ("QSF") pursuant to Paragraph IV.B.3, the Named Plaintiff and each of the Class Members, on behalf of themselves and each of their heirs, representatives, successors, assigns, and attorneys, shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever released, dismissed with prejudice, relinquished, and discharged all Released Claims as defined in Paragraph I.AA herein.

**IV. THE SETTLEMENT PROCESS**

A. <u>Court Approval of Settlement and Dismissal of Case.</u> As soon as practicable and without undue delay, the Named Plaintiff will seek the Court's Preliminary Approval of the terms of this Agreement (which Defendants will not oppose) and, upon Final Approval, the Named Plaintiff will seek the Court's dismissal of the Litigation with prejudice, on the condition that the Court retain jurisdiction to administer and enforce the terms of this Agreement, to the extent allowed by law.

1.      A condition precedent to this Agreement is the Court's approval of the Preliminary Approval Order attached as Exhibit B, without any changes by the Court to the Preliminary Approval Order that Defendants reasonably and in good faith deem material.

2.      The Parties shall provide to the Court for review and approval this Agreement, with exhibits, including (a) the proposed Preliminary Approval Order in substantially the form attached as Exhibit B, and (b) the Proposed Settlement Notice, attached as Exhibit A; and such other information as the Court may request.

3.      The Parties shall cooperate and take all necessary steps to effectuate judicial approval of the Agreement. Should the Court not approve the Agreement, or should the Court not approve and enter the Preliminary Approval Order in the form attached as Exhibit B (or in a form without any changes by the Court that Defendants deem material), the terms of this Agreement will be null and void, the Parties will retain all rights and defenses in the Litigation, and all negotiations and information and materials pertaining in any way to this Agreement or the settlement of the Litigation will be inadmissible. In such an event, the Parties agree in good faith to negotiate about appropriate revisions and re-submit for the Court's approval. In the event this settlement is never approved by the Court, the Parties will retain all rights and defenses in the Litigation, and all negotiations and information and materials pertaining in any way to this Agreement or the settlement of the Litigation will be inadmissible.

4.      Within ten (10) days following the filing of this Agreement with the Court, the Settlement Administrator shall serve upon the Office of the Comptroller of the Currency of the United States and the appropriate State official of each State in which any Class Member resides, as determined by Defendants' records, a notice of the proposed settlement in compliance with the requirements of the Class Action Fairness Act, 28 U.S.C. § 1715 ("CAFA").

**Exhibit 4**

14

5.   <u>Final Approval</u>. At least thirty (30) days after the Opt Out Response Deadline the Court shall set the Final Settlement Approval Hearing. Prior to the Final Settlement Approval Hearing, the Named Plaintiff will move the Court for entry of the Final Approval Order and the associated Judgment (which Defendants will not oppose). The Parties shall make all reasonable efforts to secure entry of the Final Approval Order and the associated Judgment. If the Court rejects their request, fails to enter the Final Approval Order, or fails to enter the Judgment, this Agreement shall be void *ab initio*, and Defendants shall have no obligations to make any payments under the Agreement, except for costs already incurred by the Settlement Administrator, which shall be borne equally by, on one hand, Class Counsel and the Named Plaintiff, and the Defendants, on the other. At the time the motion is filed requesting Final Approval, the Named Plaintiff and Class Counsel also shall make an application for attorneys' fees and costs and the Service Payment. Notwithstanding any order entered on Named Plaintiff's and Class Counsel's application for awards to them, under no circumstance shall Defendants be required to pay any such awards absent occurrence of the Effective Date.

B.   <u>Settlement Administration.</u> If the Court grants Preliminary Approval of this Agreement, the parties will use Analytics Consulting LLC (or any other mutually-agreed settlement administrator) to administer the settlement.   Reasonable fees and expenses of the Settlement Administrator shall be paid from Maximum Settlement Fund.   In no circumstances will any administration of the settlement, including issuance of the Proposed Settlement Notice, occur unless and until the Court grants Preliminary Approval as set forth in Paragraph IV.A. The Parties agree to the following procedure for administration of the settlement:

1.   <u>Collection and Validation of Contact and Payroll Information.</u>

**Exhibit 4**

a.     Within fourteen (14) days of Preliminary Approval, Defendants shall provide the names and addresses ("Contact Information"), as well as payroll or other data needed for purposes of allocating the Net Settlement Amount ("Payroll Information") of Class Employees to the Settlement Administrator and Class Counsel. Any and all information, including Social Security Numbers, provided by Defendants or Class Counsel shall be held in confidence and shall be used solely for purposes of effectuating this Agreement. This information shall not be disclosed to the Named Plaintiff or Class Employees.

b.     Upon receipt of the Contact Information, the Settlement Administrator shall make reasonable efforts to obtain valid, current addresses for Class Employees, including validating Contact Information through the national change of address database or other third-party change of address databases prior to sending the Proposed Settlement Notice and thereafter as needed.

c.     Upon receipt of the Payroll Information, the Settlement Administrator shall calculate the amount of the Settlement Checks for each Class Employee in accordance with Paragraph III.A.

2.     Issuance of Proposed Settlement Notice to Class Employees.

a.     Within fourteen (14) days of receiving the Contact Information and the Payroll Information, the Settlement Administrator shall issue the Proposed Settlement Notice, as approved by the Court, in substantially the form attached hereto and made a part of this Settlement Agreement as Exhibit A to all Class Employees. The Proposed Settlement Notice shall inform Class Employees of their right to opt-out of the settlement, object to the settlement, or elect to participate in the settlement, and the approximate amount they are entitled to receive if they participate.   If the Proposed Settlement Notice sent to a Class Employee is returned as

undeliverable, the Settlement Administrator shall promptly undertake reasonable steps including performing a single skip trace to determine the Class Employee's current address and, if an additional address is located, to send the Proposed Settlement Notice to the additional address. Although, only one (1) additional Proposed Settlement Notice may be sent to a Class Employee following a skip trace, the Settlement Administrator shall send a Proposed Settlement Notice to any Class Employee who provides the Settlement Administrator with updated address information.

        b.      Eligible Class Employees shall have a deadline of forty-five (45) days from the date the Proposed Settlement Notice is first mailed to opt out of the settlement by fully complying with the requirements for doing so as set forth in the Proposed Settlement Notice attached hereto as Exhibit A. If the Settlement Notice sent to a Class Employee is returned as undeliverable, but the Settlement Administrator locates an additional address for the Class Employee and thereafter sends the Proposed Settlement Notice to that additional address, then that Class Employee shall have a deadline of the earlier of thirty (30) days from the date the Proposed Settlement Notice was mailed to the additional address to opt out of the settlement or seventy-five (75) days from date the Settlement Administrator first mailed the Proposed Settlement Notice to Class Employees. Opt Outs must be returned via U.S. First Class Mail and be postmarked by the Opt Out Response Deadline, which shall be specified in the Proposed Settlement Notice, to be timely.

        3.      <u>Establishment and Funding of the QSF.</u>

        a.      If the Court grants Preliminary Approval of this Agreement, the Settlement Administrator shall establish a QSF pursuant to 26 C.F.R. § 1.468B-1 for the purposes of administering the Settlement on or before the Effective Date. The Parties shall provide the

Settlement Administrator with all necessary cooperation for the creation of the QSF, including but not limited to the execution of all necessary documents.

b. Defendants shall fund the QSF with the Maximum Settlement Fund within fourteen (14) days of the Effective Date.

c. To effectuate the terms of the Settlement and to correct for mathematical or factual errors in the allocations to Class Members, the Settlement Administrator shall allocate from the Maximum Settlement Fund $5,000.00 to create a Reserve Fund, which the Settlement Administrator may use, with approval from Defendants and Class Counsel, to make payments to Class Members who dispute their allocation amounts, to individuals who were not identified as Class Employees but have a good faith claim for participation in the settlement, or for any other reasonable purpose necessary to effectuate the settlement.

4. <u>Issuance of the Payments under This Agreement.</u>

a. Within fourteen (14) days of the date Defendants fund the QSF with the Maximum Settlement Fund, the Settlement Administrator shall issue (i) Settlement Checks allocated from the Net Settlement Fund in accordance with Paragraph III.A to Class Members; (ii) a wire transfer in the amount of any Court-approved attorneys' fees and costs to Class Counsel; and (iii) a check in the amount of any Court-approved Service Payment to the Named Plaintiff.

b. The Settlement Checks shall be valid and negotiable for a period of one hundred and twenty (120) days from issuance ("Participation Deadline"). Any Settlement Checks that are not cashed or deposited within one hundred and twenty (120) days from issuance shall become void. Sixty (60) days prior to the Participation Deadline, the Settlement Administrator shall issue reminder postcards to each of the Class Members who have not negotiated his or her Settlement Check by that date.

**Exhibit 4**

c. At the end of the one hundred and twenty (120) day period from the date the Settlement Checks were mailed, the Named Plaintiff and the Class Members shall remain bound by this Agreement and the Final Order Approving Settlement, notwithstanding any failure to cash or deposit any Settlement Check issued pursuant to this Paragraph.

C. <u>Unnegotiated Settlement Checks.</u>

1. Any portion of the Net Settlement Amount that is not claimed by Class Members because those individuals did not timely negotiate their Settlement Checks (the "Unnegotiated Settlement Checks"), shall be transferred by the Settlement Administrator to the unclaimed property fund of the state where the Class Member worked to be held for that Class Member in exchange for their release of claims as part of this Settlement Agreement. Any expenses incurred shall be considered Settlement Administration Costs and will be paid from the Maximum Settlement Fund. Anything remaining in the funds held by the Settlement Administrator after payments are made to the Class Representative, Settlement Class, and Class Counsel, such as over-estimated taxes, shall belong to Defendants.

D. <u>Tax Treatment of Settlement Checks.</u>

1. For tax purposes, 50% of each Settlement Check shall be treated as back wages, and the other 50% of each Settlement Check shall be treated as interest, any applicable penalties, liquidated damages and other non-wage relief.

2. Payments treated as back wages shall be made net of all applicable employment taxes, including, without limitation, federal, state and local income tax withholding and the employee share of the FICA tax, and shall be reported to the Internal Revenue Service ("IRS") and other appropriate taxing authorities (together with the IRS, the "Taxing Authorities") and the payee under the payee's name and Social Security number on an IRS Form W-2, as taxable

**Exhibit 4** 19

wage income. The employee portion of all applicable income and payroll taxes will be the sole responsibility of the individual Class Member, and shall come out of the Net Settlement Amount. However, payments treated as back wages shall not be made net of any Employer Payroll Taxes, which shall be paid by Defendants independent of and in addition to the Maximum Settlement Fund.

3.     Payments treated as interest and/or liquidated damages shall be made without withholding and shall be reported to the Taxing Authorities and the payee, to the extent required by law, under the payee's name and Social Security number on an IRS Form 1099, as taxable non-wage income.

4.     The Settlement Administrator shall be responsible for determining the appropriate number of exemptions to be used in calculating payroll tax and withholding, deciding the appropriate tax rate, and issuing IRS Forms W-2 and Forms 1099 as appropriate.

E.     <u>Tax Treatment of Attorneys' Fees.</u> Within seven (7) calendar days following Final Approval, Class Counsel shall provide the Claims Administrator with a duly completed IRS Form W-9. The payments provided by Paragraph III.D shall be considered attorneys' fees and reported on behalf of Class Counsel to the Taxing Authorities on a Form 1099 issued to Class Counsel by the Settlement Administrator, provided the Settlement Administrator has timely received a duly completed Form W-9 from Class Counsel.

F.     <u>Tax Treatment of Service Payment.</u> The Service Payment paid to the Named Plaintiff under this Agreement shall be reported as taxable non-wage income to the Taxing Authorities on a Form 1099 issued to the Named Plaintiff by the Settlement Administrator.

G.     <u>Responsibility for Taxes.</u>

**Exhibit 4**

20

1.      Defendants are only responsible for the Employer Payroll Taxes arising from the payments under this Agreement. In the event that it is determined by the Taxing Authorities that Class Counsel, the Named Plaintiff, and/or any Class Member owes any additional taxes with respect to any attorneys' fees or costs, any Service Payment, or any Settlement Check distributed under this Agreement, it is expressly agreed that the determination of any tax liability is between Class Counsel, Named Plaintiff, and/or the Class Members and the Tax Authorities, and that Defendants will not be responsible for the payment of such taxes, including any interest and penalties.

2.      Class Counsel, Counsel for the Defendants, and Defendants make no representations, and it is understood and the Named Plaintiff agrees on behalf of Class Members, that Class Counsel, Counsel for Defendants, and Defendants have made no representations, as to the taxability of any portions of the Settlement Check to the Named Plaintiff, or any Class Member, the payment of any costs or award of attorneys' fees to Class Counsel, or any Service Payment to the Named Plaintiff. The Proposed Settlement Notice will advise Class Employees to seek their own tax advice prior to acting in response to the Notices. Neither Class Counsel nor Counsel for Defendants intend anything contained herein to constitute legal advice regarding the taxability of any amount paid hereunder, nor will it be relied upon as such.

3.      The Named Plaintiff and/or any Class Member agrees to indemnify and hold harmless Defendants and Released Parties for any taxes, penalties, interest, or other amounts due or owing by Defendants for any taxes due or owed by the Named Plaintiff and/or any Class Member on any portion(s) of the Settlement Check to the Named Plaintiff or any Class Member, or any Service Payment to the Named Plaintiff.  Other than as set forth above, and as required by law, Defendants and the Settlement Administrator will not make from the payment to the Named

Electronically Filed - Greene - August 15, 2025 - 04:04 PM

Plaintiff, and/or any Class Member any deductions, withholdings, or additional payments, including without limitation, medical or other insurance payments or premiums, employee 401(k) contributions or matching employer contributions, wage garnishments, or charity withholdings, and entry of the Final Judgment shall be deemed authority not to make such deductions, withholdings, or additional payments. Any amount paid to the Named Plaintiff and/or any Class Member shall not create any credit or otherwise affect the calculation of any deferred compensation, benefit, pension, or other compensation or benefit plan provided by Defendants.

        H.    <u>Other Responsibilities of the Settlement Administrator.</u>

        1.    The Settlement Administrator shall provide periodic updates to Class Counsel and Counsel for Defendants regarding Opt Outs, Class Member objections, and Settlement Check negotiation rates.

        2.    The Settlement Administrator will create the following for purposes of communicating with class members: toll free telephone number, email address, P.O. Box, and website. The Settlement Administrator will not use Defendants' names or the names of any of Defendants' related entities in the website address. The Settlement Administrator shall keep a log of all communications with any Class Employees and shall be responsible for responding to inquiries about the settlement. In the event any Class Employee requests to speak to Class Counsel or has a question that seeks legal advice about the settlement, the Settlement Administrator shall provide that person with Class Counsel's contact information, including telephone number, email address, and mailing address. The Settlement Administrator shall forward all other unresolved questions or issues in writing to Class Counsel and Counsel for Defendants, who will work jointly to attempt to provide a resolution.

**Exhibit 4**

3.      In communications to Class Employees, the Settlement Administrator and the Parties will cooperate to facilitate the purposes of the settlement. Any communication between Class Counsel and a Class Employee shall not discuss any other Class Employee's decision to participate (or not to participate) in this Settlement or allocation of money thereunder.

4.      Within seven (7) days of the Opt Out Response Deadline for all Class Employees, the Settlement Administrator shall provide Defendants and Class Counsel with a list of the names and addresses of all Class Employees (a) who have opted out of the settlement; (b) who do not opt out of the settlement; and (c) the final allocations of amounts to be distributed to each of the settlement participants. Once the final allocations have been calculated, payments to each settlement participant will be in accordance with those allocations.

## V.      NON-ADMISSION OF LIABILITY

This Agreement shall not in any way be construed as an admission by any Defendant that it has acted wrongfully with respect to the Named Plaintiff, Class Employees, or to any other person, collectively or individually, and Defendants specifically disclaim any liability to or wrongful acts against the Named Plaintiff, Class Employees, or any other person, on the part of Defendants or the Released Parties. Furthermore, the Parties agree that this Agreement does not constitute an adjudication of the merits of the Litigation or any other matters released in this Agreement. Accordingly, the Parties agree that none of them has prevailed on the merits; nor shall this Agreement serve or be construed as evidence that (1) any party has so prevailed; (2) Defendants or the Released Parties have engaged in any wrongdoing; or (3) any claims may or should proceed on a class action basis against any of the Defendants or the Released Parties. Nothing in this provision shall prevent the Parties from bringing an action to enforce the terms of this Agreement.

**Exhibit 4**

## VI.    COURT RETAINS JURISDICTION TO ENFORCE AGREEMENT

The Court shall retain jurisdiction with respect to the implementation and enforcement of the terms of the Agreement, to the extent permitted by law, and all Parties hereto submit to the jurisdiction of the Court for purposes of implementing and enforcing the settlement embodied in the Agreement. This retention of jurisdiction encompasses any disagreement among the Parties concerning the final forms of the Notices or other documents necessary to implement this Agreement, and all other disputes regarding the Agreement and its implementation. Any action to enforce this Agreement shall be commenced and maintained only in this Court.

## VII.    PUBLICATION OF SETTLEMENT

Unless ordered by the Court as part the approval process, counsel for the Parties agree not to publicize the settlement (including, without limitation, in a verdicts/settlements service, on a website, through social media, or via any other means) except, if asked, they may respond to a public inquiry by stating an agreement was reached on terms that will be submitted to the Court for approval. Plaintiffs' counsel may post a reference to the settlement on their website and bios submitted to courts to demonstrate adequacy of counsel that does not identify Defendants by name but identifies the settlement amount, nature of the case, and type of claims involved.

## VIII.    GOVERNING LAW

This Agreement is made and entered into in the State of Missouri and shall in all respects be interpreted, enforced, and governed by and under the laws of the State of Missouri except as preempted by ERISA. Any legal action relating to this Agreement shall be brought in this Court before Judge Harpool or any judge presiding in his stead.

## IX.    COOPERATION CLAUSE

The Parties agree to cooperate to effectuate the settlement of the Litigation, including securing the Court's approval of the Agreement, assisting with the administration of the settlement

**Exhibit 4**

in accordance with the terms of this Agreement, and obtaining a final dismissal. The Parties further agree to cooperate to the extent reasonably necessary to effect and implement all terms and conditions of the Agreement and to exercise their best efforts to accomplish the terms and conditions of the Agreement, including but not limited to obtaining the dismissal, transfer to the Court, or stay of any pending or subsequently-filed class action lawsuit that alleges any of the claims covered by the Release herein.

If Class Counsel, or anyone working under their direction, receive inquiries from individuals (including Class members or others) with respect to any claims they believe they may have against Defendants, Class Counsel shall notify counsel for Defendants of any such claims before instituting any legal proceedings. To the extent consistent with Class Counsel's legal and ethical obligations, the undersigned, and any of their clients, will attempt to informally resolve any future disputes with Defendants before any legal proceedings are commenced. Such attempt at informal resolution shall include strong encouragement to participate in formal mediation of the matter before instituting proceedings in court or arbitration.

## X.    ASSIGNMENTS

The Named Plaintiff and Class Counsel represent that they have not assigned or transferred, or purported to assign or transfer, to any person or entity any claim or any portion thereof or interest therein, including, but not limited to, any interest in the Litigation, or any related action.

## XI.    NO REPRESENTATIONS FROM DEFENDANTS

The Named Plaintiff and Class Counsel represent and acknowledge that, in executing this Agreement, they do not rely and have not relied upon any representation or statement made by Defendants or by any of its agents, representatives, or attorneys with regard to the subject matter, basis, or effect of this Agreement.

**Exhibit 4**
25

## XII.   BINDING AGREEMENT

This Agreement shall be binding upon the Parties and upon their past, present, and future respective heirs, administrators, representatives, executors, successors, and assigns, and shall inure to the benefit of Defendants and to their past, present, and future respective heirs, administrators, representatives, executors, predecessors, successors, successors-in-interest, assigns, parent corporations, affiliates, subsidiaries, divisions, joint ventures, administrators, service providers, consultants, subcontractors, board of trustees, boards of directors, officers, trustees, diretors, partners, agents, managers, members, employees, independent contractors, representatives, attorneys, fiduciaries, insurers, co-insurers, reinsurers, accountants, auditors, advisors, and all other persons acting under, by, through, or in concert with them.

## XIII.   ARM'S LENGTH TRANSACTION; MATERIALITY OF TERMS

The Parties have negotiated all the terms and conditions of this Agreement at arm's length. All terms and conditions of this Agreement in the exact form set forth in this Agreement are material to this Agreement and have been relied upon by the Parties in entering into this Agreement.

## XIV.   SEVERABILITY

Should any clause, sentence, provision, Paragraph, or part of this Agreement be adjudged by any court of competent jurisdiction, or be held by any other competent governmental authority having jurisdiction, to be illegal, invalid, or unenforceable, such judgment or holding shall not affect, impair, or invalidate the remainder of this Agreement, but shall be confined in its operation to the clause, sentence, provision, Paragraph, or part of the Agreement directly involved, and the remainder of the Agreement shall remain in full force and effect.

## XV.   WAIVERS, ETC. TO BE IN WRITING

Exhibit 4

26

No waiver, modification, or amendment of the terms of this Agreement, whether purportedly made before or after the Court's Preliminary or Final Approval of this Agreement, shall be valid or binding unless in writing, signed by or on behalf of all Parties, and then only to the extent set forth in such written waiver, modification, or amendment subject to any required Court approval. Any failure by any party to insist upon the strict performance by the other party of any of the provisions of this Agreement shall not be deemed a waiver of future performance of the same provisions or of any of the other provisions of this Agreement, and such party, notwithstanding such failure, shall have the right thereafter to insist upon the specific performance of any and all of the provisions of this Agreement.

## XVI.  CAPTIONS

The captions or headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and shall have no effect upon the construction or interpretation of any part of this Agreement.

## XVII.  CONSTRUCTION

The determination of the terms and conditions of this Agreement has been by mutual agreement of the Parties. Each party participated jointly in the drafting of this Agreement, and therefore the terms and conditions of this Agreement are not intended to be, and shall not be, construed against any party by virtue of draftsmanship.

## XVIII. SOLE AND ENTIRE AGREEMENT

This Agreement, including Exhibits A through D and attached hereto, set forth the entire agreement between the Parties hereto. This Agreement fully supersedes any and all prior oral or written agreements or understandings between the Parties hereto pertaining to the subject matter hereof.  This Agreement may only be modified in writing.

## XIX. EXTENSIONS OF TIME

If any deadlines related to this Agreement cannot be met, Class Counsel and Counsel for Defendants shall meet and confer to reach agreement on any necessary revisions of the deadlines and timetables set forth in this Agreement. In the event that the Parties fail to reach such agreement, any of the Parties may apply to the Court via a noticed motion for modification of the dates and deadlines in this Agreement.

## XX. FACSIMILE/ELECTRONIC SIGNATURES

Any signature made and transmitted by facsimile or email for the purpose of executing this Agreement shall be deemed an original signature for purposes of this Agreement and shall be binding upon the party whose counsel transmits the signature page by facsimile or email.

## XXI. THIRD PARTY BENEFICIARIES

The Agreement shall be binding upon, and inure to the benefit of, the successors and assigns of the Parties hereto; but this Agreement is not designed to and does not create any third party beneficiaries other than third parties that are identified as Released Parties as defined in Paragraph I.BB.

## XXII. COUNTERPARTS

This Agreement may be executed in two or more counterparts, each of which counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

**Exhibit 4**

28

**NAMED PLAINTIFF:**

DATED: __12/30/2024_____    By: _____

*Nora Ruiz*

Nora Ruiz

**DEFENDANTS:**

DATED: _____    By: _____

Bass Pro Group LLC

DATED: _____    By: _____

BPS Direct LLC d/b/a Bass Pro Shops

- 29 -87209175.1 OGLETREE

**Exhibit 4**

**NAMED PLAINTIFF:**

DATED: _____        By: _____
                                            Nora Ruiz


**DEFENDANTS:**

DATED: _2/6/25_                         By: _____
                                            Bass Pro Group LLC

DATED: _2/6/25_                         By: _____
                                            BPS Direct LLC d/b/a Bass Pro Shops

# EXHIBIT A

Electronically Filed - Greene - August 15, 2025 - 04:04 PM

**Exhibit 4**

<div align="center">

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**SOUTHERN DIVISION**

</div>

| | |
|---|---|
| **NORA RUIZ, individually and on behalf of all others similarly situated,** | |
| **Plaintiff,** | **Case No. 6:24-cv-03122-MDH** |
| **v.** | |
| **BASS PRO GROUP LLC, and BPS DIRECT LLC, d/b/a BASS PRO SHOPS,** | |
| **Defendants.** | |

<div align="center">

**OFFICIAL COURT NOTICE REGARDING**
<u>**PROPOSED SETTLEMENT OF CLASS ACTION**</u>

</div>

To:

[Name]
[Address]
[City, State Zip]

**If you were a participant in the Bass Pro Group LLC Health & Welfare Plan ("Health Plan") and had a tobacco surcharge deducted from your wages from April 26, 2018 through October 18, 2024, you may be entitled to a payment from a class action lawsuit settlement.**

**Read this Notice carefully, as the proposed settlement will affect your rights. To receive proceeds from the settlement, <u>you do not have to do anything in response to this Notice</u>, as explained in further detail below**.

**A federal court authorized this Notice. This is not a solicitation from a lawyer.**

- This Notice is directed to: All participants in the Health Plan who had a tobacco surcharge deducted from their wages from April 26, 2018 through October 18, 2024.

- The Named Plaintiff identified in the caption (the "Named Plaintiff") sued Defendants Bass Pro Group LLC and BPS Direct LLC d/b/a Bass Pro Shops ("Defendants"), by filing a Complaint (the "Complaint") on April 26, 2024, alleging that they breached their fiduciary duties under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et*

<div align="center">

More information is available at [link to settlement website]

</div>

<div align="right">

**Exhibit 4**

</div>

*sea.,* ("ERISA"), through a wellness program that discriminated against employees based on an impermissible health factor when they failed to provide a reasonable alternative standard with respect to their tobacco surcharge policy.

- The Named Plaintiff filed the Complaint as a class action under ERISA.

- Although Defendants deny the allegations in the Complaint, the Parties have agreed to settle this dispute for the purpose of avoiding further disputes and litigation with its attendant risk, expense, and inconvenience. The Court has not made any ruling on the merits of the claims and no Party has prevailed in the lawsuit. However, the Court has reviewed and preliminarily approved this settlement and this Notice.

- The settlement monies are being used to pay certain current Health Plan participants, to pay attorneys' fees, litigation costs, a service payment to the Named Plaintiff, and the costs of administering the settlement. Defendants will not take an adverse action against any Health Plan participant arising from acceptance or rejection of the settlement payment.

- Under the allocation formula created by the settlement, the estimated gross amount you will recover is $_____, which you will receive in the mail if the Court grants final approval of the settlement and you do not submit a written request to opt out of the settlement (described in Section 8 below). This amount is based on a pro rated portion of the amount of any tobacco surcharges that you had deducted from your pay from April 26, 2018 through October 18, 2024 and will be subject to various deductions, including applicable taxes.

- Your decisions have legal consequences for you. You have a choice to make:

| YOUR LEGAL RIGHTS AND OPTIONS IN RESPONSE TO THIS NOTICE: | |
|---|---|
| **IF YOU DO NOTHING** | By **NOT** submitting a written request to opt out of the settlement, you will be bound by the release of the Released Claims (defined in Section 7 of this Notice) and you will receive in the mail a settlement check in the gross amount of $_____ representing your share of the settlement fund less required deductions. |
| **IF YOU SUBMIT A REQUEST TO OPT OUT** | If you timely submit a written request to opt out of settlement, you will receive nothing under the settlement, but you will not be bound by the release of any of the claims described in this Notice. |

- These rights and options are explained more fully below.

**BASIC INFORMATION**

More information is available at [link to settlement website]

**Exhibit 4**

**1. Why did I receive this Notice?**

Defendants' records show that you participated in the Health Plan and had a tobacco surcharge deducted from your wages during the period of April 26, 2018 through October 18, 2024. Because you meet these criteria, you are a member of the proposed "Settlement Class."

You are receiving this Notice because, as a potential Settlement Class Member, you have a right to know about the settlement of a class action lawsuit that affects your rights. This Notice explains the lawsuit, the settlement, and your rights and options.

The Court supervising this case is the U.S. District Court for the Western District of Missouri. The lawsuit is known as *Ruiz v. Bass Pro Group, LLC, et al.*, Case No. 6:24-cv-03122-MDH.

**2. What is this lawsuit about?**

The Complaint alleges that Defendants violated ERISA through a wellness program that discriminated against employees based on an impermissible health factor when they failed to provide a reasonable alternative standard with respect to their tobacco surcharge policy. Defendants deny all the claims asserted in the Complaint and maintain that the wellness program at issue complied with all applicable law.

**3. Why is there a proposed settlement?**

The Court did not decide in favor of the Named Plaintiff or Defendants, and no Party prevailed. The Parties agreed to a settlement to avoid further disputes and the risk, expense, and inconvenience of litigation.

On [DATE], the Court granted preliminary approval of the proposed settlement. The Court will decide whether to give final approval to the proposed settlement in a hearing scheduled for [DATE] ("Final Approval Hearing"). *See* Section 12 below for details.

The Named Plaintiff and her attorneys believe that this settlement is a good outcome for all individuals covered by the proposed settlement. But if you believe the settlement is not in your interests, you may opt out of the settlement. *See* Section 8 below for details.

**THE SETTLEMENT BENEFITS – WHAT YOU GET**

**4. What does the settlement provide?**

The Settlement Amount, $4,950,000 in total, fully resolves and satisfies the attorneys' fees and costs approved by the Court, all amounts to be paid to individuals covered by the Settlement, Court-approved service payment to the Named Plaintiff, interest, and the Settlement

More information is available at [link to settlement website]

**Exhibit 4**

Administrator's fees and costs. The Settlement funds are being divided among the individuals covered by the Settlement according to an allocation formula.

| 5.  How much is my payment and how was it calculated? |
|---|

Based on the allocation formula that has been approved by the Court, you will be receiving a settlement check in the gross amount of $_____, less all required deductions. The allocation formula takes into account the total amount of any tobacco surcharges that you had deducted from your pay from April 26, 2018 through October 18, 2024.  The Settlement Agreement contains the exact allocation formula. You may obtain a copy of the Settlement Agreement by following the instructions in Section 13 below.

Half of each Settlement Check will be treated as back wages for which you will receive an IRS Form W-2, and will be treated as taxable wage income, and the other 50% will be treated as interest, liquidated damages, and any applicable penalties.

Neither Class Counsel nor Defendants make any representations concerning the tax consequences of your settlement payment. You are advised to obtain personal tax advice prior to acting in response to this Notice.

**HOW YOU GET A PAYMENT**

| 6.  How do I get my payment? |
|---|

To receive proceeds from the settlement, **you do not have to do anything in response to this Notice**.

If the Court grants final approval of the settlement and you do **not** submit an written request to opt out of the settlement (described in Section 8 below), you will be bound by the release of certain federal, state, and local law claims described in Section 7 below, and you will receive in the mail a Settlement Check in the gross amount of $_____, less all required deductions, representing your share of the settlement fund.

| 7.  What am I giving up if I receive proceeds from the settlement? |
|---|

If you do not request exclusion from the settlement in accordance with Section 8 below, you will be deemed to have waived, released, and forever discharged any and all actual or potential claims, actions, demands, rights, obligations, liabilities, damages, attorneys' fees, expenses, costs, and causes of action under federal, state, and local laws, including ERISA, that were or could have been asserted based on or relating to the facts alleged in the Complaint, whether known or unknown, and including claims arising out of or related to premiums paid for coverage under the Bass Pro Group LLC Health & Welfare Plan ("Plan") and allegedly improperly deducted wages as a result of tobacco use by participants and beneficiaries of the Plan, including claims for back wages, liquidated damages, punitive damages, attorneys' fees, costs, expenses, interest, and

More information is available at [link to settlement website]

**Exhibit 4**

penalties ("Released Claims"), against Defendants and their present and former affiliates, divisions, members, joint venture partners, subsidiaries, parents, predecessors, any merged entity or merged entities and/or its or their present and former officers, partners, directors, employees, agents, attorneys, shareholders and/or successors, insurers or reinsurers, and employee benefit plans, including but not limited to the Bass Pro Group LLC Health & Welfare Plan (and the trustees, administrators, fiduciaries, agents, representatives, insurers and reinsurers of such plans), and their assigns, trustees, heirs, administrators, executors, representatives and/or principals, and all persons or entities acting by, through, under or in concert with any of them, and any individual or entity that could be jointly liable with any of them (the "Released Parties"). The full scope of the release is set forth in the Settlement Agreement.

The Released Claims include all potential damages based on said claims, and are intended to include all claims described or identified herein arising between April 26, 2018 up through [DATE OF PRELIMINARY APPROVAL]. However, the Released Claims do **not** include any rights or claims (i) that may arise after [DATE OF PRELIMINARY APPROVAL]; or (ii) which may not be infringed, limited, waived, released or extinguished as a matter of law.

### HOW YOU REQUEST EXCLUSION FROM OR OBJECT TO THE SETTLEMENT

**8. What if I do not want to participate in the settlement?**

If you do not want to participate in the settlement and want to retain your right to pursue your own independent action, you must send a letter stating your desire to be excluded from the settlement, include the name of the Litigation, your name, your address, and your signature. Requests for exclusion should be sent in an envelope addressed to the Settlement Administrator as set forth in Section 13 below.

In order to be valid, your written request to opt out of the settlement must be received by the Settlement Administrator and be postmarked no later than [DATE]. If you timely submit a written request to opt out of the settlement, you will not be eligible to receive any of the benefits under the Settlement. You will, however, retain whatever legal rights you may have against Defendants with regard to all of the released claims described above in Section 7.

**9. What if I want to object to the settlement?**

If you do not request exclusion from the settlement but believe the proposed Settlement is unfair or inadequate in any respect, you may object to the settlement by filing a written objection with the Court and mailing a copy of your written objection to the Settlement Administrator.

All objections must be signed and include your address, telephone number, and the name of the Litigation. Your objection should clearly explain why you object to the proposed settlement and must state whether you or someone on your behalf intends to appear at the Final Approval Hearing. All objections must be filed with the Court, received by the Settlement Administrator, and postmarked by no later than [DATE]. If you submit a timely objection, you may appear, at your own expense, at the Final Approval Hearing, discussed below.

More information is available at [link to settlement website]

**Exhibit 4**

Any Settlement Class Member who does not object in the manner described above shall be deemed to have waived any objections and shall forever be foreclosed from objecting to the fairness or adequacy of the proposed Settlement, the payment of attorneys' fees, litigation costs, the Court-approved service payment, the claims process, and any and all other aspects of the Settlement. Likewise, regardless of whether you attempt to file an objection, you will be deemed to have released all of the Released Claims as set forth above in Section 7 unless you request exclusion from the Settlement in accordance with Section 8 above.

**THE LAWYERS REPRESENTING YOU**

**10. Do I have a lawyer in this case?**

The Court has determined that the lawyers from the law firms of Stueve Siegel Hanson LLP and McClelland Law Firm, P.C., who have entered their appearance in this case, are qualified to represent you and all individuals covered by this settlement. These lawyers are called "Class Counsel." You will not be charged for these attorneys. The attorneys will be paid from the settlement fund in an amount to be approved by the Court. You do not need to retain your own attorney to participate as a member of this class action. However, you may consult with any attorney you choose at your own expense before deciding whether to opt out of this settlement.

**11. How will the lawyers be paid?**

Class Counsel will ask the Court to award attorneys' fees in an amount not to exceed one-third (33.3%) of the Settlement Amount plus reimbursement of up to $35,000 in expenses, which will be paid from the Settlement Amount. In addition, Class Counsel will ask the Court to authorize payment from the Settlement Amount of a service payment of not more than $10,000 to the Named Plaintiff to recognize the risks she took and services to the beneficiaries of this settlement.

**FINAL APPROVAL OF THE SETTLEMENT**

**12. When will the settlement be final and when will I receive my settlement payment?**

If the Court grants Final Approval of the settlement, and you did not request exclusion from the settlement, you will receive your settlement payment in the mail after Final Approval.

The Court will hold a Final Approval Hearing on the fairness and adequacy of the proposed settlement, the plan of distribution, Class Counsel's request for attorneys' fees and costs, and the service payment to the Named Plaintiff on [DATE] in Courtroom ___ of the U.S. District Court, Western District of Missouri, located at 222 N. John Q. Hammons Parkway, Springfield, Missouri 65806. The Final Approval Hearing may be continued without further notice to Class Members. You are not required to appear at the hearing to participate in or to opt-out of the Settlement.

**FOR MORE INFORMATION**

More information is available at [link to settlement website]

**Exhibit 4**

## 13. Are there more details about the settlement?

This Notice summarizes the proposed settlement. More details are in a Settlement Agreement. You are encouraged to read it. To the extent there is any inconsistency between this Notice and the Settlement Agreement, including between the description of the releases as provided in Section 7 above and the description of the releases as provided in the Settlement Agreement, the provisions in the Settlement Agreement control. You may obtain a copy of the Settlement Agreement at [link to settlement website] or by sending a request, in writing, to:

Administrator Contact Information
Administrator Contact Information
Administrator Contact Information
Administrator Contact Information
Administrator Contact Information
Administrator Contact Information
Administrator Contact Information

## 14. How do I get more information?

If you have other questions about the settlement, you can contact the Settlement Administrator, or Class Counsel at the addresses and/or telephone numbers below.

Email: [SSH email]
Telephone: [SSH 1-800 Number]

These are the lawyers acting as Class Counsel, one of whom will respond to your questions at the above email and telephone numbers:

George A. Hanson
Alexander T. Ricke
STUEVE SIEGEL HANSON LLP
460 Nichols Road, Suite 200
Kansas City, Missouri 64112

Ryan L. McClelland
McCLELLAND LAW FIRM, P.C.
The Flagship Building
200 Westwoods Drive
Liberty, Missouri 64068

## 15. What if my name or address changes before I receive my settlement payment?

If, for future reference and mailings from the Court or Settlement Administrator, you wish to change the name or address listed on the envelope in which the Class Notice was first mailed to

More information is available at [link to settlement website]

**Exhibit 4**

you, then you must fully complete, execute, and mail the Change of Name and/or Address Information Form (enclosed with this Notice as Form A).

DATED:              , 2025

**PLEASE DO NOT CALL OR WRITE THE COURT ABOUT THIS NOTICE.**

**Exhibit 4**

# FORM A

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION**

NORA RUIZ, individually and on behalf
of all others similarly situated,

Plaintiff,

v.                                                  Case No. 6:24-cv-03122-MDH

BASS PRO GROUP LLC, and BPS
DIRECT LLC, d/b/a BASS PRO SHOPS,

Defendants.

## CHANGE OF NAME AND/OR ADDRESS INFORMATION FORM

**Instructions:**  Please complete this Change of Name and/or Address Information Form **only** if you wish to change your name and/or mailing address information.

**Former Name and Mailing Address**:

Name (first, middle, and last): _____

Home Street Address: _____

City, State, Zip Code: _____

Home Telephone Number:  (_____) _____

**New Name and Mailing Address**:

Name (first, middle, and last): _____

Home Street Address: _____

City, State, Zip Code: _____

Home Telephone Number:  (_____) _____

I understand that all future correspondence in this Litigation, including, but not limited to, important notices or payments to which I am entitled (if any), will be sent to the new address listed

**Exhibit 4**

above and not to the address previously used. I hereby request and consent to use the address listed above for these purposes.

Dated: _____

_____
(Signature)

_____
(Print Name)

PLEASE RETURN THIS FORM VIA UNITED STATES MAIL TO:

Administrator Contact Information
Administrator Contact Information
Administrator Contact Information
Administrator Contact Information
Administrator Contact Information
Administrator Contact Information
Administrator Contact Information

**Exhibit 4**

# EXHIBIT B

Electronically Filed - Greene - August 15, 2025 - 04:04 PM

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**SOUTHERN DIVISION**

NORA RUIZ, individually and on behalf
of all others similarly situated,

               **Plaintiff,**

    v.

BASS PRO GROUP LLC, and BPS
DIRECT LLC, d/b/a BASS PRO SHOPS,

           **Defendants.**

**Case No. 6:24-cv-03122-MDH**

**[PROPOSED] ORDER GRANTING PRELIMINARY APPROVAL**
**OF CLASS ACTION SETTLEMENT**

On _____, 2025, the Court heard a motion for preliminary approval of a

settlement of a class action by Plaintiff Nora Ruiz ("Named Plaintiff"), individually and on behalf

of all others similarly situated, and Defendants Bass Pro Group LLC, and BPS Direct LLC, d/b/a

Bass Pro Shops ("Defendants"). The Court has considered the Settlement Agreement and its

exhibits, including the Proposed Settlement Notice; and the submissions of counsel, and hereby

finds and orders as follows:

1.      Unless otherwise defined herein, all terms used in this Order (the "Preliminary

Approval Order") will have the same meaning as defined in the Settlement Agreement.

2.      The Court finds on a preliminary basis that the settlement memorialized in the

Settlement Agreement, and filed with the Court, falls within the range of reasonableness and,

therefore, meets the requirements for preliminary approval.

3.      The Court grants preliminary approval of the parties' Settlement Agreement.

**Exhibit 4**

4.     The Court certifies, for settlement purposes only, the following Settlement Class pursuant to the Settlement Agreement and Fed. R. Civ. P. 23:

a.     **Nationwide ERISA Class:** All participants in Defendants' group health plan who had a tobacco surcharge deducted from their wages from April 26, 2018 through October 18, 2024.

5.     The Court appoints, for settlement purposes only, the Named Plaintiff Nora Ruiz as the Class Representative of the Settlement Class.

6.     The Court appoints, for settlement purposes only, the law firms of Stueve Siegel Hanson LLP and McClelland Law Firm, P.C. as Class Counsel for the purposes of Settlement, and the releases and other obligations therein.

7.     This Court approves Analytics Consulting LLC as Settlement Administrator to perform duties in accordance with the terms of the Settlement Agreement.

8.     The Proposed Settlement Notice to be provided as set forth in the Settlement Agreement is hereby found to be the best practicable means of providing notice under the circumstances and, when completed, shall constitute due and sufficient notice of the proposed class settlement and the Final Approval Hearing to all persons and entities affected by and/or entitled to participate in the settlement, in full compliance with the notice requirements of Fed. R. Civ. P. 23, due process, the Constitution of the United States, the laws of the State of Missouri, and all other applicable laws. The Notice is accurate, objective, and informative, and provides members of the Settlement Class with all of the information necessary to make an informed decision regarding their participation in the settlement and its fairness.

9.     The Notice Regarding Proposed Settlement of Class Action, attached to the Settlement Agreement as Exhibit A, including the Change of Name or Address Information Form

**Exhibit 4**

(Form A), is approved. The Settlement Administrator is authorized to mail those documents to the Class Employees as provided in the Settlement Agreement.

10.     Class Employees who wish to opt out of the Settlement must submit a written request to opt-out of the settlement no later than (a) forty-five (45) days from the date the Settlement Administrator first mails the Proposed Settlement Notice to Class Employees, or (b) thirty (30) days from the date the Settlement Administrator mails the Proposed Settlement Notice to a Class Employee's additional address, whichever date is later, provided that under no circumstances will any Class Employee be permitted to submit his or her written request to opt-out of the settlement more than seventy-five (75) days from date the Settlement Administrator first mails the Proposed Settlement Notice to Class Employees.

11.     Any written objection to the settlement must be submitted to the Court no later than forty-five (45) days after the Proposed Settlement Notice is mailed to the Class Employees. The Court will not consider any objections filed after that deadline and such objections, if any, shall be deemed waived.

12.     Pending the Court's decision on final approval of the settlement and entry of the Court's Final Approval Order, the Litigation and any other action or proceeding brought by or on behalf of the Named Plaintiff or any Class Member that asserts any claim released under the Settlement Agreement shall be stayed in each such action or proceeding.

13.     Neither this Order, the Settlement Agreement, nor any other documents or information relating to the settlement of this Litigation shall constitute, be construed to be, or be admissible in this Litigation or any other proceeding as evidence: (a) that any group of similarly situated or other employees exists to maintain a class action under Rule 23 of the Federal Rules of Civil Procedure, or comparable state laws or rules; (b) of an adjudication of the merits of this

Litigation; (c) of an adjudication of any of the matters subject to the Release in the Settlement Agreement; (d) that any party has prevailed in this case, or (e) that Defendants or the Released Parties have engaged in any wrongdoing.

14.     The Named Plaintiff and Defendants are ordered to carry out the settlement according to the terms of the Settlement Agreement.

15.     The Court will conduct a Final Approval Hearing on _____, 2025, at ____ a.m./p.m. to determine the overall fairness of the settlement and to approve the amount of attorneys' fees and costs to Class Counsel and the Service Payment to the Named Plaintiff.  The Final Approval Hearing may be continued without further notice to Class Members. The Named Plaintiff shall file her motion for approval of the settlement, and Class Counsel shall file their unopposed motion for attorneys' fees, costs and expenses, and the Service Payment on or before _____, 2025.

IT IS SO ORDERED.


Dated: _____, 2025

                                        _____
                                        DOUGLAS HARPOOL
                                        UNITED STATES DISTRICT JUDGE

# EXHIBIT C

Electronically Filed - Greene - August 15, 2025 - 04:04 PM

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION**

NORA RUIZ, individually and on behalf
of all others similarly situated,

Plaintiff,

v.

BASS PRO GROUP LLC, and BPS
DIRECT LLC, d/b/a BASS PRO SHOPS,

Defendants.

Case No. 6:24-cv-03122-MDH

**[PROPOSED] ORDER GRANTING
FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

On ⬚⬚⬚⬚⬚, 2025, the Court heard a motion for final approval of a settlement of a class action by Plaintiff Nora Ruiz ("Named Plaintiff"), individually and on behalf of all others similarly situated, and Defendants Bass Pro Group LLC and BPS Direct LLC d/b/a Bass Pro Shops ("Defendants"). The Court has considered the Motion for Final Approval of Class Action Settlement and other related materials submitted by the parties, as well as the parties' presentation at the hearing on final approval, and otherwise being fully informed in the premises, hereby finds and orders as follows:

1.      Unless otherwise defined herein, all terms used in this Order (the "Final Approval Order") will have the same meaning as defined in the Settlement Agreement.

2.      The Court has jurisdiction over the subject matter of this Litigation pursuant to 28 U.S.C. §§ 1331, 1332, and 1367 and 29 U.S.C. §1132(e)(1), including jurisdiction over all members of the Settlement Class certified by order dated ⬚⬚⬚, 2024 (ECF Doc. ⬚⬚), and defined as:

a. **Nationwide ERISA Class:** All participants in Defendants' group health plan who had a tobacco surcharge deducted from their wages from April 26, 2018 through October 18, 2024.

3.      The Court finds that the Settlement Class satisfies the requirements of Fed. R. Civ. P. 23(a) and is maintainable under Rule 23(b)(3) for purposes of settlement of this Litigation only. In so finding, the Court does not determine whether the certification of the class would remain proper under the more stringent standard that requires a showing of, *inter alia*, manageability.

4.      The Court confirms the appointments of (a) Named Plaintiff Nora Ruiz as Class Representative of the Settlement Class, and (b) the law firms of Stueve Siegel Hanson LLP and McClelland Law Firm, P.C. as Class Counsel.

5.      The Notice Regarding Proposed Settlement of Class Action ("Proposed Settlement Notice") sent to the Class members via First Class Mail adequately informed the Class Members of the terms of the Settlement Agreement, their estimated recovery if the Settlement was approved, the process available to obtain monetary relief, their right to request exclusion from the Class and pursue their own remedies, and their opportunity to file written objections and appear and be heard at the Final Approval Hearing. The Proposed Settlement Notice also adequately informed the Class Members of the contact information for the Settlement Administrator and Class Counsel. Thus, the Court finds that the Proposed Settlement Notice provided to the Class Members satisfied the requirements of Fed. R. Civ. P. Rule 23(e)(1)(B).

6.      The Court finds that the settlement memorialized in the Settlement Agreement, and filed with the Court, is fair, reasonable, and adequate, and in the best interests of the Class Members. The Court finds that: (a) the strength of the Class Representative's and Class Members' claims weighed against the defenses of Defendants and the complexity, length, and expense of

further litigation, support approval of the Settlement; (b) the Maximum Settlement Amount of $4,950,000 as set forth in the Settlement Agreement is a fair, reasonable, and adequate settlement of the Named Plaintiff's individual claims and the claims of the Settlement Class; (c) the Settlement was reached pursuant to arm's-length negotiations between the parties; (d) the support for the Settlement expressed by Class Counsel and counsel for Defendants, who have significant experience representing parties in complex class actions, weighs in favor of approval of the Settlement; (e) the absence of any objections to the Settlement by Class Members supports approval of the Settlement; and (f) the Litigation has progressed to a stage where the Court and the parties could evaluate the merits of the case, potential damages, and the probable course of future litigation.

7.     The Settlement Administration Costs of $_____ are approved and shall be paid to the Settlement Administrator from the Qualified Settlement Fund according to the procedures set forth in the Settlement Agreement.

8.     The Service Payment, as set forth in the Settlement Agreement, is approved and shall be awarded and paid to Named Plaintiff from the Qualified Settlement Fund according to the procedures set forth in the Settlement Agreement.

9.     Class Counsel is awarded $_____ for attorneys' fees and $_____ for costs and will receive such payment from the Qualified Settlement Fund according to the procedures set forth in the Settlement Agreement.

10.    Class Members shall receive their settlement shares according to the allocation formula and procedures set forth in the Settlement Agreement. Any unclaimed funds to Class Employees shall be distributed to the unclaimed property fund of the state where the Class Employee worked according to the procedures set forth in the Settlement Agreement.

**Exhibit 4**

11.     The Court orders that any Class Employee who did not timely submit a written request to opt-out of the settlement is bound by the terms of the Settlement Agreement, and fully releases and discharges Defendants and the Released Parties from the Released Claims.

12.     As identified by the Settlement Administrator, the Court finds that ___ individuals have timely requested exclusion from the Settlement Class. These individuals are (a) excluded from the Rule 23 Class previously certified; (b) are not bound by the terms of the Settlement Agreement; (c) do not release Defendants and all other Released Parties from the Released Claims; and (d) are not entitled to participate in the monetary portion of the Settlement.  A list of all such individuals who timely submitted a written request to opt-out of the settlement is attached to this Order as Exhibit A.

13.     Neither this Order, the Settlement Agreement, nor any other documents or information relating to the settlement of this Litigation shall constitute, be construed to be, or be admissible in this Litigation or any other proceeding as evidence: (a) that any group of similarly situated or other employees exists to maintain a class action under Rule 23 of the Federal Rules of Civil Procedure, or comparable state laws or rules; (b) of an adjudication of the merits of this Litigation; (c) of an adjudication of any of the matters subject to the Release in the Settlement Agreement; (d) that any party has prevailed in this case; or (e) that Defendants, or the Released Parties have engaged in any wrongdoing.

14.     This Court grants final approval of the Settlement.

15.     This matter is dismissed with prejudice, without any cost to any of the parties except as provided in the Settlement Agreement. The Clerk is directed to enter judgment consistent with this Order.

IT IS SO ORDERED.

**Exhibit 4**

Dated: _____, 2025

_____
DOUGLAS HARPOOL
UNITED STATES DISTRICT JUDGE

**Exhibit 4**

Electronically Filed - Greene - August 15, 2025 - 04:04 PM



Katrina D. Gibson, Esq.
Financial Lines
Telephone: (609) 519-4649
Email: Katrina.Gibson@cna.com

June 11, 2024

**VIA EMAIL ONLY** (DPJones2@basspro.com)
David Jones
Johnny Morris Outdoors, LLC
2500 East Kearney Street
Springfield, MO 65898

| | |
|---|---|
| Named Insured: | Johnny Morris Outdoors, LLC |
| Claimant: | Nora Ruiz, et *al.* |
| Policy: | Fiduciary Liability Solutions policy no. 596433932 (the "Policy") |
| Issuing Company: | Continental Casualty Company ("Continental") |
| Policy Period: | 11/1/2023 to 11/1/2024 |
| Limit of Liability: | $10 million |
| Retention: | $1.5 million each **Mass or Class Action Claim** |
| Claim No.: | LCA05676 |

Dear David Jones:

Continental further acknowledges receipt of notice of the Complaint filed in the following matter, which was reported under the above-referenced Policy: *Nora Ruiz v. Bass Pro Group LLC and BPS Direct LLC d/b/a Bass Pro Shops*, U.S.D.C., W.D. Missouri, no. 6:24-cv-03122 (the "Action"). Based upon our review of the Policy and the information provided, and for the reasons explained at greater length below, Continental has determined that this matter asserts allegations that fall within the scope of the Policy's coverage, and therefore it will be providing certain coverage for this matter, including a defense, subject to the terms and conditions of the Policy and our reservation of rights, as set forth below.

This letter is addressed to you because it is my understanding that you are authorized to receive on behalf of the **Named Insured**[1] insurance materials pertaining to this matter. If you are not the person to whom such materials should be directed, please promptly forward this to the appropriate person and advise me accordingly. To assist you

---

[1] Words in bold font are defined terms in the Policy.

Electronically Filed - Greene - August 15, 2025 - 04:04 PM

in understanding this letter, we suggest that the Policy be reviewed together with this letter. This letter does not modify the terms and conditions of the Policy.

## Factual Background and Allegations

On April 26, 2024, Plaintiff Nora Ruiz filed an ERISA Class Action Complaint in the Western District of Missouri against Defendants Bass Pro Group LLC and BPS Direct LLC for alleged breaches of fiduciary duty and other statutory violations under ERISA in connection with the Bass Pro Group LLC Health and Welfare Benefit Plan (the "Plan"). Plaintiff alleges Defendants violated ERISA's anti-discrimination provision by charging a tobacco user surcharge to Plan participants who use tobacco. According to Plaintiff, the tobacco cessation program offered through the Plan does not qualify as a bona fide "wellness program" under ERISA, and thus does not meet a safe harbor exception to ERISA's prohibition against tobacco surcharges. The Complaint asserts the following Counts under ERISA: (1) unlawful surcharge – failure to provide a reasonable alternative standard, 29 U.S.C., 1182(b); (2) unlawful surcharge – failure to provide required notice, 29 U.S.C. 1182(b); and (3) breach of fiduciary duty.

## Coverage Analysis

Continental issued to Johnny Morris Outdoors, LLC claims-made Fiduciary Liability Solutions policy number 596433932 for the **Policy Period** effective 11/1/2023 to 11/1/2024. The Policy has a $10 million aggregate Limit of Liability and, per Endorsement No. 15, an applicable $1.5 million Retention for each **Mass or Class Action Claim**. The Policy also has various sub-limits as specified in the Declarations. **Defense Costs** erode the Policy Retention and Limit of Liability.

## I. Scope of Coverage and Limitations/Exclusions

Pursuant to the Policy's Insuring Agreement, the Policy provides certain coverage for **Loss** from a **Claim** against an **Insured** for a **Wrongful Act** by such **Insured** or by any natural person for whose **Wrongful Act** such **Insured** is legally responsible, provided the **Claim** was first made during the **Policy Period** and reported pursuant to Section VI of the Policy. *See* Fiduciary Liability Solutions Form ("FL Form") at p. 1. Based on the information you have provided, the Complaint asserts allegations that appear to fall within the scope of the Policy's Insuring Agreement. As such, Continental acknowledges that the Policy provides certain coverage for this matter subject to the limitations, exclusions and conditions discussed in this letter.

While we give no credence to Plaintiff's allegations, please note that the Policy contains several provisions that apply or could apply to limit or exclude coverage for this matter. First, coverage is limited, in part, to **Claims** made against an **Insured** for a **Wrongful Act** involving a **Plan**. The Complaint has been asserted against Bass Pro Group LLC and BPS Direct LLC for alleged misconduct involving the Bass Pro Group LLC Health and Welfare Benefit Plan. It is Continental's understanding that each such entity is a

Electronically Filed - Greene - August 15, 2025 - 04:04 PM

**Subsidiary** of the **Named Insured** and thus constitutes an **Insured Entity** under the Policy. It is also Continental's understanding that the Plan constitutes a covered "**Plan**," as that term is defined it the Policy, because it is an ERISA-regulated employee welfare benefit plan that was, prior to the effective date of the Policy, sponsored solely by an **Insured Entity** for the benefit of the **Employees** or **Executives** of the **Insured Entity**. *See* FL Form at pp. 5-6. However, if either of these understandings are incorrect, please advise me as soon as possible. Continental reserves the right to limit or disclaim coverage for this matter if it learns that the Defendants are not **Insured Entities** and/or the Plan does not constitute a covered **Plan** under the Policy.

The Policy's coverage is further limited to covered **Loss**. The definition of **Loss** in the Policy provides, in part:

> **Loss** means those amounts that any **Insured** is legally liable to pay as awards, settlements or judgments . . . and **Defense Costs**. . . .

> However, **Loss** (other than **Defense Costs**) shall not include:

> 1. any **Clean-up Costs**;

> 2. any taxes, sanctions, criminal or civil fines, or penalties imposed by law other than, to the extent insurable by law: [exceptions a. through g] . . . .

> 3. any amount for which an **Insured Person** is absolved from payment by reason of any covenant, agreement or court order;

> 4. any amount deemed uninsurable under the law pursuant to which this Policy is construed;

> 5. any amount attributable to the cost of non-monetary relief . . . .

> 6. benefits due or to become due under any **Plan**, or benefits which would be due under any **Plan** if such **Plan** complied with all applicable law, except that such benefits shall constitute **Loss** if:

>> a. an **Insured Person** is legally obligated to pay such benefits as a personal obligation, and

>> b. recovery for the benefits is based upon a covered **Wrongful Act**;

>> provided, however, nothing in this subparagraph shall exclude that portion of **Loss** related to a **Claim** to the extent it alleges a loss to a **Plan**, or loss in the actual accounts of participants in a **Plan**, by reason of a change in value of the investments held by that **Plan**,

**Exhibit 5**

including, but not limited to, the securities of the **Insured Entity**, regardless of whether the amounts sought in such **Claim** have been characterized by plaintiffs as benefits or held by a court to be benefits; or

7. an employer's contributions owed to a **Plan** and other amounts for which the **Insureds** are legally obligated to pay by reason of the failure to collect such contributions, unless such failure is due to the negligence of the **Insured**.

*See* FL Form at pp. 3-4, as amended by Endorsement No. 13. The Complaint seeks the following relief: class certification; reimbursement of the tobacco surcharge to class participants; disgorgement or restitution of all payments unlawfully assessed by Defendants or, alternatively, the profits earned by Defendants; injunctive relief and various other types of equitable relief, including an accounting, surcharge, removal/replacement of the Plan fiduciaries, and constructive trust; damages; attorneys' fees/costs; and interest. Please be advised that Continental reserves the right to limit or disclaim coverage for any portion of a settlement or judgment on the basis that it does not constitute covered "**Loss**" under the Policy, including but not limited to Plaintiff's claims for disgorgement, restitution, the return/reimbursement of the tobacco surcharge, and the cost of any non-monetary relief.

Exclusion III.3 of the Policy provides:

### 3. Illegal Profits/Deliberate Acts

The Insurer shall not be liable to pay that part of **Loss** under this Policy in connection with any **Claim** made against any **Insured**:

based upon or arising out of:

a. the gaining of any profit, remuneration or financial advantage to which any **Insured** was not legally entitled; or

b. the committing of any deliberate fraudulent or deliberate criminal act by any **Insured**,

if established in a final non-appealable adjudication in any action or proceeding, other than an action or proceeding initiated by the Insurer to determine coverage under this Policy.

For purposes of determining the applicability of this Exclusion, the facts pertaining to the knowledge possessed by any **Insured** shall not be imputed to any other **Insured**;

*See* FL Form at p. 7. The Complaint asserts allegations that potentially implicate this Exclusion, including but not limited to the claims for restitution, disgorgement, and the return of the tobacco surcharges that Plaintiff alleges Defendants illegally charged and/or received. Accordingly, please be advised that Continental reserves all rights regarding the potential applicability of this Exclusion to the Action.

## II.   Defense Arrangements and Allocation

Pursuant to Section VI of the Policy, Continental has the right and duty to defend a **Claim** that is covered by the Policy, and Continental has the right to appoint counsel and to make such investigation and defense of a **Claim** as is deemed necessary by Continental. Pursuant to our prior communications, the **Insureds** have requested to use their choice of counsel for this matter—Ogletree Deakins—and Continental has consented to this request subject to the terms and conditions stated in my emails dated May 23, 2024.

Pursuant to Section V.3 of the Policy, Continental will pay 100% of the **Defense Costs** for this **Claim** in excess of Retention and up to the Policy's Limit of Liability. For loss other than **Defense Costs**, coverage under the Policy is limited to covered **Loss** only. Accordingly, please be advised that Continental reserves the right to make an allocation in the event the **Insured** incurs both uncovered loss and covered **Loss** (other than **Defense Costs**) in this matter.

## III.   Other Pertinent Policy Provisions

The Policy requires each **Insured** to give Continental full cooperation and, without waiver of privilege or confidentiality, provide Continental with copies of documents, information, and assistance that it may reasonably request. Moreover, the **Insureds** agree not to do anything that in any way increases Continental's exposure under the Policy or in any way prejudices Continental's potential or actual rights of recovery. *See* Section XVII of the FL Form. To that end, please advise whether the Plan and/or any **Insured Entity** has any third-party contracts or agreements that could potentially provide a right to a defense or indemnification of the Action, including any agreements with a third-party administrator of the Plan, a Plan insurer, and/or an entity that is otherwise connected to the tobacco cessation program and/or tobacco surcharge at issue in the Complaint. **If so, kindly provide me copies of with copies of any written contracts or agreements with such entity(ies) as soon as possible.**

Pursuant to Section V of the Policy, Continental is not liable for any **Loss** incurred by an **Insured** to the extent the **Loss** results from an **Insured** admitting liability, consenting to any judgment, agreeing to any settlement or making any settlement offer without Continental's prior written consent. To that end, please advise me in advance of engaging in any settlement discussions in connection with this matter. Please also be advised that Continental is also not liable for any defense costs that were incurred prior to the date this matter was reported to CNA.

**Exhibit 5**

Electronically Filed - Greene - August 15, 2025 - 04:04 PM

The Policy also contains an Other Insurance provision which provides that if any **Loss** from a **Claim** is insured under any other insurance, then this Policy applies only as excess over any other valid and collectible insurance unless such other insurance is written only as specific excess insurance over this Policy's limit of liability. *See* Section XI of FL Form. It further provides that this Policy shall be specifically excess over any other valid and collectible insurance pursuant to which any other insurer has a duty to defend a **Claim** for which this Policy may be obligated to pay **Loss**. Please confirm that you have given notice of this matter under all potentially applicable insurance policies and advise whether any other carriers have accepted a duty to defend and/or agreed to provide defense coverage for this matter. We would also appreciate your providing us with copies of any correspondence from those carriers as well as copies of their insurance policies.

## Conclusion

As explained above, Continental acknowledges that the Complaint contains allegations that appear to fall within the scope of the Policy's Insuring Agreement, and therefore Continental agrees to provide certain coverage under the Policy for the Action subject to the reservation of rights, limitations and exclusions discussed herein. As this matter develops, circumstances could change, affecting coverage under the Policy. If this occurs, we will issue a supplemental coverage letter advising of any change in our position.

If you disagree with Continental's preliminary coverage determination, please provide a written explanation of your position and we will be happy to review it and respond accordingly. The content of this letter is not intended, nor should it be deemed to be, exhaustive or exclusive. Continental continues to reserve all of its rights, remedies and defenses under the Policy and applicable law, including, but not limited to the right to raise additional defenses to coverage. Neither this letter nor any other act on behalf of Continental should be construed as waiving any such rights, remedies or defenses. If you have any questions or comments regarding this matter, please do not hesitate to contact me.

Very truly yours,

Katrina D. Gibson

Cc: Via Email

Peter.evans@marsh.com
SRosenfelder@basspro.com

**Exhibit 5**

**IN THE CIRCUIT COURT OF GREENE COUNTY**
**(THIRTY-FIRST JUDICIAL CIRCUIT)**
**STATE OF MISSOURI**

| | |
|---|---|
| **GREAT OUTDOORS GROUP, LLC AND BPS DIRECT LLC,** ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Case No. 2531-CC01011 |
| v. ) | |
| ) | Division No. 6 |
| **CONTINENTAL CASUALTY COMPANY,** ) | |
| ) | |
| ) | |
| Defendant. ) | |

**ENTRY OF APPEARANCE**

COMES NOW Christopher L. Clark, with the law firm of Thompson Coburn LLP, and hereby enters his appearance on behalf of Plaintiffs Great Outdoors Group, LLC and BPS Direct, LLC in the above-captioned matter.

Dated: August 18, 2025

Respectfully submitted,

THOMPSON COBURN LLP

By: */s/Christopher L. Clark*
William R. Bay, #26977
Matthew S. Darrough, #46307
Christopher L. Clark, #72747
One U.S. Bank Plaza, Suite 2700
St. Louis, Missouri 63101
(314) 552-6000
FAX (314) 552-7000
wbay@thompsoncoburn.com
mdarrough@thompsoncoburn.com
cclark@thompsoncoburn.com

*Attorneys for Plaintiffs*

Electronically Filed - GREENE - August 18, 2025 - 01:28 PM

# IN THE 31st CIRCUIT COURT OF GREENE COUNTY, MISSOURI

Great Outdoors Group, LLC and BPS Direct LLC
_____
**Plaintiff(s)/Petitioner(s)**

**Vs**                                                      Case No._____
                                                                        2531-CC01011

Continental Casualty Company
_____
**Defendant(s)/Respondent(s)**

## REQUEST FOR APPOINTMENT OF SPECIAL PROCESS SERVER

**Comes now** _____Plaintiffs_____, pursuant to Local Rule 4.2.1, and at their own risk requests the
**appointment of**

_Alicia Misuraca_____   12213 Big Bend Road St. Louis, MO 63122   _314-621-9300_____
**Name of Server**                              **Address**                                       **Telephone #**

**(a natural person of lawful age who is not a part to this action) to serve the summons and petition in this cause. This
appointment as special server does not include the authorization to carry a concealed weapon in the performance of
this duty.**

**Appointed as requested:**

**Bryan Feemster,  Clerk of the Circuit Court**

**By:** _____        **Requested by:** _____
**Deputy Clerk**                                                         **Sign Name**

_____                                                     Christopher Clark
**Date**                                                                **Print Name**

### SPECIAL PROCESS SERVERS

**1. The Circuit Clerk may appoint a natural person other than the Sheriff to serve process in any cause.**

**2. Orders appointing a person other than the Sheriff to serve process shall be made at the risk of the requesting party.**

**3. Any person of lawful age, other than the Sheriff, appointed to serve process shall be a natural person and not a
corporation or other business association.**

**4. No person, other than the Sheriff, shall be appointed to serve any order, writ, or other process which requires any
levy, seizure, sequestration, garnishment or other taking by an officer.**

**5. Requests for appointment of a person other than the Sheriff to serve process shall be made on "Request for
Appointment of Special Process Server" form which may be obtained from the Office of the Circuit Clerk or a similar
form may be used.**

**6. This appointment as Special Process Server does not include the authorization to carry a concealed weapon in the
performance thereof.**

**It is incumbent on the Special Process Server to <u>completely fill out</u> and return paperwork in a timely fashion.**

**IN THE CIRCUIT COURT OF GREENE COUNTY**
**(THIRTY-FIRST JUDICIAL CIRCUIT)**
**STATE OF MISSOURI**

| | | |
|---|---|---|
| **GREAT OUTDOORS GROUP, LLC AND** | ) | |
| **BPS DIRECT LLC,** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No.  2531-CC01011 |
| v. | ) | |
| | ) | Division No. 6 |
| **CONTINENTAL CASUALTY COMPANY,** | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY OF APPEARANCE**

COMES NOW William R. Bay, with the law firm of Thompson Coburn LLP, and hereby enters his appearance on behalf of Plaintiffs Great Outdoors Group, LLC and BPS Direct, LLC in the above-captioned matter.

Dated:  August 18, 2025

Respectfully submitted,

THOMPSON COBURN LLP

By: */s/William R. Bay*
    William R. Bay, #26977
    Matthew S. Darrough, #46307
    Christopher L. Clark, #72747
    One U.S. Bank Plaza, Suite 2700
    St. Louis, Missouri 63101
    (314) 552-6000
    FAX (314) 552-7000
    wbay@thompsoncoburn.com
    mdarrough@thompsoncoburn.com
    cclark@thompsoncoburn.com

*Attorneys for Plaintiffs*



# Summons in Civil Case

IN THE 31ST JUDICIAL CIRCUIT, GREENE COUNTY, MISSOURI

| Judge or Division:<br>JOSHUA BOYD CHRISTENSEN | Case Number: 2531-CC01011 | |
|---|---|---|
| Plaintiff/Petitioner:<br> GREAT OUTDOORS GROUP LLC<br><br>vs. | Plaintiff's/Petitioner's Attorney/Address<br>MATTHEW SCOTT DARROUGH<br>ONE US BANK PLAZA<br>ST LOUIS, MO 63101 | |
| Defendant/Respondent:<br> CONTINENTAL CASUALTY<br>COMPANY | Court Address:<br>JUDICIAL COURTS FACILITY<br>1010 N BOONVILLE AVE<br>SPRINGFIELD, MO 65802 | (Date File<br>Stamp for<br>Return) |
| Nature of Suit:<br>CC Breach of Contract | | |

**The State of Missouri to:** CONTINENTAL CASUALTY COMPANY
**Alias:**

**CT CORPORATION SYSTEM**
**5661 TELEGRAPH RD., SUITE 4B**
**SAINT LOUIS, MO 63129**

You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for plaintiff/petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.

*COURT SEAL OF*



*GREENE COUNTY*

| 19-AUG-2025 | /s/Bryan Feemster by af |
|---|---|
| Date | Clerk |

**Further Information:**

SJRC (12-24) SM36 (SMCC) *For Court Use Only:* Document ID # 25-SMCC-2167, 1 of 2 (2531-CC01011) — Civil Procedure Form No. 1, SCR 54.01 – 54.05, 54.13, and 54.20; 506.120 – 506.140, and 506.150 RSMo

Case 6:25-cv-03275-MDH    Document 1-1    Filed 09/25/25    Page 161 of 166

## Officer's or Server's Return

**Note to serving officer**: Service should be returned to the court within 30 days after the date of issue.

I certify that I have served the above Summons by: (check one)

☐ delivering a copy of the summons and petition to the defendant/respondent.

☐ leaving a copy of the summons and petition at the dwelling house or usual place of abode of the

defendant/respondent with _____, a person at least 18 years of

age residing therein.

☐ (for service on a corporation) delivering a copy of the summons and petition to:

_____ (name) _____ (title).

☐ other: _____.

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date)

at _____ (time).

_____     _____
Printed Name of Officer or Server              Signature of Officer or Server

**Must be sworn before a notary public if not served by an authorized officer.**
Subscribed and sworn to before me on _____ (date).

*(Seal)*     My commission expires: _____  _____
                                              Date                      Notary Public

**Service Fees (if applicable)**

| | | |
|---|---|---|
| Summons | $_____ | |
| Non Est | $_____ | |
| Sheriff's Deputy Salary | | |
| Supplemental Surcharge | $_____10.00_____ | |
| Mileage | $_____ (_____ miles @ $._____ per mile) | |
| **Total** | **$_____** | |

A copy of the summons and petition must be served on **each** defendant/respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.

SJRC (12-24) SM36 (SMCC) *For Court Use Only:* **Document ID # 25-SMCC-2167**, 2 of 2 (2531-CC01011) — Civil Procedure Form No. 4, SCR 54.01 – 54.05, 54.13, and 54.20; 506.120 – 506.140, and 506.150 RSMo

Case 6:25-cv-03275-MDH     Document 1-1     Filed 09/25/25     Page 162 of 166

**IN THE CIRCUIT COURT OF GREENE COUNTY**
**(THIRTY-FIRST JUDICIAL CIRCUIT)**
**STATE OF MISSOURI**

**GREAT OUTDOORS GROUP, LLC AND** )
**BPS DIRECT LLC,** )
                                )
      Plaintiffs, )
                                )       Case No.  2531-CC01011
v. )
                                )       Division No. 6
**CONTINENTAL CASUALTY COMPANY,** )
                                )
                                )
                                )
      Defendant. )

**[PROPOSED] ORDER**

Plaintiffs' Motion to Appoint a Special Process Server in the above matter is GRANTED.

This Court hereby appoints Alicia Misuraca to serve process in this cause.

/s/Bryan Feemster by af
_____
                    Clerk        ~~JUDGE~~

08/25/2025
_____
                                 DATE

## AFFIDAVIT OF SERVICE

| Case: 2531-CC01011 | Court: In the 31st Judicial Circuit, Green County, Missouri | County: | Job: 14013875 (251541) |
|---|---|---|---|
| Plaintiff / Petitioner: Great Outdoors Group LLC | | Defendant / Respondent: Continental Casualty Company | |
| Received by: McDowell and Associates | | For: Thompson Coburn | |
| To be served upon: Continental Casualty Company | | | |

I, Clayton Willis, being duly sworn, depose and say: I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to make service of the documents and informed said person of the contents herein

**Recipient Name / Address:** Continental Casualty Company, 5661 Telegraph Road 4B, St. Louis, MO 63129

**Manner of Service:** Registered Agent, Aug 26, 2025, 11:39 am CDT

**Documents:** Summons, Petition, Exhibit 1, Exhibit 2, Exhibit 3, Exhibit 4, Exhibit 5

**Additional Comments:**
1) Successful Attempt: Aug 26, 2025, 11:39 am CDT at 5661 Telegraph Road 4B, St. Louis, MO 63129 received by Continental Casualty Company.
Served Traci Macmann.

Clayton Willis     Date 8/26/25

McDowell and Associates
12213 Big Bend Road
Saint Louis, MO 63122
314-621-9300

Subscribed and sworn to before me by the affiant who is personally known to me.

**Notary Public**

**Date** 8/26/2025     **Commission Expires** 12/15/2025

ALICIA MISURACA
Notary Public, Notary Seal
State of Missouri
St. Louis County
Commission # 18892057
My Commission Expires 12-15-2025

Electronically Filed - GREENE - August 26, 2025 - 03:14 PM



# Summons in Civil Case

IN THE 31ST JUDICIAL CIRCUIT, GREENE COUNTY, MISSOURI

| Judge or Division:<br>JOSHUA BOYD CHRISTENSEN | Case Number:  2531-CC01011 | |
|---|---|---|
| Plaintiff/Petitioner:<br>GREAT OUTDOORS GROUP LLC<br><br>vs. | Plaintiff's/Petitioner's Attorney/Address<br>MATTHEW SCOTT DARROUGH<br>ONE US BANK PLAZA<br>ST LOUIS, MO  63101 | |
| Defendant/Respondent:<br>CONTINENTAL CASUALTY<br>COMPANY | Court Address:<br>JUDICIAL COURTS FACILITY<br>1010 N BOONVILLE AVE<br>SPRINGFIELD, MO  65802 | (Date File<br>Stamp for<br>Return) |
| Nature of Suit:<br>CC Breach of Contract | | |

The State of Missouri to:    **CONTINENTAL CASUALTY COMPANY**
                             Alias:

**CT CORPORATION SYSTEM**
**5661 TELEGRAPH RD., SUITE**
**4B**
**SAINT LOUIS, MO  63129**

You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for plaintiff/petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.

***COURT SEAL OF***



***GREENE COUNTY***

| 19-AUG-2025 | /s/Bryan Feemster by af |
|---|---|
| Date | Clerk |

**Further Information:**

SJRC (12-24) SM30 (SMCC) *For Court Use Only:* Document ID # 25-SMCC-2167  1 of 2 (2531-CC01011)    Civil Procedure Form No. 1, SCR 54.01 – 54.05, 54.13, and 54.20; 506.120 – 506.140, and 506.150 RSMo

Case 6:25-cv-03275-MDH    Document 1-1    Filed 09/25/25    Page 165 of 166

Electronically Filed - GREENE - August 26, 2025 - 03:14 PM

### Officer's or Server's Return

**Note to serving officer**: Service should be returned to the court within 30 days after the date of issue.

I certify that I have served the above Summons by: (check one)

☐ delivering a copy of the summons and petition to the defendant/respondent.

☐ leaving a copy of the summons and petition at the dwelling house or usual place of abode of the defendant/respondent with _____, a person at least 18 years of age residing therein.

☒ (for service on a corporation) delivering a copy of the summons and petition to:

_Traci Macmann_ (name) _Reg. Agent_ (title).

☐ other: _____.

Served at _5001 Telegraph Rd 48 St. Louis MO 63129_ (address) in _St. Louis_ (County/City of St. Louis), MO, on _8/26/25_ (date) at _11:39 am_ (time).

_Clayton Willis_        _Clayton Willis_
Printed Name of Officer or Server     Signature of Officer or Server

**Must be sworn before a notary public if not served by an authorized officer.**
Subscribed and sworn to before me on _8/26/2025_ (date).

My commission expires: _12/15/2025_    _Alicia Misurac_

(Seal)

ALICIA MISURAC
Notary Public, Notary Seal
State of Missouri
St. Louis County
Commission # 18892609
My Commission Expires 12-15-2025

         Date           Notary Public

**Service Fees (if applicable)**

| | | |
|---|---|---|
| Summons | $_____ | |
| Non Est | $_____ | |
| Sheriff's Deputy Salary | | |
| Supplemental Surcharge | $____10.00____ | |
| Mileage | $_____ (_____ miles @ $._____ per mile) | |
| **Total** | $_____ | |

A copy of the summons and petition must be served on **each** defendant/respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.

SJRC (12-24) SM30 (SMCC) *For Court Use Only:* **Document ID # 25-SMCC-2167** 2 of 2 (2531-CC01011)    Civil Procedure Form No. 1, SCR 54.01 – 54.05, 54.13 and 54.20; 506.120 – 506.140, and 506.150 RSMo

Case 6:25-cv-03275-MDH    Document 1-1    Filed 09/23/25    Page 166 of 166